

EXHIBIT
2

**DISTRICT COURT**
**F I L E D**

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

MAY 15 2024

DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

NANCY BRANDWEIN, Ex. Rel.
GAFP, Inc. f/k/a Ameristar Fence Products,
Inc.,

          Plaintiff,

v.

FEDERAL INSURANCE, COMPANY,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)

*105830669*

**CJ-2024-01828**

Case No.: **DAMAN CANTRELL**

**Jury Trial Demanded**

## PETITION FOR DECLARATORY JUDGMENT
## AND ALTERNATIVE CLAIMS FOR BREACH OF CONTRACT AND BAD FAITH
## APPLICATION FOR ORDER APPOINTING DIRECTOR AS TRUSTEE TO
## PROSECUTE SUIT

**COMES NOW** the Plaintiff, Nancy Brandwein, Ex. Rel. GAFP, Inc. f/k/a Ameristar

Fence Products, Inc. ("GAFP"), by and through its attorneys, James N. Edmonds and

Kristopher K. McVay, of the law firm Atkinson, Brittingham, Gladd, Fiasco and Edmonds,

and for its claims against Federal Insurance Company states as follows:

### THE PARTIES AND JURISDICTION

1.      GAFP, Inc. f/k/a Ameristar Fence Products, Inc., ("GAFP") is a dissolved

Oklahoma corporation which was in the business of manufacturing fence products to be sold

to wholesalers for retail sale and distribution throughout the central United States, including

Texas. GAFP'S principal place of business was in Tulsa County, Oklahoma.

2.      GAFP was dissolved on May 26, 2017 by corporate action reflected at the

offices of the Oklahoma Secretary of State.

3.     At the time of dissolution, Plaintiff, Nancy Brandwein, was a Director of GAFP. She seeks appointment by the Court to be made Trustee for GAFP, pursuant to 18 O.S. § 1100 for the purpose of prosecuting this suit as a necessary matter of unfinished business of GAFP.

4.     This matter falls within the scope of 18 O.S. § 1099 related to suit and winding up the corporation.

5.     Defendant, Federal Insurance Company, ("Federal"), is a foreign, for-profit insurance company with its principal place of business in a state other than Oklahoma.

6.     Federal regularly engages in the business of insurance in the State of Oklahoma, including in Tulsa County. Federal has one or more agents in Tulsa County.

7.     Non-parties, Julie Damian and Marcos Damian, Individually and on behalf of the Estate of Kade Damian (collectively "Damian Plaintiffs") are the Plaintiffs in a wrongful death action filed against GAFP and others in the District Court of Williamson County, Texas in Case No. 18-1403-C26, ("Underlying Lawsuit") originally filed on October 26, 2018.

8.     Non-party, Assa Abloy, Inc., is a foreign corporation with its principal place of business in New Haven, Connecticut. Assa Abloy is the purchaser of assets previously owned by GAFP pursuant to a contractual agreement described below.

9.     Non-party, Edward L. Gibbs was the President, CEO and Stockholder of GAFP. Mr. Gibbs is an "insured" under the subject insurance policy identified below.

10.     Pursuant to 12 O.S. § 2004 (F) and 12 O.S. § 137, venue and jurisdiction are proper and vested in the District Court in and for Tulsa County, Oklahoma.

2

## FACTS

11.    Plaintiff[1] adopts and incorporates paragraphs 1 through 10 set forth above as if fully set forth herein.

12.    On September 30, 2013, GAFP, formerly known as Ameristar Fence Products, Inc., entered into an Asset Purchase Agreement (the "APA") with Assa Abloy and other entities for the sale of GAFP's assets pertaining to the manufacturing and distribution of fence products. (Asset Purchase Agreement, attached as Exhibit "1").

13.    Under the APA, GAFP is designated as one of the **"Sellers"** and Assa Abloy is designated as the **"Parent"** of certain subsidiaries designated under the APA as the **"Buyers."**

14.    The APA contains a section on **"Indemnification."** The APA requires **Sellers** to indemnify **Buyers** as follows:

**Indemnification by the Sellers**

The Sellers shall, jointly and severally, defend, indemnify and hold harmless each of the Buyers, the Parent and their respective Affiliated Persons and representatives (collectively, the **"Buyer Indemnitees"**) from and against, and pay or reimburse the Buyer Indemnitees for, any and all Losses, resulting from, arising out of or relating to: (a) any breach of or inaccuracy in any representation or warranty when made by the Sellers in or pursuant to this Agreement or any Ancillary Agreement or in any certificate furnished by any Seller hereunder or thereunder; (b) any failure of the Sellers to perform any covenant or agreement hereunder or any Ancillary Agreement; (c) any Excluded Liabilities or Excluded Assets; (d) any and all Losses in respect of any employees of any Seller related to occurrences at or prior to the Closing except, with respect to Transferred Employees, to the extent assumed by the Buyers pursuant to Section 9; (e) the operation of the Business by the Sellers or the Sellers' ownership, operation or use of the Assets at or prior to the Closing; and (f) any product liability claim with respect to products manufactured or sold or events occurring at or prior to the Closing; and (g) Seller Expenses.

---

[1] Nancy Brandwein, a Director of the dissolved corporation, GAFP, brings this Petition for and on behalf of GAFP.

(Exhibit "1", pp. 67-68, Section 13.1.1).

15.    The APA makes it clear that the Sellers are assuming the tort liability of the Buyers for products manufactured *prior* to the Closing. For instance, the APA explains that for products manufactured *following* the Closing, the Sellers are not assuming the Buyers' tort liability:

> The Buyers and Sellers expressly agree that Sellers are not, nor shall the Sellers be deemed, to have assumed any duty, responsibility, obligation or liability of the Buyers resulting from, relating to or arising out of the ownership or operation of the Assets *following* the Closing, including any contracts, agreements, commitments or warranties associated therewith, unless otherwise provided by law or regulation or provided herein or agreed to in writing by the Sellers.

(Exhibit "1", p. 69, Section 13.3.9) (emphasis added). The corollary of the foregoing provision, and the reason for the foregoing provision, is that the Sellers are assuming such liability for products sold *prior* to the Closing pursuant to Section 13.1.1.

16.    GAFP is the named insured on Policy No. 3599-09-99 TUL Continuum Products/Products Completed Operations Insurance (the "Policy") issued by Federal with an Injury Or Offense Period  from November 1, 2013 to November 1, 2018, and a Claim Reporting Period of November 1, 2018 to November 1, 2019. (Continuum Products/Completed Operations Insurance Policy, Declarations, attached as Exhibit "2").

17.    Pursuant to the terms of the Policy, any entity whose regular course of business is the sale of GAFP's products is a vendor and an "**insured**". The Policy states:

> Any vendor is an **Insured**, but only with respect to **bodily injury** or **property damage** arising out of the distribution or sale of **your products** in the regular course of that vendor's business and only if products/completed operations coverage is provided under this contract.

(Exhibit "2", Page 4 of 20).

4

18.     The Policy provides coverage for "**bodily injury**" and "**property damage**" as defined in the Policy. The Policy states:

> Subject to the applicable Limits of Insurance, we will pay damages the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed under an **insured contract** for **bodily injury** or **property damage** to which this insurance applies caused by an **occurrence**.
>
> This insurance applies to **bodily injury** or **property damage** included within the **products-completed operations** hazard which occurs during the Injury Period stated in the Declarations

(Exhibit "2", Page 5 of 20).

19.     The Policy expressly requires Federal to defend lawsuits to which the Policy applies. The investigation and defense provisions of the Policy provide:

> We will have the right and duty to defend any **insured** against a **suit** seeking damages for **bodily injury** or **property damage**. However, we will have no duty to defend any **insured** against a **suit** seeking damages to which this insurance does not apply. We may at our discretion investigate any **occurrence** and settle any claim or **suit** that may result.
>
> The amount we will pay for damages is limited as described in Limits Of Insurance. Our right and duty to defend end when we have used up the applicable Limit Of Insurance in the payment of judgments or settlements under **bodily injury** or **property damage**.
>
> We have no further obligation or liability to pay sums or perform acts or services unless explicitly provided for under Supplementary Payments shown below.

(Exhibit "2", Page 6 of 20).

20.     The Policy contains an exclusion for liabilities the insured is obligated to pay by reason of assumption of liability in a contract or agreement. The contractual liability exclusion is inapplicable to an agreement that is an "**insured contract**." (Exhibit "2", Page 7 of 20).

5

21.    The exception for an "**insured contract**" expressly states that expenses for a

defense owed under the **insured contract** exception are outside of the Limits of Insurance. In

this regard, the exception for an **insured contract** states:

> When a claim for such **bodily injury** or **property damage** is made, we will defend that claim provided the **insured** has assumed the obligation to defend such claim in the **insured contract**. Such defense payments will not reduce the Limits Of Insurance.

(Exhibit "2", Page 7 of 20).

22.    The term "**insured contract**" is defined in the Policy as:

- an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

- an elevator maintenance agreement;

- that part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization.

An **insured contract** does not include that part of any contract or agreement that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

- preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

- giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

(Exhibit "2", Page 16 of 20).

23.    On October 26, 2018, the Damian Plaintiffs initiated a wrongful death action

filed in the District Court of Williamson County, Texas in Case No. 18-1403-C26 ("Underlying

Lawsuit").

24.    In the Underlying Lawsuit, the Damian Plaintiffs allege that on March 22, 2018, Kade Damian, a two year-old child, got his head stuck in between two vertical bars protruding from the top of a Montage Genesis fence, thereby resulting in Kade Damian's death.

25.    In the Underlying Lawsuit, the Damian Plaintiffs assert strict products liability among other causes of action and assert that the Montage Genesis fence was defectively designed and that defective and insufficient warnings were provided.

26.    Various subsidiaries and affiliates of Assa Abloy, Inc. were named as defendants in the Underlying Lawsuit.

27.    By email dated May 24, 2019, Page Heslin, General Counsel of Assa Abloy, wrote to GAFP's personal attorney, Benjamin Faulkner (sometimes referred to herein as "personal counsel to GAFP"), and provided information to demonstrate the fence was manufactured *prior* to the closing date in the APA. (Email from Page Heslin to Benjamin Faulkner, May 24, 2019, attached as Exhibit "3").

28.    By email dated July 11, 2019, Mr. Faulkner wrote to Federal's adjuster, George Adkins, and advised that counsel for Assa Abloy and its subsidiaries had provided research showing the fence involved in Kade Damian's death was manufactured prior to the closing date of the APA. (Email from Benjamin Faulkner to George Adkins, July 11, 2019, attached as Exhibit "4").

29.    On behalf of GAFP, Mr. Faulkner advised Federal that it was important for Federal to assume the defense of Assa Abloy. Mr. Faulkner requested permission from Federal to advise that Federal had accepted Assa Abloy's defense.  Mr. Faulkner stated:

I would like to tell counsel that we will assume the defense, if you agree.

(Exhibit "4").

7

30.    A day later, Federal's adjuster, George Adkins, responded to Mr. Faulkner and acknowledged Federal's defense obligations to Assa Abloy under the Policy by stating:

> Upon review of the documents, I tend to agree with your analysis. However, would you please request copies of the invoices referenced in the Excel spreadsheet? If the invoices support the spreadsheet, ***Chubb will retain defense counsel in the case*** as the Continuum Policy period may have Plaintiff triggered.

Federal was not satisfied with the information provided by Assa Abloy. Instead of assuming the defense of Assa Abloy, Federal requested additional documentation. (Email from George Adkins to Benjamin Faulkner, July 12, 2019, attached as Exhibit "5") (emphasis added).

31.    On August 27, 2019, the Damian Plaintiffs sued GAFP in the pending Underlying Lawsuit via a Fourth Amended Petition.

32.    GAFP was dissolved on May 26, 2017 by the Oklahoma Secretary of State, pursuant to voluntary application for dissolution.

33.    The Underlying Lawsuit was brought against GAFP within three (3) years of the date of dissolution of GAFP.

34.    In August of 2019, a new adjuster, Michael Moore, took over for the file from George Adkins. By letter dated September 10, 2019, Mr. Moore issued a reservation of rights. Federal did not address GAFP's previous request that Federal assume Assa Abloy's defense. Instead, Federal erroneously referred to a "potential or future claim by Assa Abloy," knowing that counsel for GAFP had already requested a defense for Assa Abloy pursuant to the APA. (Letter from Michael Moore to Benjamin Faulkner, September 10, 2019, attached as Exhibit "6").

35.    Although Federal reserved its rights as to whether the indemnity provisions in the APA constituted an **insured contract** under the Policy, at no point did Federal deny that it

owed a defense and indemnity to Assa Abloy pursuant to the **insured contract** provision of the Policy.

36.      Federal continued to ignore its duty to defend Assa Abloy and the request of GAFP's personal counsel that Federal assume the defense of Assa Abloy and its subsidiaries pursuant to the APA and the Policy. Federal did so ostensibly because it was dissatisfied with Assa Abloy's evidence, which would later be adjudicated as dispositive.

37.      By letter dated March 3, 2020, counsel for Assa Abloy and its subsidiaries wrote to defense counsel retained by Federal to defend GAFP, Andrew Hutton, and demanded a defense and indemnity with respect to the Damian Plaintiffs' claims in the Underling Lawsuit. Assa Abloy stated it had provided evidence that proved the fence was manufactured prior to the date of closing in the APA. (Letter from Stephanie Clouston to Andrew Hutton, March 3, 2020, attached as Exhibit "7").

38.      Federal's unwarranted delay in providing a defense to Assa Abloy and its subsidiaries in the Underlying Lawsuit turned a party that had initially wanted to work with GAFP and its counsel into an adversary. This occurred when Federal should have been defending Assa Abloy and its subsidiaries in a joint and unified defense at the express request of personal counsel for GAFP.

39.      By letter dated March 6, 2020, personal counsel for GAFP wrote to Federal's adjuster, Michael Moore, noting that the APA sets out the parties' obligations as to indemnification. In addition, counsel for GAFP made it clear that GAFP and its principal and affiliates were relying upon Federal to protect their interests. Counsel for GAFP reaffirmed GAFP's position that the indemnity provisions of the APA constitute an **insured contract**. Counsel for GAFP stated:

From the insured's perspective, my reading of our policy is that this is an Insured Contract, insofar as coverage for indemnification is concerned. So, we will rely upon your guidance and that of counsel, Andy Hutton of Gordon, Rees, Scully, Mansukhani, to respond appropriately to the letter from Stephanie Clouston.

(Letter from Benjamin Faulkner to Michael Moore, March 6, 2020, attached as Exhibit "8").

40.     Federal understood that the indemnity issue was not going away. Federal agreed to allow the product identification issue to be tabled, and thus Federal's liability for Assa Abloy's costs and attorneys fees was reserved for a determination at a later date.

41.     On March 9, 2020, Federal acknowledged to Assa Abloy that the defense and indemnity obligations flowing from the APA depended upon whether the fence in question was manufactured and sold prior to or after the closing date of the APA.

42.     During the course of the litigation, it was determined and adjudicated that the Montage Genesis fence involved in the death of Kade Damian was in fact manufactured by GAFP and/or its affiliates *prior to* the date of closing in the APA.

43.     The Federal adjuster, Michael Moore, was aware of Assa Abloy's previous request for defense and indemnity.

44.     Federal authorized the settlement of Plaintiffs' claims against GAFP and its affiliates on or about September 7, 2023. In settling those claims, and in eliminating future liability for the continued defense of GAFP, Federal never disclosed that Federal would attempt to recast its antecedent defense obligations to Assa Abloy under the **insured contract** provisions of the Policy as a new liability claim subject to the Limits Of Insurance.

45.     Federal was aware that Assa Abloy's right to payment of defense costs and fees under the **insured contract** provisions of the Policy remained pending. Federal was silent

10

regarding its obligations to pay defense costs and fees under the **insured contract** provisions of the Policy.

46.     After Assa Abloy reasserted its claim for the costs and fees for defending the Underlying Lawsuit, Federal, for the first time, advised that it was construing the prior demand to accept the defense of Assa Abloy as a new claim subject to the Limits Of Insurance, instead of a defense expense subject to the **insured contract** provisions of the Policy.

47.     By letter dated December 7, 2023, Federal's adjuster wrote to personal counsel hired for GAFP and stated Federal would not pay for the defense costs incurred by Federal because it had exhausted the Limits Of Insurance. Federal's denial does not address the **insured contract** provisions of the Policy or the provision of the Policy which states:

> When a claim for such **bodily injury** or **property damage** is made, we will defend that claim provided the **insured** has assumed the obligation to defend such claim in the **insured contract**. Such defense payments will not reduce the Limits Of Insurance.

(Letter from Michael Moore to Benjamin Faulkner, December 7, 2023, attached as Exhibit "9"); (Exhibit "2", Page 7 of 20).

48.     Federal's denial does not address the fact that demand was made upon Federal in 2019 to defend Assa Abloy. Federal's denial does not address the fact that Federal's first adjuster agreed a defense was owed and that, upon satisfactory proof, Federal would retain counsel to defend Assa Abloy.

49.     Federal was aware of the fact that if it was determined that the fence was manufactured prior to the closing date of the APA, it owed for the defense of Assa Abloy in the Underlying Lawsuit.

50.     Federal settled the Damian Plaintiffs' claims against GAFP without informing GAFP that Federal would take the position that payment of the Limits would negate Federal's

antecedent duty to pay for the previously incurred defense costs of Assa Abloy prior to exhaustion of the limits of liability.

## APPLICATION FOR APPOINTMENT OF NANCY BRANDWEIN, DIRECTOR, AS TRUSTEE FOR GAFP

51.    Plaintiff adopts and incorporates paragraph 1 through 50 set forth above as if fully set forth herein.

52.    Pursuant to 18 O.S. § 1099, the district court has the discretion to extend the corporate life of a corporation beyond three (3) years from dissolution in order to close its business.

53.    Also pursuant to statute, following dissolution, the Court may appoint one or more directors of the corporation to be a trustee to collect the debts of the corporation and prosecute, in the name of the corporation, such suits as are necessary to achieve final settlement of unfinished business.

54.    Nancy Brandwein was a Director of GAFP at the time of dissolution, and seeks to be appointed by the Court as Trustee to do all things necessary to settle unfinished business of GAFP.

## DECLARATORY JUDGMENT

55.    Plaintiff adopts and incorporates paragraphs 1 through 54 set forth above as if fully set forth herein.

56.    An actual controversy exists between the parties concerning whether the Policy provides coverage for the defense costs incurred by Assa Abloy and its affiliates in defending the claims of the Damian Plaintiffs in the Underlying Lawsuit.

12



57.     Determination of Federal's duty to defend Assa Abloy and to pay for the defense of Assa Abloy in the Underlying Lawsuit prior to the settlement will terminate and resolve the controversy giving rise to this proceeding pursuant to 12 O.S. § 1651 et seq.

58.     Plaintiff seeks a declaration regarding coverage and Federal's duty as follows:

(a)     Federal had a duty to defend Assa Abloy and to pay for defense costs and fees in the Underlying Lawsuit under the defense and **insured contract** provisions of the Policy up to the time the liability Policy limits were exhausted;

(b)     That under the terms of the Policy, failure to pay the antecedent defense costs of Assa Abloy incurred prior to exhaustion of the Policy Limits is no different than failing to pay the antecedent defense costs of GAFP, in that either failure is contrary to both logic and the intent of the Policy;

(c)     Federal knew or should have known that there is no legal basis under Oklahoma law or under the terms of the APA and Policy to take the position that Federal's antecedent obligation to pay defense costs incurred by Assa Abloy and/or its subsidiaries in defending the Underlying Lawsuit were subject to the being negated by subsequent exhaustion of the Policy limits;

(d)     Federal knew or should have known that there was no basis under Oklahoma law to take the position that Federal owed no duty to pay for the antecedent debt and obligation for defense costs and fees of either GAFP or Assa Abloy with respect to the Underlying Lawsuit without first expressly advising GAFP that settlement of GAFP's liability would relieve Federal from the duty to pay prior defense costs and fees for either GAFP and/or Assa Abloy;

(e)    That in refusing to pay the antecedent debts for defense costs and fees of Assa Abloy incurred prior to exhaustion of the Policy limits, Federal breached the terms of the Policy with respect to both GAFP and Assa Abloy and its subsidiaries.

**ALTERNATIVE CLAIMS FOR BREACH OF CONTRACT AND BAD FAITH**

59.    Plaintiff adopts and incorporates paragraphs 1 through 58 set forth above as if fully set forth herein.

60.    In the alternative to the declaratory relief requested above, Plaintiff asserts that the facts as alleged above, and in particular Federal's actions in remaining silent regarding its duty to defend Assa Abloy in the Underling Lawsuit, constitutes a bad faith breach of contract for which GAFP is entitled to compensatory damages.

61.    GAFP timely put Federal on notice of Assa Abloy's status under the **insured contract** provisions of the Policy.

62.    GAFP and Assa Abloy timely made demand for defense and indemnity in the APA, the indemnity provisions of which constitute an **insured contract** under the Policy.

63.    According to the United States Court of Appeals for Tenth Circuit, "an 'insured contract' must generally include indemnification agreements, since it specifically excludes only certain types of such agreements." *True Oil Co. v. Mid-Continent Cas. Co.*, 173 Fed. Appx. 645, 650 (10th Cir. 2006); *see also N. Am. Specialty Ins. Co. v. Pen Pals Prods., LLC*, 789 F. Supp. 2d 1343, 1348 (M.D. Ga. 2011).

64.    Federal unreasonably delayed and failed to resolve the request to defend and indemnify Assa Abloy during the course of the litigation, even after Federal was informed of the judicial determination that the fence involved in Kade Damian's death was manufactured prior to the closing date in the APA.

14

65.     Federal unreasonably delayed a decision on the defense and indemnity claim of Assa Abloy and acted in bad faith by taking advantage of GAFP in failing to disclose that Federal would take the position that settlement of the Damian Plaintiffs' claims against GAFP would negate antecedent debts for defense costs in defending the Underlying Lawsuit prior to the exhaustion of the Policy limits, including the cost of defending Assa Abloy.

66.     Federal knowingly remained silent and failed to disclose its position that settling for Policy limits on behalf of GAFP would negate Federal's prior and antecedent obligation to pay defense fee and costs, whether for the defense of GAFP or for Assa Abloy and its subsidiaries.

67.     As a result of Federal's breach of its contractual obligations and bad faith, GAFP has suffered damages for loss of policy benefits, including the costs, expenses, and attorneys fees incurred in defending Assa Abloy in the Underlying Lawsuit which should have been paid by Federal.

68.     Federal breached a duty owed to both GAFP and Assa Abloy in failing to consider whether Assa Abloy and/or its subsidiaries were **insureds** under the Policy.

69.     Federal's actions as detailed above constitute a breach of an insurance company's duty  under the Unfair Claims Settlement Practices Act to disclose applicable coverages.

70.     Federal breached a duty owed to GAFP and acted in bad faith by ignoring the fact that a defense was requested and owed to Assa Abloy and its subsidiaries under the APA and the Policy, and that the Policy expressly provides that the defense costs and fees are outside the liability limits in the Policy.

71.     As a direct and proximate result of Federal's conduct, GAFP has suffered damages to date in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.

## **PRAYER**

**WHEREFORE**, Plaintiff, Nancy Brandwein, Director of GAFP at the time of the dissolution of GAFP, applies to the Court for an Order appointing her Trustee of GAFP for the purpose of bringing this action and completing unfinished business of GAFP; and as Plaintiff for and on behalf of GAFP, prays that this Court enter a declaratory judgment in favor of GAFP and against Federal and holding that the Policy provides coverage for the Underlying Lawsuit, as follows:

(a)     Federal was put on timely notice of GAFP's and Assa Abloy's request that Federal pay for the costs and fees of Assa Abloy's defense;

(b)     Federal owed a duty to defend and indemnify Assa Abloy in the Underlying Litigation;

(c)     Federal owed a duty to indemnify GAFP and/or Assa Abloy for all costs of defense occurring prior to the settlement in the Underlying Lawsuit and exhaustion of Policy limits;

(d)     The exhaustion of Policy limits under the Policy does not negate Federal's liability and prior duty to pay for the cost of defense, including attorneys fees, prior to the exhaustion of the Policy limits; and

(e)     Federal has a duty to satisfy any judgment entered against GAFP for any defense costs and fees incurred by Assa Abloy or its subsidiaries incurred prior to the date of exhaustion of the Policy limits.

In the alternative, Plaintiff prays that this Court enter judgment that Federal has breached its contractual obligations under the Policy and acted in bad faith, and award compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), as well as Plaintiff's costs, expenses, and attorneys fees of this action, and such other and further relief as this Court deems just and equitable under the premises.

Respectfully submitted,

**ATKINSON, BRITTINGHAM, GLADD, FIASCO & EDMONDS**
A PROFESSIONAL CORPORATION

James N. Edmonds, OBA #15757
Kristopher K. McVay, OBA #33231
1500 ParkCentre
525 South Main
Tulsa, OK 74103-4524
Telephone: (918) 582-8877
Facsimile: (918) 585-8096
Email: jedmonds@abg-oklaw.com
kmcvay@abg-oklaw.com
*Attorneys for Plaintiff*

S:\Files\372\294\Petition 5-14-24-jja.docx

EXECUTION VERSION

**AMERISTAR FENCE PRODUCTS, INC.**

**AMERISTAR COIL PROCESSING, LLC**

**AMERISTAR SECURITY PRODUCTS, LLC**

**AMERISTAR FENCE PRODUCTS CANADA**

**EDWARD L. GIBBS**, Individually and
as Trustee of the Edward L. Gibbs Trust dated April 8, 1986

AS SELLERS

**AND**

**ASSA ABLOY INC.**

AS PARENT

**COIL USA INC.**

AS U.S. BUYER

**ASSA ABLOY COIL CANADA, LTD.**

AS CANADIAN BUYER

**ASSET PURCHASE AGREEMENT**

EXHIBIT

1

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | Background | 1 |
| 2 | Definitions | 1 |
| 3 | Sale and Purchase | 14 |
| 4 | Assumed Liabilities and Excluded Liabilities | 15 |
| 5 | Assigned Contracts; Governmental Approvals; and Title and Survey | 16 |
| 6 | Purchase Price, Closing Balance Sheet and Earn-Out | 18 |
| 7 | Conditions Precedent | 26 |
| 8 | Closing | 29 |
| 9 | Employees | 31 |
| 10 | Insurance | 35 |
| 11 | Representations and Warranties | 35 |
| 12 | Covenants | 59 |
| 13 | Indemnification | 67 |
| 14 | Transfer Taxes | 72 |
| 15 | Confidentiality | 72 |
| 16 | Announcements | 72 |
| 17 | Costs | 73 |
| 18 | Entire Agreement | 73 |
| 19 | Amendments and Waivers | 73 |
| 20 | Notices | 73 |
| 21 | Assignments | 74 |
| 22 | Partial Invalidity | 75 |
| 23 | Governing Law and Disputes | 75 |
| 24 | Schedules | 76 |
| 25 | Bulk Sales | 77 |
| 26 | Counterparts | 77 |
| 27 | Binding Effect | 77 |
| 28 | No Third Party Beneficiaries | 77 |
| 29 | Specific Performance | 77 |
| 30 | Waiver of Jury Trial | 77 |

SCHEDULES

| | |
|---|---|
| Schedule 3.1.1 | Real Property |
| Schedule 3.1.2 | Fixed Assets |
| Schedule 3.1.6 | Prepaid Expenses |
| Schedule 3.5 | Excluded Assets |
| Schedule 4.2 | Debts and Liabilities as at the Balance Sheet Date |
| Schedule 6.1.2 | Guidelines for Preparing the Closing Balance Sheet |
| Schedule 6.3.1 | Guidelines for Calculating Working Capital |
| Schedule 6.5.2 | Earn-Out EBIT for 2012 |
| Schedule 6.5.5 | Guidelines for Calculating Earn-Out EBIT and 2013 EBIT |
| Schedule 7.1.1 | Competition Authorities |
| Schedule 7.1.2 | Governmental Approvals and Consents |
| Schedule 10 | Insurance Policies |
| Schedule 11.1.1(b) | Qualified to do Business |
| Schedule 11.1.3(a) | Encumbrances on Assets |
| Schedule 11.1.3(c) | Facts or Conditions Materially Affecting Assets |
| Schedule 11.1.4 | Permits and Licenses |
| Schedule 11.1.5 | Financial Statements |
| Schedule 11.1.6 | Disclosed Liabilities |
| Schedule 11.1.8 | Accounts Payable |
| Schedule 11.1.9(h) | Material Defects on the Real Property |
| Schedule 11.1.9(k) | Leased Premises and Real Property |
| Schedule 11.1.10 | Assigned Contracts |
| Schedule 11.1.10(g) | Investigations by Governmental Authority |
| Schedule 11.1.11 | Outstanding or Potential Claims Under Insurance Policies |
| Schedule 11.1.12 | Compliance with Environmental Laws |
| Schedule 11.1.13 | Owned and Licensed Intellectual Property |
| Schedule 11.1.14 | Employment Matters (Including List of Key Employees) |
| Schedule 11.1.15(a) | Compliance with Law |

| | |
|---|---|
| Schedule 11.1.15(h) | Material Governmental Authority Consents |
| Schedule 11.1.16(c) | Investigations |
| Schedule 11.1.17 | Products |
| Schedule 11.1.18(a) | Customers |
| Schedule 11.1.18(b) | Suppliers |
| Schedule 11.1.20 | Absence of Certain Changes |
| Schedule 11.1.21 | Governmental Approvals |
| Schedule 11.1.24(a) | Affiliate Transactions |
| Schedule 11.1.24(b) | Guaranteed Obligations; Liabilities |
| Schedule 11.2.2 | Governmental Approvals |
| Schedule 12.1.1(a)(vi) | Agreements to Terminate Between Signing and Closing |
| Schedule 12.1.1(b)(viii) | Material Increases or Decreases in the Level of Stock of the Business Between Signing and Closing |
| Schedule 12.1.3 | Accounts Receivable |

**ASSET PURCHASE AGREEMENT**

This asset purchase agreement (this **"Agreement"**) is entered into on September 30, 2013,

BY AND AMONG:

(1)        **AMERISTAR FENCE PRODUCTS, INC.**, an Oklahoma corporation (**"AFP"**);

(2)        **AMERISTAR COIL PROCESSING, LLC**, an Oklahoma limited liability company (**"ACP"**);

(3)        **AMERISTAR SECURITY PRODUCTS, LLC**, an Oklahoma limited liability company (**"ASP"**);

(4)        **AMERISTAR FENCE PRODUCTS CANADA**, an Ontario corporation (**"AFP Canada"**);

(5)        **EDWARD L. GIBBS**, individually (**"Gibbs"**) and as Trustee of the Edward L. Gibbs Trust dated April 8, 1986 (the **"Trust"** and with AFP, ACP, ASP, AFP Canada and Gibbs collectively, the **"Sellers"**);

(6)        **ASSA ABLOY INC.**, an Oregon corporation (the **"Parent"**);

(7)        **COIL USA INC.**, a Delaware corporation and wholly-owned subsidiary of the Parent (the **"U.S. Buyer"**); and

(8)        **ASSA ABLOY COIL CANADA, LTD.**, an Ontario corporation (the **"Canadian Buyer"** and, together with the U.S. Buyer, the **"Buyers"**).

**1       Background**

1.1      The Sellers are engaged in the manufacture and sale of ornamental fences, gates, security fencing and related products in the fence and security industry (the **"Business"**).

1.2      The Sellers agree to sell and the Buyers agree to purchase the Business on the terms and conditions set out in this Agreement.

1.3      The Canadian Buyer will purchase the Assets of AFP Canada and assume the Assumed Liabilities of AFP Canada.

1.4      As a condition and inducement to the Buyers' willingness to enter into this Agreement, contemporaneously with the execution and delivery of this Agreement, Key Employees (as defined below) have entered into employment agreements or consulting agreements with the Buyers on terms satisfactory to the Buyers, such agreements to become effective as of the Closing in accordance with their terms.

**2       Definitions**

2.1      In this Agreement, the following definitions are used:

"**2013 EBIT**" means earnings directly relating to the Business before interest expense, interest income, income tax expense (including Texas Margin Tax and

franchise taxes), non-recurring or unusual items, i.e., items clearly and objectively, positively or negatively, affecting comparability and which are decided by the Buyers and the Sellers mutually, all as determined under applicable law and in accordance with the adjustments set out on <u>Schedule 6.5.5</u>. For the avoidance of doubt, non-recurring or unusual items include amounts that are no longer applicable to the Business as a result of the acquisition of the Business by the Buyers and the other transactions contemplated by this Agreement are set out on <u>Schedule 6.5.5</u>;

**"2014 Earn-Out Amount"** means ten million two hundred fifty thousand dollars ($10,250,000) or, if there has been an Escrow Buyers Release, fifteen million two hundred fifty thousand dollars ($15,250,000);

**"2015 Earn-Out Amount"** means twenty million five hundred thousand dollars ($20,500,000) or, if there has been an Escrow Buyers Release, twenty-five million five hundred thousand dollars ($25,500,000);

**"Accounts Receivable"** means the accounts receivable of the Sellers relating to the Business;

**"ACP"** has the meaning given in the Preamble;

**"Adjusted Sales"** means net sales prepared in accordance with the principles set out on <u>Schedule 6.5.5</u>, excluding any revenue related to aircraft and excluding the effect of any customer rebates;

**"Adjustment Statement"** has the meaning set out in <u>Section 6.4.1</u>;

**"Affiliate Transaction"** has the meaning set out in <u>Section 11.1.24(a)</u>;

**"Affiliated Person"** means, with respect to any Person, a Person directly or indirectly controlling, controlled by or under common control with such Person;

**"AFP"** has the meaning given in the Preamble;

**"AFP Canada"** has the meaning given in the Preamble;

**"Agreement"** means this asset purchase agreement, including all the Schedules and Exhibits attached to it;

**"Allocation Schedule"** has the meaning set out in <u>Section 6.1.4</u>;

**"ALTA"** means the American Land Title Association;

**"Ancillary Agreements"** means, collectively, agreements with the Key Employees, the Bill of Sale, the Assumption Agreement, the Canadian Bill of Sale and the Canadian Assumption Agreement and, if the Escrow Thresholds have not been met or it has not been finally determined as of the Closing whether they have been met pursuant to <u>Section 6.6</u>, the Escrow Agreement;

**"Anti-Corruption Law"** means: (i) the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 1997; (ii) the Foreign Corrupt Practices Act of 1977 of the United States of America, as amended by the Foreign Corrupt Practices Act Amendments of 1988 and 1998, and as may be

further amended and supplemented from time to time; (iii) the U.K. Bribery Act 2010; and (iv) any other applicable law (including any: (a) statute, ordinance, rule or regulation; (b) order of any court, tribunal or any other judicial body; and (c) rule, regulation, guideline or order of any public body, or any other administrative requirement) which prohibits the conferring of any gift, payment or other benefit on any person or any officer, employee, agent or adviser of such person or is broadly equivalent to the laws referred to in (ii) and (iii) or was intended to enact the provisions of the OECD Convention or which has as its objective the prevention of corruption;

**"ASP"** has the meaning given in the Preamble;

**"Assets"** has the meaning set out in Section 3.1;

**"Assigned Contracts"** means those agreements, contracts, undertakings, arrangements, outstanding offers and other engagements entered into on or prior to Closing by or on behalf of the Sellers which relate to the Business to the extent that at Closing the same remain to be completed or performed or remain in force, including the IP Licenses, the Lease Agreements, supply, vendor and vendee, service, insurance, distributor and customer contracts and sales agreements and, the Assumed Seller Benefit Plans, but excluding employment and other agreements with Employees and the Sellers' insurance policies, as are listed on Schedule 11.1.10;

**"Assumed Seller Benefit Plans"** has the meaning set out in Section 9.14;

**"Assumed Liabilities"** means those liabilities of the Business as of the Closing Date which are detailed in Section 4.1, to be set forth on the Closing Balance Sheet;

**"Balance Sheet Date"** means June 30, 2013;

**"Buffington Litigation"** means *Ameristar Coil Processing LLC and Ameristar Fence Products, Inc. v. William E. Buffington Company, Inc.*, Case No. CJ-2009-6979;

**"Business"** has the meaning set out in Section 1.1;

**"Business Day"** means a day when banks are open for general banking business in New York City, New York and Tulsa, Oklahoma;

**"Buyer Indemnitees"** has the meaning set out in Section 13.1.1;

**"Buyers"** has the meaning given in the Preamble;

**"Canadian Assumption Agreement"** has the meaning set out in Section 4.5;

**"Canadian Bill of Sale"** means a bill of sale and assignment for the Assets of AFP Canada;

**"Canadian Buyer"** has the meaning given in the Preamble;

**"Canadian Purchase Price"** means $500,000;

**"Claimant"** has the meaning set out in Section 23.4;

"**Closing**" means the completion of the transactions contemplated by this Agreement;

"**Closing Balance Sheet**" means a combined balance sheet of the Business as of the close of business on the Closing Date prepared in accordance with the principles set out on Schedule 6.1.2, consistently applied;

"**Closing Date**" means: (i) the last Business Day of the calendar month in which the last of the conditions precedent in Sections 7.1 and 7.2 has been fulfilled or waived or, if such fulfillment or waiver occurs after October 30, 2013, on the third (3rd) Business Day following such satisfaction or waiver; or (ii) such other date as the Parties may agree in writing;

"**Closing Working Capital Position**" means the Working Capital as reflected in the Closing Balance Sheet;

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended;

"**Competition Authorities**" means the competition authorities or courts in the jurisdictions set out on Schedule 7.1.1;

"**Competitive Business**" has the meaning set out in Section 12.1.4;

"**Confidential Information**" means any information of any kind or nature whatsoever, whether written or oral, including this Agreement and financial information, trade secrets, customer lists and other information, regarding the Buyers, the Sellers or the Business which is not known to the general public;

"**Consent Costs**" has the meaning set out in Section 5.6;

"**Cooperation Costs**" has the meaning set out in Section 5.7;

"**Current Assets**" means the combined current assets of the Business, as determined in accordance with the principles set out on Schedule 6.3.1 and, to the extent not inconsistent with the principles set out on Schedule 6.3.1, including (i) Accounts Receivable (net of reserves for doubtful accounts), (ii) Inventories (net of obsolete, excess or discontinued inventory) and (iii) prepaid expenses and other current assets related to the Business, but excluding (a) cash and cash equivalents, (b) any current Tax assets, (c) all amounts due from or receivable from the Sellers, (d) any interest income receivable related to the Sellers' investments, and (e) any assets that would be Excluded Assets if the measurement date were the Closing Date, subject to further adjustment as set out on Schedule 6.3.1;

"**Current Liabilities**" means the combined current liabilities of the Business, as determined in accordance with the principles set out on Schedule 6.3.1, including (i) trade accounts payable, (ii) accrued expenses, including rebates and incentives, and (iii) any other current liabilities related to the Business, but excluding (a) any current Tax liabilities, (b) all amounts due to or payable to the Sellers, (c) interest payable and debt, and (d) any liabilities that would be Excluded Liabilities if the measurement date were the Closing Date, subject to further adjustment as set out on Schedule 6.3.1;

"**De Minimis Loss**" has the meaning set out in <u>Section 13.3.1</u>;

"**Dispute Resolution Auditor**" means a qualified auditor selected from the Chicago, Illinois office of Ernst & Young LLP;

"**Domain Name Assignment**" means the domain name assignment in the form attached hereto as <u>Exhibit B</u>;

"**Draft Closing Balance Sheet**" has the meaning set out in <u>Section 6.1.2</u>;

"**Earn-Out**" has the meaning set out in <u>Section 6.5.1</u>;

"**Earn-Out EBIT**" means earnings directly relating to the Business before interest expense, interest income, income tax expense (including Texas Margin Tax and franchise taxes), non-recurring or unusual items, i.e., items clearly and objectively, positively or negatively, affecting comparability and which are decided by the Buyers exclusively, all as determined under applicable law, and in accordance with <u>Schedule 6.5.5</u> and the principles set out on <u>Schedule 6.5.5</u>. For the avoidance of doubt, non-recurring or unusual items include amounts that are no longer applicable to the Business as a result of the acquisition of the Business by the Buyers and the other transactions contemplated by this Agreement as set out on <u>Schedule 6.5.5</u>;

"**Earn-Out Period**" has the meaning set out in <u>Section 6.5.4</u>;

"**Employees**" means all persons who at the Closing Date are employed by the Sellers and involved in the Business;

"**Encumbrance**" means any claim, mortgage, charge, pledge, lien, option, equity, retention of title, right of pre-emption, right of first refusal, easement, hypothecation, right of others, encumbrance, adverse claim or interest, covenant, encroachment, servitude, call or put right, voting right or other security interest or restriction or limitation of any kind;

"**Environment**" or "**Environmental**" means any meaning given to it in any relevant legal system, including land, soil, sediment, man-made structures, natural resources, water (including water under or within land or in drains or sewers), air (including air within buildings) and any living organisms or ecological systems;

"**Environmental Laws**" means any applicable laws (whether civil, criminal or administrative), statutes, regulations, directives, codes, ordinances, judgments, orders and any other measures imposed by any Governmental Authority with regard to the pollution or the protection of: (i) the Environment; (ii) human health or human safety (including workers' health and safety); or (iii) any other living organisms supported by the Environment, or relating to contamination and the use, generation, management, handling, transport, treatment, disposal, emission, discharge or Release or threatened Release of Hazardous Substances;

"**Environmental Liabilities and Costs**" means Losses imposed by or pursuant to Environmental Laws, including related to Remedial Actions, based on, arising out of or in respect of: (i) the ownership or operation of the Business or Assets by any Seller or any of their predecessors or Affiliated Persons prior to the Closing; (ii) the

Environmental conditions existing on the Closing Date on, under, above or about any Assets or any other real properties, assets or facilities currently or previously owned, leased or operated by any Seller or any of their predecessors or Affiliated Persons; (iii) expenditures necessary to cause any Assets or any aspect of the Business to be in compliance with Environmental Laws in effect as of the Closing; and (iv) any off-site liabilities arising out of the operation of the Business;

**"Environmental Permits"** means any permits, licenses, consents, approvals, judgments, decisions, registrations, waiver, order, exemption and other authorizations or notifications which are issued, granted or required under any Environmental Laws which are used in or required for the operation of the Business or the occupation or use of the Properties;

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder;

**"ERISA Affiliate"** means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA;

**"Escrow Agent"** has the meaning set out in Section 6.2.2;

**"Escrow Agreement"** has the meaning set out in Section 6.2.2;

**"Escrow Amount"** has the meaning set out in Section 6.2.2;

**"Escrow Buyers Release"** means a release of the Escrow Amount to the Buyers pursuant to the terms of the Escrow Agreement;

**"Escrow Thresholds"** means, for the period from January 1, 2013 through and including September 30, 2013, both (i) Adjusted Sales are greater than or equal to one hundred twenty-four million, five hundred thousand dollars ($124,500,000) and (b) 2013 EBIT is greater than or equal to twenty-five million, five hundred thousand dollars ($25,500,000);

**"Estoppel Certificate"** means a certificate from the lessor of each of the Leased Premises listed on Schedule 11.1.9(k) addressed to the Buyers certifying the following regarding such Lease Agreement: (i) that such Lease Agreement is in full force and effect; (ii) that there are no defaults thereunder or any conditions that with the passage of time would constitute a default thereunder; (iii) the current rent and additional rent payable by lessee; and (iv) the expiration date of the Lease Agreement, or a certificate in the form so provided in any Lease Agreement, together with any other statements reasonably requested by the Buyers with respect to the Lease Agreements;

**"Excluded Assets"** has the meaning set out in Section 3.5;

**"Excluded Liabilities"** means any and all liabilities of the Sellers other than the Assumed Liabilities and any liabilities to the extent they relate to any Excluded

---

Asset; for the avoidance of doubt, any and all Seller Benefit Plans (other than the Assumed Seller Benefit Plans), any and all Taxes of the Sellers or of any other Person or in any way relating to the Business (whether primary or secondary, direct or indirect, known or unknown, absolute or contingent, matured or unmatured, or otherwise), any and all claims from any former stockholder of any Seller and any and all Environmental Liabilities and Costs shall be Excluded Liabilities;

"**Financial Statements**" means the financial statements for AFP, ACP, ASP and AFP Canada attached as Schedule 11.1.5;

"**Fixed Assets**" means all plant, machinery, tools, equipment, computers, fixtures, furniture, furnishings, tools, dies, molds, parts, vehicles and other tangible property owned by the Sellers for the purpose of the Business, as listed on the Signing Date set out on Schedule 3.1.2;

"**Full Warranty Deeds**" shall mean the deeds used to convey each parcel of Real Property as contemplated herein, substantially in the form of Exhibit F attached hereto;

"**Fundamental Representations**" has the meaning set out in Section 13.3.1;

"**Gibbs**" has the meaning given in the Preamble;

"**Government Contract**" means any contract entered into between any of the Sellers or any of their Affiliated Persons, on the one hand, and any Governmental Authority , on the other hand, and relating to the provision of goods and/or services to or for the benefit of a Governmental Authority;

"**Governmental Approvals**" means any consent, authorization, waiver, permit (including any Environmental Permit), grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including any Governmental Authority;

"**Governmental Authority**" means any international, supranational or national government, any state, provincial, local or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States of America or a foreign nation or jurisdiction, any court, tribunal or arbitrator, or any self-regulatory organization;

"**Hazardous Substances**" means any substance that: (i) is or contains asbestos, urea formaldehyde insulation, polychlorinated biphenyls, petroleum or petroleum products, radon gas, microbiological contamination or related materials; (ii) requires Remedial Action pursuant to any Environmental Law, or is defined, listed or identified as a "hazardous waste," "hazardous substance," "toxic substance" or words of similar import thereunder; or (iii) is regulated under any Environmental Law;

"**HSR Act**" has the meaning set out in Section 12.1.5(c);

"**Indemnified Party**" has the meaning set out in <u>Section 13.4.1</u>;

"**Indemnifying Party**" has the meaning set out in <u>Section 13.4.1</u>;

"**Initial Purchase Price**" means three hundred eighty-one million dollars ($381,000,000), which amount shall be reduced by the Escrow Amount if the Escrow Thresholds have not been met or it has not been finally determined as of the Closing whether they have been met pursuant to <u>Section 6.6</u>;

"**Intellectual Property**" means the following (whether registered or not, including applications and rights to apply for the registration of the following): (i) rights in inventions; (ii) patents, including reissues, divisions, supplementary protection certificates and other continuations and extensions thereof, petty patents and utility models; (iii) trademarks, service marks and rights in trade names and business names, including the goodwill associates therewith; (iv) rights in domain names and URLs; (v) logos and get-up; (vi) rights to sue for passing-off and unfair competition; (vii) design rights; (viii) copyrights in works of authorship of any kind (including copyrights in software), moral rights, rights of attribution, neighboring rights and database rights; (ix) Know-how; (x) any other rights of a similar kind in any part of the world; (xi) copies and tangible embodiments of all of the foregoing, in whatever form or medium; and (xii) all rights thereunder or in respect thereof, including rights in opposition proceedings and to sue or recover and retain damages, costs and attorney's fees for past, present and future infringement or other violation of any of the foregoing;

"**Intellectual Property Assignment**" means the assignment of Intellectual Property in the form attached hereto as <u>Exhibit C</u>;

"**Interest Rate**" means a floating rate equal to the U.S. prime rate as published by *The Wall Street Journal*;

"**Inventory**" means the inventory, including raw materials, work in progress, spare parts, replacement parts, component parts, office and other supplies and finished goods used in the Business, owned by the Sellers or previously purchased and in transit to any Seller, finished goods held at any location or facility of any Seller or in transit to any Seller, and rights in and to products sold or leased;

"**IP Licenses**" means all the contracts, licenses and agreements to which any Seller is a party with respect to any Owned Intellectual Property or Licensed Intellectual Property licensed to or by, or created for or by, any Seller;

"**IRS**" means the U.S. Internal Revenue Service;

"**Key Employee**" means each of the persons listed as "Key Employee" on <u>Schedule 11.1.14</u>;

"**Know-how**" means confidential and proprietary, industrial and/or commercial information and/or techniques in any form, including trade secrets, drawings, formulas, test results, reports, project reports and testing or manufacturing

---

A16931565

procedures, instruction and training manuals, tables of operating conditions, market forecasts, lists and particulars of customers and suppliers;

**"Lease Agreement"** means the lease agreement for each of the Leased Premises, together with any and all amendments, modifications, restatements, extensions, renewals, guaranties or other agreements with respect thereto;

**"Leased Premises"** means the premises leased by the Sellers used in the Business as set out on Schedule 11.1.9(k);

**"Licensed Intellectual Property"** means all Intellectual Property licensed to the Sellers which is used in or related to the Business;

**"Loss"** means any liability, damage, claim, demand, obligation, loss, fine, cost, expense, royalty or deficiency (whether known, unknown, disclosed, undisclosed, absolute, contingent, accrued or otherwise, whether or not resulting from Third Party Claims), including Taxes, interest and penalties with respect thereto and reasonable out-of-pocket expenses and reasonable attorneys' and accountants' fees and expenses incurred in the investigation or defense of any of the same or in asserting, preserving or enforcing any of the respective rights in connection with or under this Agreement or any Ancillary Agreement;

**"Material Adverse Effect"** means (i) any event, occurrence, fact, condition, change or effect that has had or would reasonably be expected to have a materially adverse effect on the Business, the Assets, the Assumed Liabilities or the results of operations, condition (financial or otherwise) or prospects of the Business, taken as a whole, (ii) any impairment of the ability of any party to perform its obligations under this Agreement, or (iii) any effect that prevents or materially delays the consummation of any of the transactions contemplated by this Agreement;

**"Mediation"** has the meaning given in Section 23.2;

**"October 31 Balance Sheet"** has the meaning given in Section 12.3.2;

**"October 31 Working Capital Position"** has the meaning given in Section 12.3.2;

**"Order"** means any judgment, order, administrative order, writ, stipulation, injunction (whether permanent or temporary), award, decree or similar legal restraint of, or binding settlement having the same effect with, any Governmental Authority;

**"Owned Intellectual Property"** means all Intellectual Property owned by the Sellers which is used in or is related to the Business;

**"Parent"** has the meaning given in the Preamble;

**"Party"** means any of the Sellers, the Buyers or the Parent and **"Parties"** means the Sellers, the Buyers and the Parent, collectively;

**"Patent Assignment"** means the patent assignment in the form attached hereto as Exhibit D;

---

**"Permitted Encumbrances"** shall mean (a) mechanics', carriers', warehousemens', workmen's liens and other similar Encumbrances arising in the ordinary course of business which are not yet due and payable or are being contested in good faith by appropriate proceedings; (b) Encumbrances for Taxes, assessments and other governmental charges not yet due and payable or that may subsequently be paid without penalty or that are being contested in good faith by appropriate proceedings; (c) with respect to the Real Property, (i) easements, covenants, rights-of-way, claims, restrictions and other Encumbrances of record set forth in the title insurance reports for the Properties to be provided to Buyers by the Title Company pursuant to this Agreement, and which do not adversely affect the Real Property and are otherwise acceptable to the Sellers in their commercially reasonable discretion, (ii) any state of facts a current survey of the Real Property would show, and which do not adversely affect the Properties and are otherwise acceptable to the Sellers in their commercially reasonable discretion and (iii) zoning, building and other similar restrictions imposed by any Governmental Authority; and (f) with respect to any Leased Premises, any Encumbrance affecting solely the interest of the landlord thereunder and not the interest of tenant thereunder, who do not materially impair the value or use of the Leased Premises. For purposes of this definition only, the term "Real Property" shall be deemed to include the Tulsa Airport Ground Lease;

**"Person"** means any individual, firm, company, corporation or other corporate body, government, state or agency of a state or any joint venture, trust, association or partnership (general or limited), whether incorporated or not, and any other legal entity;

**"Preliminary Purchase Price"** has the meaning set out in Section 6.2.1;

**"Preliminary Working Capital Adjustment"** means the amount by which the Preliminary Working Capital Position exceeds the Target Working Capital Position (in which case it will be added to the Initial Purchase Price) or by which it is less than the Target Working Capital Position (in which case it will be deducted from the Initial Purchase Price);

**"Preliminary Working Capital Position"** means the Sellers' good faith estimate of the Closing Working Capital Position, to be provided by the Sellers to the Buyers as set out in Section 6.1.2;

**"Properties"** means any owned or leased properties and any premises, including land, water, buildings and facilities whether located below or above ground, currently owned, leased, site-leased, used or otherwise controlled by the Sellers and which are used or have been used in the Business, including the Real Property and the Leased Premises, together with and any all existing title insurance policies, surveys, consents, permits, approvals, estoppels, operating manuals, warranties, correspondence, financial statements and records and all other documents and records related to the Properties;

**"Purchase Price"** has the meaning set out in Section 6.1.1;

"**Real Property**" means the real property listed on <u>Schedule 3.1.1</u>;

"**Recall**" has the meaning set out in <u>Section 11.1.17</u>;

"**Release**" means any releasing, disposing, discharging, injecting, spilling, leaking, leaching, pumping, dumping, emitting, escaping, emptying, seeping, dispersal, migration, transporting, placing and the like, including the moving of any materials through, into or upon, any land, soil, surface water, groundwater or air, or otherwise entering into the indoor or outdoor environment;

"**Remedial Action**" means all actions required to: (i) clean up, remove, treat or in any other way remediate any Hazardous Substances; (ii) prevent the release of Hazardous Substances so that they do not migrate or endanger or threaten to endanger public health or welfare or the environment; or (iii) perform studies, investigations and care related to any such Hazardous Substances;

"**Request**" has the meaning set out in <u>Section 23.4</u>;

"**Respondent**" has the meaning set out in <u>Section 23.4</u>;

"**Seller Benefit Plan**" means any agreement, plan, program, fund, policy, contract, arrangement or understanding (either written or unwritten and whether or not legally binding) providing compensation, benefits, pension, retirement, profit sharing, stock bonus, stock option, stock purchase, stock ownership, stock appreciation right, phantom or stock equivalent, bonus, incentive, deferred compensation, perquisites, hospitalization, medical, dental, vision, vacation, insurance, sick pay, disability, death benefit, severance, worker's compensation, supplementary unemployment benefits, or similar employee benefits, or any salary reduction agreement, change-of-control agreement, retention agreement, employment agreement or consulting agreement, covering any current or former employee, officer, director or consultant of any Seller and the beneficiaries and dependents thereof, or entered into, maintained or contributed to, as the case may be, by any Seller, including (i) any "employee welfare benefit plan" (as defined in Section 3(2) of ERISA), whether or not terminated and (ii) any "employee pension benefit plan" (as defined in Section 3(1) of ERISA), whether or not terminated;

"**Seller Expenses**" means, to the extent paid or payable by any Seller or its representatives, expenses, fees or charges incurred on or before the Closing in connection with the exploration of a potential business combination or sale transaction, including preparation, negotiation, execution, and delivery of this Agreement and any Ancillary Agreements and the consummation of the Closing, any of the transactions contemplated by this Agreement, including all brokers', attorneys', accountants', consultants', professionals', investment bankers', and other advisers' fees and expenses payable by any Seller that have not been paid in full in cash as of the Closing, and any other amounts that are expressly designated as transaction expenses in this Agreement;

"**Seller Indemnitees**" has the meaning set out in <u>Section 13.2</u>;

"**Sellers**" has the meaning given in the Preamble;

**"Sellers' Calculation of 2013 Adjusted Sales and 2013 EBIT Statement"** has the meaning set out in Section 6.6.2;

**"Signing Date"** means the date of this Agreement;

**"Surviving Sections"** means Sections 2, 16, 17, 18, 19, 20, 21, 23, 28 and 30;

**"Target Working Capital Position"** means fifty-five million dollars ($55,000,000), subject to Section 12.3.2;

**"Taxes"** means (i) all federal, state, local or foreign and other taxes, assessments, duties, impositions, levies, contributions and liabilities, including taxes based on alternative or add-on minimum, gross income, franchise, net income, value added, margin (including Texas Margin Tax), gross receipts, property, sales, use, transfer, gains, license, excise, employment, payroll, withholding or minimum taxes, or any other tax custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Authority, and (ii) any liability for any amount described in the immediately preceding clause (i) as a result of being a transferee or successor, by contract or otherwise, or as a result of being or having been a member of an affiliated, consolidated, combined, unitary, aggregate, or similar group for Tax purposes, or pursuant to a tax indemnity, tax sharing or other contract, agreement, arrangement or understanding, and the term **"Tax"** means any one of the foregoing Taxes;

**"Tax Return"** means any return, declaration, report, claim, election, notice or information return or statement or other document (including any related or supporting information, schedules, or exhibits) filed or required to be filed with any federal, state, local or foreign Governmental Authority or other authority in connection with any Tax;

**"Third Party Claim"** has the meaning set out in Section 13.4.1;

**"Threshold Amount"** has the meaning set out in Section 13.3.1;

**"Title Company"** means a nationally recognized title insurance company reasonably satisfactory to the Buyers for the issuance of the Title Policies;

**"Title Policies"** has the meaning set out in Section 7.2.6;

**"Title Policy Costs"** has the meaning set out in Section 5.7;

**"to the Buyers' knowledge"** means the actual knowledge of Larry Denbrock; John Davenport; Vicki Gordon; Gail Spain; Mike Scheve; Bob Hubbard; Michael Trzynka; Vinod Sintha; and Maurice Conroy, who shall be deemed to have knowledge of such matters as he or she would have discovered had he or she made due and proper inquiries within his or her respective area of responsibility with respect to the Business;

**"to the Sellers' knowledge"** means the actual knowledge of Edward L. Gibbs, CEO and Director; Mark Meek, President and Director; Nancy Brandwein, Executive

Vice President of Administration and Director; Barry Willingham, Vice President; Dennis Patrick, Vice President of Manufacturing; Keith Armour, Vice President of Supply Chain; Bill Schenke, Vice President of Sales; Scott Galbraith, Vice President of Security Products; and Galen Sawyer, EHS&S Director, who shall be deemed to have knowledge of such matters as they would have discovered had they made due and proper inquiries within his or her respective area of responsibility with respect to the Business;

**"Trademark Assignment"** means the trademark assignment in the form attached hereto as <u>Exhibit E</u>;

**"Transfer Taxes"** means any and all sales (including bulk sales), use, value added, documentary, stamp, gross receipts, registration, transfer, conveyance, excise, recording, license and other similar Taxes or fees imposed on the transactions (or deemed transactions) contemplated by, or related to, this Agreement and all transactions involving the ownership, acquisition, or perfection of security interests, including any expenses and fees relating to registering foreign and U.S. Intellectual Property in the name of the Buyers or its designees (for the avoidance of doubt, Transfer Taxes do not include any Taxes imposed, in whole or in part, on the basis of net income by any tax authority);

**"Transferred Employees"** has the meaning set out in <u>Section 9.1</u>;

**"Trust"** has the meaning given in the Preamble;

**"Tulsa Airport Ground Lease"** means that certain Lease Agreement by and between The City of Tulsa, Oklahoma and AFP dated February 13, 2003, as the same may be amended, modified, restated or otherwise supplemented from time to time;

**"U.S. Assumption Agreement"** has the meaning set out in <u>Section 4.4</u>;

**"U.S. Bill of Sale"** means a bill of sale and assignment for the Assets, excluding the Assets of AFP Canada;

**"U.S. Buyer"** has the meaning given in the Preamble;

**"WARN Act"** has the meaning set out in <u>Section 9.7</u>;

**"Working Capital"** means Current Assets minus Current Liabilities; and

**"Working Capital Adjustment"** means the amount by which the Closing Working Capital Position exceeds the Target Working Capital Position, or the amount by which the Closing Working Capital Position is less than the Target Working Capital Position.

2.2     **Headings; Table of Contents**

Headings and table of contents should be ignored in construing this Agreement.

2.3     **Gender; Singular; Plural**

References to one gender include all genders and references to the singular include the plural and vice versa.

2.4    **Schedules**

References to this Agreement shall include any Schedules and Exhibits to it, and references to Sections, Exhibits and Schedules are to Sections of, and Exhibits and Schedules to, this Agreement.

2.5    **Information**

References to books, records or other information mean books, records or other information in any form, including paper, electronically stored data, magnetic media, film and microfilm.

2.6    **Interpretation**

In this Agreement, unless the context otherwise requires, any reference to "including" or "in particular" shall be illustrative only and without limitation.

Any reference to "dollars" or "$" will mean United States of America Dollars unless otherwise specified.

**3    Sale and Purchase**

3.1    Upon the terms and subject to the conditions set out in this Agreement, the Sellers agree to sell, convey, transfer, assign and deliver to the Buyers, and the Buyers agree to purchase, and the Parent agrees to cause the Buyers to purchase, as at the Closing Date, the properties, assets and rights of the Sellers related to the Business as a going concern, including the following (collectively, the **"Assets"**):

3.1.1    The Properties, which includes the Real Property and the leasehold interests of the Sellers in each of the Leased Premises under the Lease Agreements;

3.1.2    the Fixed Assets;

3.1.3    the Inventory;

3.1.4    the Owned Intellectual Property;

3.1.5    notes, bonds and other evidences of indebtedness of, and rights to receive payments from, any Person;

3.1.6    credits, prepaid expenses and items, deferred charges, advance payments, security deposits and similar items, including those listed on <u>Schedule 3.1.6</u>;

3.1.7    the Sellers' rights and obligations under the Assigned Contracts (subject to the terms set out in <u>Sections 5.1</u> and <u>5.2</u>);

3.1.8    books and records, including financial, accounting and operating data and records, marketing and promotional materials, customer lists and mailing lists and personnel and litigation files;

3.1.9    Governmental Approvals, including pending applications thereof or renewals thereof, in each case to the extent that its transfer is permitted by applicable law;

3.1.10    rights to any litigation with respect to the Business or the ownership, use or value of any Asset;

3.1.11    the know-how and goodwill of the Business, including the exclusive right for the Buyers to hold itself out as the successor to the Business of the Sellers;

3.1.12    guaranties, warranties, indemnities and similar rights in favor of the Sellers and any of their Affiliated Persons to the extent related to any Asset;

3.1.13    insurance benefits, including rights and proceeds, arising from or relating to the Assets or Assumed Liabilities prior to the Closing;

3.1.14    the Accounts Receivable, unbilled revenue and other receivables arising out of the sale or other disposition of goods and services to the Business;

3.1.15    the benefit of any claim under any of the Sellers' insurance policies related to the Business;

3.1.16    all of the rights of the Sellers arising out of or relating to the Buffington Litigation;

3.1.17    any notices or filings prepared or filed by the Sellers to preserve or secure any rights the Sellers may have with respect to current or potential Accounts Receivable; and

3.1.18    any other properties, assets or rights which are used in the Business.

3.2    The Business and the Assets shall be transferred to the Buyers on and as of the Closing Date with full title guarantee, free and clear from any Encumbrances or liabilities, other than Assumed Liabilities.

3.3    Should any properties, assets or rights referred to in Section 3.1.18 be discovered, such properties, assets or rights shall forthwith be transferred by the Sellers to the Buyers without any additional compensation.

3.4    All revenues, costs, risks, liabilities and expenses related to the Business due, attributable to or accrued before and on the Closing Date shall be for the account of the Sellers and all revenues, costs, risks, liabilities and expenses related to the Business due, attributable to or accrued after the Closing Date shall be for the account of the Buyers. If, at any time after the Closing, the Sellers receive any monies in respect of any Accounts Receivable, then the Sellers shall pay to the Buyers, as soon as reasonably practicable, the amount recovered.

3.5    The properties, assets and rights listed on Schedule 3.5 (the "**Excluded Assets**") shall not be sold and transferred to the Buyers.

**4        Assumed Liabilities and Excluded Liabilities**

4.1    Subject to compliance by the Sellers with their obligations in this Agreement, the Buyers shall as at the Closing Date assume the following debts and liabilities related to the Business (other than any Excluded Liabilities) to the extent that they are reflected in the Closing Balance Sheet:

---

A16931565

15

4.1.1    accounts payable and other Current Liabilities;

4.1.2    accrued expenses; and

4.1.3    warranty obligations relating to products sold by the Business.

4.2    The debts and liabilities referred to in <u>Section 4.1</u> as at the Balance Sheet Date are set out on <u>Schedule 4.2</u>.

4.3    The Sellers and the Buyers shall use commercially reasonable efforts to obtain consent from the creditors in respect of the assignment of the Assumed Liabilities to the Buyers. Unless and until such consent is obtained, the Buyers shall perform on behalf of the Sellers all the obligations of the Sellers under the Assumed Liabilities.

4.4    At the Closing, the U.S. Buyer shall assume the Assumed Liabilities, excluding the Assumed Liabilities of AFP Canada, by executing and delivering to the Sellers an assignment and assumption agreement in a form reasonably satisfactory to the Sellers (the **"U.S. Assumption Agreement"**).

4.5    At the Closing, the Canadian Buyer shall assume the Assumed Liabilities of AFP Canada by executing and delivering to the Sellers an assignment and assumption agreement in a form reasonably satisfactory to the Sellers (the **"Canadian Assumption Agreement"**).

4.6    The Buyers shall not assume any of the Excluded Liabilities. The Sellers and their respective Affiliated Persons shall retain and be responsible for all Excluded Liabilities.

**5    Assigned Contracts; Governmental Approvals; and Title and Survey**

5.1    The Sellers and the Buyers shall cooperate and use their commercially reasonable efforts to obtain consent or to procure a novation, assignment or transfer of the Assigned Contracts on terms reasonably acceptable to the Buyers. The Sellers shall as soon as possible after receipt deliver to the Buyers any consents which have not been delivered to the Buyers on Closing, duly executed by the appropriate parties.

5.2    Insofar as any Assigned Contract cannot effectively be assigned or transferred to the Buyers without the consent of a third party or except by an agreement of novation:

5.2.1    the Sellers and the Buyers shall use commercially reasonable efforts to obtain such consent or to procure such novation, assignment or transfer on terms reasonably acceptable to the Buyers and shall keep each other informed of the progress in obtaining such consent or procuring such novation, assignment or transfer; and

5.2.2    unless and until such consent is obtained or the Assigned Contracts are novated, assigned or transferred, this Agreement shall not be construed as an assignment, transfer or novation or an attempted assignment, transfer or novation and the Buyers shall, to the extent that the Assigned Contracts permit, perform on behalf of the Sellers all the obligations of the Sellers which fail to be performed after the Closing Date and the Sellers shall, to the extent that the Assigned Contracts permit, procure (including by the use of subleasing, sublicensing or subcontracting) that the Buyers

receive all the benefits from such Assigned Contracts in respect of the period after the Closing Date, including, for any Lease Agreement, entry by the Sellers into a management agreement pursuant to which the Sellers continue to operate and perform under such Lease Agreement. For the avoidance of doubt, no consideration whatsoever shall be payable to either Party for any performance taken under this Section 5.2.2. Nothing in this Section 5.2.2 shall be deemed a waiver by the Buyers of its right to receive an effective assignment of all of the Assets at the Closing, nor shall any Assets covered by this Section 5.2.2 be deemed to constitute Excluded Assets.

5.3     If consent to the assignment of or if the novation of any Assigned Contract is refused or otherwise not obtained on terms reasonably acceptable to the Buyers within three (3) months of the Closing:

5.3.1   the Buyers shall be entitled to require the Sellers to procure the termination of the Assigned Contract and the obligations of the Parties under this Agreement in relation to such Assigned Contract shall cease forthwith; and

5.3.2   references in this Agreement to the Assigned Contracts and the Business (other than in this Section 5.3) shall be construed as excluding such Assigned Contract, as appropriate.

5.4     Where an Assigned Contract is terminated pursuant to Section 5.3.1, the Sellers shall repay to the Buyers the amount of the consideration ascribed to such Assigned Contract in the Closing Balance Sheet or, if no amount is ascribed, such amount as may be agreed within ten (10) Business Days by the Sellers and the Buyers, or, failing such agreement, the disagreement will be submitted to Mediation in accordance with Section 23.2. If, and to the extent that, any such disagreement has not been settled pursuant to the Mediation within sixty (60) days of appointment of the mediator, the resolution of such disagreement shall, on the application of the Sellers or Buyers, be determined by the Dispute Resolution Auditor to be its value together with interest thereon at the Interest Rate calculated from the Closing Date until the date of payment. Sections 6.4.3, 6.4.4 and 6.4.5 shall apply *mutatis mutandis* to the engagement and determination of the Dispute Resolution Auditor pursuant to this Section 5.4.

5.5     In connection with the transfer of the Governmental Approvals, the Sellers undertake to promptly execute all transfer documents and to do all necessary or desirable acts and things in order to validly transfer to the Buyers the Governmental Approvals. In the event that any Governmental Approval cannot be transferred to the Buyers in accordance with this Section 5.5, the provisions of Sections 5.2, 5.3 and 5.4 shall apply correspondingly.

5.6     The costs (the **"Consent Costs"**) incurred for obtaining consent or procuring a novation, assignment or transfer of the Assigned Contracts and the Governmental Approvals on terms reasonably acceptable to the Buyers pursuant to this Section 5 shall be shared equally between the Buyers, on the one hand, and the Sellers, on the other hand, subject to Section 17.1.

5.7    The Sellers shall cooperate and use best efforts with the Buyers to obtain title commitments and ALTA surveys for each parcel of Real Property and any Leased Premises (as determined by the Buyers) necessary to obtain the Title Policies. The costs (the "**Title Policy Costs**") for obtaining a standard Title Policy and the ALTA extended coverage shall be shared equally by the Buyers, on the one hand, and the Sellers, on the other hand, subject to <u>Section 17.1</u>. The costs for obtaining the surveys shall be paid by the Buyers.

**6**        **Purchase Price, Closing Balance Sheet and Earn-Out**

**6.1**      **The Purchase Price**

6.1.1    The purchase price for the Business (other than the Assets held by AFP Canada) shall be an amount in cash equal to the Initial Purchase Price, <u>less</u> the Canadian Purchase Price, <u>less</u> or <u>plus</u>, as applicable, the Working Capital Adjustment, and subject to increase pursuant to <u>Section 6.5</u> (the "**Purchase Price**").

6.1.2    No later than three (3) Business Days prior to the Closing Date, the Sellers shall furnish to the Buyers a good faith estimate of the Closing Balance Sheet (the "**Draft Closing Balance Sheet**") in accordance with the principles set out on <u>Schedule 6.1.2</u> and the Preliminary Working Capital Position, in each case prepared in reasonable detail together with a statement, certifying as to the accuracy and completeness thereof.

6.1.3    The Draft Closing Balance Sheet shall be prepared in accordance with the principles set out on <u>Schedule 6.1.2</u>, and shall be expressed in dollars. Amounts in other currencies shall be translated into dollars at the exchange rates as published in *The Wall Street Journal* on the date of the Draft Closing Balance Sheet.

6.1.4    All amounts constituting consideration within the meaning of, and for purposes of, Section 1060 of the Code and the regulations thereunder shall be allocated among the Assets and any other assets or rights acquired by the Buyers hereunder in the manner required by Section 1060 of the Code and the regulations thereunder and all applicable laws. Within ninety (90) days after the Buyers and the Sellers have reached agreement with respect to the Adjustment Statement, the Buyers shall provide the Sellers with a proposed schedule (the "**Allocation Schedule**") allocating all such amounts as provided herein. For the avoidance of doubt, the Parties agree that the Allocation Schedule shall reflect the allocation of consideration among the different Sellers based on the relative fair market value of the Assets and any other assets or rights acquired from such Seller, shall reflect that all of the goodwill acquired by the Buyers hereunder was acquired from AFP, and shall reflect that the combined fair market value of all of the Assets and any other assets or rights purchased from AFP Canada is equal to the Canadian Purchase Price. The Allocation Schedule shall become final and binding on the Parties fifteen (15) days after the Buyers provide such schedule to the Sellers, unless the Sellers object in writing to the Buyers, specifying the basis for its objection and preparing an alternative allocation. If the Sellers do object, the Buyers and the Sellers shall in good faith attempt to resolve the dispute within fifteen (15) days of receipt by the

Buyers of written notice of the Sellers' objection. Any such resolution shall be final and binding on the Parties. If resolution is not reached within fifteen (15) days, the Buyers or the Sellers may refer the matter concerning the Allocation Schedule to Mediation in accordance with Section 23.2. If, and to the extent that, any such matter has not been settled pursuant to the Mediation within sixty (60) days of appointment of the mediator, the resolution of such matter shall, on the application of the Sellers or Buyers, be determined by the Dispute Resolution Auditor. All costs accrued in connection hereto shall be paid by the Parties in inverse proportion as they may prevail on matters resolved by the Dispute Resolution Auditor, which inverse proportionate allocations shall also be determined by the Dispute Resolution Auditor at the time the determination of the Dispute Resolution Auditor is rendered on the merits of the matters submitted. The Parties shall cooperate with each other and the Dispute Resolution Auditor in connection with the matters contemplated by this Section 6.1.4, including by furnishing such information and access to books, records (including accountants work papers), personnel and properties as may be reasonably requested. Each of the Parties agrees to (a) prepare and timely file all Tax Returns, including IRS Form 8594 (and all supplements thereto) in a manner consistent with the Allocation Schedule as finalized and (b) act in accordance with the Allocation Schedule for all Tax purposes. The Parties will revise the Allocation Schedule to the extent necessary to reflect any subsequent adjustments to the Purchase Price or other amounts constituting consideration within the meaning of, and for purposes of, Section 1060 of the Code and the regulations thereunder. In the case of any such payment, the Buyers shall propose a revised Allocation Schedule, and the Parties shall follow the procedures described above with respect to review, dispute and resolution with respect to such revision.

6.2    **The Preliminary Purchase Price and Escrow Amount**

6.2.1    The preliminary purchase price for the Business shall be an amount in cash equal to the Initial Purchase Price, less the Canadian Purchase Price, less or plus, as applicable, the Preliminary Working Capital Adjustment (the **"Preliminary Purchase Price"**), subject to adjustment pursuant to Section 6.3.

6.2.2    At the Closing, the Buyers shall pay to (a) AFP Canada the Canadian Purchase Price, and (b) the Sellers (other than AFP Canada) the Preliminary Purchase Price, in dollars by wire transfer of immediately available funds to the account specified in writing by the Sellers no later than three (3) Business Days prior to the Closing Date and, if the Escrow Thresholds have not been met or it has not been finally determined as of the Closing whether they have been met pursuant to Section 6.6, shall deposit with a financial institution or trust company (the **"Escrow Agent"**) to be mutually selected by the Buyers and the Sellers prior to the Closing, by wire transfer of immediately available funds, an amount equal to ten million dollars ($10,000,000) (the **"Escrow Amount"**) to be governed in accordance with the terms of this Agreement and an escrow agreement in the form attached as Exhibit A to be entered into by and among the Buyers, the Sellers and the Escrow Agent prior to, or contemporaneous with, the Closing (the **"Escrow Agreement"**).

**6.3**     **Purchase Price Adjustment**

6.3.1    Upon determination of the Closing Balance Sheet and the Closing Working Capital Position in accordance with <u>Section 6.4</u> and the principles set out on <u>Schedule 11.1.5</u> and the adjustments set out on <u>Schedule 6.3.1</u>, the Preliminary Purchase Price shall be adjusted as follows:

(a)   if the Closing Working Capital Position is less than the Preliminary Working Capital Position, the Sellers shall pay to the Buyers an amount equal to such shortfall; or

(b)   if the Closing Working Capital Position exceeds the Preliminary Working Capital Position, the Buyers shall pay to the Sellers an amount equal to such excess.

6.3.2    Payment of the amount of any adjustment to the Preliminary Purchase Price required in accordance with <u>Section 6.3.1</u> shall be made by wire transfer of immediately available funds to the account or accounts specified in writing by the Sellers or Buyers, as appropriate, no later than three (3) Business Days after the date of the determination of the Closing Working Capital Position, together with interest thereon from the Closing Date until and including the date of payment calculated at the Interest Rate.

**6.4**     **Closing Balance Sheet**

6.4.1    As soon as reasonably practicable, but not later than ninety (90) Business Days after the Closing Date, the Buyers shall deliver to the Sellers: (a) a written statement setting forth in detail those items and amounts, if any, in the Draft Closing Balance Sheet with which the Buyers disagrees with the Sellers and proposing a Closing Balance Sheet; and (b) a written statement setting forth in detail those items and amounts, if any, in the Preliminary Working Capital Position with which the Buyers disagree with the Sellers and proposing a Closing Working Capital Position; (clauses (a) and (b) are hereinafter jointly referred to as the **"Adjustment Statement"**).

6.4.2    In the event that the Buyers do not deliver an Adjustment Statement to the Sellers within the period set forth above in <u>Section 6.4.1</u>, or, if such Adjustment Statement is delivered, to the extent that the statement does not include any disagreement on items and amounts, the Buyers shall be deemed to have accepted the Draft Closing Balance Sheet as the Closing Balance Sheet and the Preliminary Working Capital Position as the Closing Working Capital Position.

6.4.3    Following delivery of any Adjustment Statement, the Parties shall work in good faith to resolve any disagreements. Any objections that are not resolved on a mutually agreeable basis within thirty (30) Business Days shall be resolved in the following manner:

(a)   upon a written request by either Sellers or Buyers, the disagreement shall be submitted to Mediation in accordance with <u>Section 23.2</u>;

(b) if, and to the extent that, any such disagreement has not been settled pursuant to the Mediation within sixty (60) days of appointment of the mediator, the resolution of such disagreement shall, on the application of the Sellers or Buyers, be referred for expert determination to the Dispute Resolution Auditor. The Dispute Resolution Auditor shall be instructed to make its decision and deliver the same to the Parties in a written report within sixty (60) Business Days of its appointment; and

(c) the Dispute Resolution Auditor shall determine its own procedure but shall consider only those amounts and items on which the Parties have disagreed and the decision of the Dispute Resolution Auditor shall in no event go beyond the Closing Working Capital Position proposed by the Sellers and the Buyers, respectively.

6.4.4    The decision of the Dispute Resolution Auditor shall be final and binding upon the Parties save in the event of manifest error (in which case the matter shall be remitted to the Dispute Resolution Auditor for correction). All costs accrued in connection hereto shall be paid by the Parties in inverse proportion as they may prevail on matters resolved by the Dispute Resolution Auditor, which inverse proportionate allocations shall also be determined by the Dispute Resolution Auditor at the time the determination of the Dispute Resolution Auditor is rendered on the merits of the matters submitted.

6.4.5    The Dispute Resolution Auditor shall be engaged jointly by the Sellers and the Buyers on the terms set out in this Section 6 and otherwise on terms to be agreed by the Parties within thirty (30) Business Days of referral to the Dispute Resolution Auditor. If the Parties cannot agree on the terms for the engagement of the Dispute Resolution Auditor within such time or if the Dispute Resolution Auditor should notify either Party that the Dispute Resolution Auditor is unable or unwilling to act in any matter referred to it under this Agreement, the Sellers and the Buyers shall agree on a reputable firm of accountants within five (5) Business Days of such failure or notice. If the Sellers and the Buyers cannot agree on the firm of accountants within such time, the firm of accountants is to be nominated by or on behalf of the chairman of the International Chamber of Commerce. The firm of accountants appointed pursuant to this Section 6.4.5 shall constitute the Dispute Resolution Auditor for the purposes of this Section 6.4.

6.5    **Earn-Out**

6.5.1    AFP shall, subject to the terms and conditions set forth herein, have a right to additional consideration related to the future performance of the Business (the "**Earn-Out**").

6.5.2    The Parties agree that the Earn-Out EBIT for the year ended December 31, 2012 was $31,727,356.11 as calculated in accordance with the principles set out on Schedule 6.5.2.

6.5.3    The Earn-Out shall be calculated on the performance of the Business during the two (2) following financial years from the Closing, and the amount of the Earn-Out for

A16931565

each respective financial year shall be determined and paid in accordance with the terms and conditions set forth herein and subject to Section 6.5.8.

6.5.4    From the Closing through December 31, 2015 (the "**Earn-Out Period**"), Buyers will operate the Business in a prudent manner and will (i) not take or omit to take any action for the sole purposes of reducing or minimizing Earn-Out EBIT or the amount of any Earn-Out, and (ii) solely for purposes of measuring Earn-Out EBIT, maintain books and records of the Business as a separate business unit for the duration of the Earn-Out Period.

6.5.5    For purposes of calculation of Earn-Out EBIT, the following adjustments will be made:

(a)    To the extent Buyers make any capital commitments or incur any debt other than in the ordinary course of business, consistent with past practices, Earn-Out EBIT shall be adjusted to remove the effects of any such non-ordinary course capital commitments or debt;

(b)    Earn-Out EBIT shall be adjusted to remove the effects of those items set out on Schedule 6.5.5;

(c)    Earn-Out EBIT shall not be adjusted to remove the effects of those items set out on Schedule 6.5.5;

(d)    Earn-Out EBIT shall not be adjusted solely due to any internal reorganization of the Business;

(e)    Edward L. Gibbs shall be retained by the Buyers as a business consultant for the duration of the Earn-Out Period; and

(f)    In the event of sale of the Business by the Buyers or change of control in the ownership of the Buyers during the Earn-Out Period, the entire unpaid Earn-Out will be accelerated and deemed due and payable in full.

6.5.6    Earn-Out for the financial year ending December 31, 2014:

(a)    if, as at December 31, 2014 for the financial year then ended, (i) the Earn-Out EBIT is greater than or equal to forty million dollars ($40,000,000), and (ii) the Earn-Out EBIT as a percentage of Adjusted Sales is twenty percent (20%) or greater, AFP shall be entitled to the 2014 Earn-Out Amount; and

(b)    if both thresholds set out above in clause (a) have not been achieved, AFP shall not be entitled to the 2014 Earn-Out Amount.

6.5.7    Earn-Out for the financial year ending December 31, 2015:

(a)    if, as at December 31, 2015 for the financial year then ended, (i) the Earn-Out EBIT is greater than or equal to forty-two million five hundred thousand dollars ($42,500,000), and (ii) the Earn-Out EBIT as a percentage of Adjusted Sales is twenty percent (20%) or greater, AFP shall be entitled to the 2015 Earn-Out Amount; and

(b) if both thresholds set out above in clause (a) have not been achieved, AFP shall not be entitled to the 2015 Earn-Out Amount.

6.5.8    In the event that the Sellers are required to indemnify the Buyers pursuant to Section 13.1.1(a), the 2014 Earn-Out Amount or 2015 Earn-Out Amount shall be reduced that year by the amount of such claim as follows:

(a) in the event that a claim for indemnification has been made and no amounts have been paid with respect to the 2014 Earn-Out Amount or the 2015 Earn-Out Amount, the 2014 Earn-Out Amount shall be reduced by the amount of such claim and, if the amount of the claim is greater than the maximum amount of the 2014 Earn-Out Amount (as reduced for prior claims pursuant to this Section 6.5.8), the 2015 Earn-Out Amount shall also be reduced by the amount of the difference between the claim and the 2014 Earn-Out Amount; and

(b) in the event that a claim for indemnification has been made after payment in respect of the 2014 Earn-Out Amount, the 2015 Earn-Out Amount shall be reduced by the amount of such claim.

6.5.9    The amount of the Earn-Out for each relevant financial year shall be determined by the Buyers in accordance with the terms and conditions as set forth herein and in accordance with the principles set out on Schedule 6.5.5 by March 31 following each relevant financial year. The Sellers and the Buyers shall agree on the amount of the Earn-Out based on the proposal of the Buyers by April 15 following the financial year to which such Earn-Out pertains. If such agreement is not reached by April 15, the Buyers or the Sellers shall be entitled to refer the matter concerning the calculation of the Earn-Out to Mediation in accordance with Section 23.2. If, and to the extent that, such matter has not been settled pursuant to the Mediation within sixty (60) days of appointment of the mediator, the resolution of such matter shall on the application of the Buyers or the Sellers to be determined by the Dispute Resolution Auditor. All costs accrued in connection hereto shall be paid by the Parties in inverse proportion as they may prevail on matters resolved by the Dispute Resolution Auditor, which inverse proportionate allocations shall also be determined by the Dispute Resolution Auditor at the time the determination of the Dispute Resolution Auditor is rendered on the merits of the matters submitted. Any portion of the Earn-Out earned but not paid by April 15 of the year following the financial year to which such Earn-Out payment pertains shall accrue interest at the Interest Rate thereon from such April 15 until and including the date of payment.

6.5.10    The Buyers shall pay the Earn-Out, if any, to AFP in cash.

6.5.11    The payment of the Earn-Out shall be made within three (3) weeks from the date on which the Earn-Out was finally determined, by wire transfer of immediately-available funds to the account or accounts specified in writing by the AFP; provided, however, that to the extent any indemnification claims are pending pursuant to Section 13, any amounts paid shall be reduced by the amount of such pending claims until final disposition thereof in accordance with Section 13 and provision therefor in accordance with Section 6.5.8.

6.5.12    During the Earn-Out Period, the Buyers shall provide Gibbs with updates on a quarterly basis regarding the performance of the Business with respect to Earn-Out EBIT and Adjusted Sales, such updates to be derived from the books and records of the Business maintained in the ordinary course of business, and shall provide to Gibbs such other information with respect to the performance of the Business with respect to Earn-Out EBIT and Adjusted Sales as Gibbs may reasonably request, provided that such information is maintained in the ordinary course of business and provided, further, that responding to such requests does not interfere with or hinder the operation of the Business. Further, Gibbs shall have the right to consult with Mark Meek, Nancy Brandwein, Barry Willingham and Dennis Patrick, each in his or her capacity as President, Executive Vice President of Administration, Vice President and Vice President of Manufacturing, respectively, of AFP, and with any of their respective successors in such positions, with respect to the performance of the Business with respect to Earn-Out EBIT and Adjusted Sales from time to time during the Earn-Out Period, and, for the term of the Earn-Out Period, each such individual shall not be in breach of, and Buyer hereby waives, any applicable confidentiality obligation such individual may have to the Buyer or any of its Affiliated Persons solely by virtue of, and solely to the extent related to, so consulting with Gibbs.

6.6      **Escrow Thresholds**

6.6.1    Contemporaneously with the execution of this Agreement, the Sellers have furnished to the Buyers a good faith estimate of (a) Adjusted Sales and (b) 2013 EBIT, each for the period from January 1, 2013 through and including the Signing Date.

6.6.2    As soon as reasonably practicable following the Signing Date, but in no event later than eight (8) days following the Signing Date, the Sellers shall furnish to the Buyers a calculation of (a) Adjusted Sales and (b) 2013 EBIT, each for the period from January 1, 2013 through and including the Signing Date (the **"Sellers' Calculation of 2013 Adjusted Sales and 2013 EBIT Statement"**), prepared in reasonable detail in accordance with the adjustments set out on <u>Schedule 6.5.5</u>, together with a statement certifying as to the accuracy and completeness thereof.

6.6.3    As soon as reasonably practicable, but not later than fifteen (15) Business Days after receipt of the Sellers' Calculation of 2013 Adjusted Sales and 2013 EBIT Statement, the Buyers shall deliver to the Sellers a written statement setting forth in detail those items and amounts, if any, in the Sellers' Calculation of 2013 Adjusted Sales and 2013 EBIT Statement with which the Buyers disagree.

6.6.4    In the event that the Buyers do not deliver a statement to the Sellers pursuant to <u>Section 6.6.3</u> within the period set forth therein, the Buyers shall be deemed to have accepted the amounts set forth in the Sellers' Calculation of 2013 Adjusted Sales and 2013 EBIT Statement for purposes of determining whether the Escrow Thresholds have been satisfied.

A16931565

6.6.5    Following delivery of any statement pursuant to <u>Section 6.6.2</u>, the Parties shall work in good faith to resolve any disagreements. Any objections that are not resolved on a mutually agreeable basis within thirty (30) Business Days shall be submitted to Mediation in accordance with <u>Section 23.2</u>. If, and to the extent that, any such disagreement has not been settled pursuant to the Mediation within sixty (60) days of appointment of the mediator, the resolution of such disagreement shall, on the application of the Sellers or the Buyers, be resolved by the Dispute Resolution Auditor in accordance with the procedures set out in <u>Sections 6.4.3</u>, <u>6.4.4</u> and <u>6.4.5</u>.

6.6.6    The (a) Adjusted Sales and (b) Earn-Out EBIT, each for the period from January 1, 2013, as determined pursuant to this <u>Section 6.6</u>, shall be final and binding upon the Parties for purposes of determining whether the Escrow Thresholds have been satisfied.

6.6.7    If all conditions to the Closing set forth in <u>Section 7</u> have been satisfied, or, if permissible, waived, and (a) Adjusted Sales and (b) Earn-Out EBIT, each for the period from January 1, 2013 through and including the Signing Date, have not been finally determined pursuant to this <u>Section 6.6</u>, then the Parties shall proceed to the Closing and the Escrow Amount shall be funded in accordance with <u>Section 6.2.2</u>. If it is subsequently determined that the Escrow Thresholds have been satisfied, the Escrow Amount shall be released to the Sellers in accordance with the terms of the Escrow Agreement.

6.7    **Imputed Interest**

The Parties shall treat a portion of any payment made by the Buyers to the Sellers with respect to the adjustment to the Preliminary Purchase Price under <u>Section 6.3</u>, the Earn-Out under <u>Section 6.5</u> or indemnification under <u>Section 13.2</u> of this Agreement as imputed interest to the extent required pursuant to Section 483 or Section 1274 of the Code.

6.8    **Withholding**

The Buyers shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as the Buyers are required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or foreign Tax law or pursuant to any laws to which the Buyers agree to be subject. Notwithstanding any other provision of this Agreement, to the extent that amounts are so withheld by the Buyers, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made by the Buyers.

**7**    **Conditions Precedent**

**7.1**    **General Conditions**

The agreement to sell and purchase the Assets set out in Section 3.1, the obligation of the Buyers to assume the Assumed Liabilities set out in Section 4.1 and the respective obligations of the Buyers and the Sellers to complete the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

**7.1.1**    **Competition Approvals** The receipt of all unconditional clearances and approvals of the transaction by the Competition Authorities shall have been received and the expiration of any applicable waiting period and any extensions thereof shall have expired or been terminated;

**7.1.2**    **Governmental Approvals, Consents and Estoppel Certificates** The receipt by the Buyers of the (i) Governmental Approvals set out on Schedule 7.1.2, (ii) consents under the Assigned Contracts set out on Schedule 7.1.2, (iii) consents from (a) the lessor of each of the Leased Premises listed on Schedule 11.1.9(k) to the assignment of each such Lease Agreement to the Buyers and (b) the lessor of each lease listed on Schedule 11.1.9(k) to the mortgaging of the tenant's interest under such lease to the Buyers' lenders, and (iv) the Estoppel Certificates, dated within thirty (30) days of the Closing Date in form and substance reasonably satisfactory to the Buyers; and

**7.1.3**    **No Injunction** The consummation of the transactions contemplated hereby shall not have been enjoined or prohibited by applicable law and no proceeding by or before any Governmental Authority challenging such transactions shall have been initiated or threatened.

**7.2**    **Conditions Precedent to the Buyers' Obligations**

The agreement to sell and purchase the Assets set out in Section 3.1, the obligation of the Buyers to assume the Assumed Liabilities set out in Section 4.1 and the obligations of the Buyers to complete the transactions contemplated by this Agreement shall be subject to the satisfaction or the waiver by the Buyers on or prior to the Closing Date of the following conditions precedent:

**7.2.1**    **Employment and Consulting Agreements** No Key Employee shall be in breach or violation of any of his or her existing terms and conditions of employment or consulting agreement. Each Key Employee shall have remained in the continuous employ or party to a consulting agreement of the Business throughout the period from the date hereof until the Closing and not be under any notice of termination of employment;

**7.2.2**    **Sellers' Representations and Warranties** Sellers' representations and warranties being true and correct in all material respects as at the Closing Date with the same effect as though made on such date (except for such representations and warranties that are made as of a specific date, which shall speak only of such date);

7.2.3 **Covenants** The Sellers having performed or complied in all material respects with all agreements and conditions required by this Agreement to be performed by it on or prior to the Closing Date;

7.2.4 **Certificate** Each Seller shall have delivered to the Buyers a certificate, dated the Closing Date and signed by it or its duly authorized officer, as appropriate, to the effect that the conditions set forth in this Section 7.2.4 and Section 7.2.5 have been satisfied;

7.2.5 **Material Adverse Effect** No event, development or state of circumstances having occurred, or being threatened to occur, in respect of the Business that, individually or in the aggregate, in the reasonable opinion of the Buyers, has resulted in, or may result in, a Material Adverse Effect;

7.2.6 **Title Policies** The Buyers shall have received from the Title Company: (i) with respect to each parcel of Real Property listed on Schedule 3.1.1: (A) an ALTA owner's policy of title insurance insuring the Buyers' fee ownership interest in such Real Property; and (ii) with respect to each of the Leased Premises listed on Schedule 11.1.9(k) (as determined by the Buyers prior to Closing), an ALTA owner's policy of title insurance with the appropriate leasehold interest endorsement insuring the Buyers' leasehold interest in such Leased Premises, in form and substance reasonably satisfactory to the Buyers (each, a **"Title Policy"** and, collectively, **"Title Policies"**);

7.2.7 **FIRPTA Certificates** The Buyers shall have received a certification from each Seller (other than AFP Canada) that meets the requirements of U.S. Treasury Regulations section 1.1445-2(b) and properly certifies that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

7.2.8 **Corporate Proceedings** All corporate or other proceedings of the Sellers in connection with the transactions contemplated by this Agreement shall be reasonably satisfactory to the Buyers, and the Buyers shall have received copies of all documents and instruments incident thereto as may be reasonably requested; and

7.2.9 **Escrow Agreement** If the Escrow Thresholds have not been met or it has not been finally determined as of the Closing whether they have been met pursuant to Section 6.6, the applicable Sellers shall have entered into the Escrow Agreement.

7.3 **Conditions Precedent to the Sellers' Obligations**

The agreement to sell and purchase the Assets set out in Section 3.1 and the obligations of the Sellers to complete the transactions contemplated by this Agreement shall be subject to the satisfaction or the waiver by the Sellers on or prior to the Closing Date of the following conditions precedent:

7.3.1 **Buyers' Representations and Warranties** The Buyers' representations and warranties being true and correct in all material respects as at the Closing Date with the same effect as though made on such date (except for such representations and warranties that are made as of a specific date, which shall speak only of such date);

---

A16931565

7.3.2    **Covenants** The Buyers having performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed or complied with by them on or prior to the Closing Date;

7.3.3    **Certificate** Each Buyer shall have delivered to the Sellers a certificate, dated the Closing Date and signed by it or its duly authorized officer, as appropriate, to the effect that the conditions set forth in <u>Sections 7.3.1</u> and <u>7.3.2</u> have been satisfied; and

7.3.4    **Corporate Proceedings** All corporate or other proceedings of the Sellers in connection with the transactions contemplated by this Agreement shall be reasonably satisfactory to the Buyers, and the Buyers shall have received copies of all documents and instruments incident thereto as may be reasonably requested.

7.4    **Termination**

7.4.1    This Agreement may be terminated at any time prior to the Closing:

(a) by the written agreement of the Buyers and Gibbs;

(b) by any Party by written notice to the other Parties if the transactions contemplated hereby shall not have been consummated pursuant hereto by 11:59 p.m. Tulsa, Oklahoma time on December 31, 2013, unless such date shall be extended by the mutual written consent of the Sellers and the Buyers, and unless the failure to consummate the transactions contemplated hereby shall by such date (as it may be extended in accordance with this clause (b)) shall be due to the failure of the terminating party to perform or comply with any of the agreements, covenants or conditions hereof to be performed or complied with by such party prior to the Closing, provided that any Party shall have the right, in its sole discretion, to extend such date for an additional three (3) months if the only condition set forth in this Agreement that has not been satisfied is the condition set forth in <u>Section 7.1.1</u> and the reason for the non-satisfaction of such condition is, in whole or in part, a "government shutdown" arising from a failure by Congress to enact appropriations;

(c) by either the Sellers or the Buyers by written notice to the other Parties if any Governmental Authority shall have issued an Order (which Order the Parties shall use their commercially reasonable efforts to lift), in each case permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Order shall have become final and non-appealable; or

(d) by either the Sellers or the Buyers by written notice to the other Parties if any event, fact or condition shall occur or exist that shall have made it impossible to satisfy a condition precedent to the terminating party's obligations to consummate the transactions contemplated by this Agreement, unless the occurrence or existence of such event, fact or condition shall be due to the failure of the terminating party to perform or comply with any of the

agreements, covenants or conditions hereof to be performed or complied with by such party prior to the Closing.

7.4.2    In the event of the termination of this Agreement pursuant to the provisions of Section 7.4.1, this Agreement shall become void and have no effect, without any liability to any Person in respect hereof or of the transactions contemplated hereby on the part of any party hereto, or any of its Affiliated Persons, except as specified in the Surviving Sections and except for any liability resulting from such party's fraud, gross negligence or breach of this Agreement.

7.4.3    In the event this Agreement is terminated after October 31, 2013 by the Sellers pursuant to Section 7.4.1(b) or Section 7.4.1(d), the Buyers shall indemnify and hold harmless the Sellers against the incremental costs they may incur in connection with the purchase of steel inventory by virtue of the fact that such inventory was not purchased prior to October 31, 2013.

**8    Closing**

8.1    Subject to Section 7, the Closing shall take place at the offices of AFP, 1555 N. Mingo Road, Tulsa, Oklahoma, at 9:00 a.m. local time on the Closing Date.

8.1.1    On Closing:

(a)    the Sellers shall deliver to the Buyers:

(i)    at the registered address of the Business, such of the Assets as are capable of being transferred by delivery;

(ii)    such documents as are required by the Buyers to complete the sale and purchase of the Assets and vest title to the Assets in the Buyers, including:

(I)    the Trademark Assignment, Patent Assignment, Domain Name Assignments and Intellectual Property Assignment in each case duly executed by each applicable Seller;

(II)    all prosecution files and other documents relating to the validity of the Owned Intellectual Property (including in relation to the unregistered trademarks "Nemesis" and "Whiplash" and any other material unregistered Intellectual Property);

(III)    evidence satisfactory to the Buyers that the Sellers have done all things necessary to transfer all domain names comprised in the Owned Intellectual Property into the Buyers' name;

(IV)    Full Warranty Deeds and all other transfer documentation, transfer tax returns, customary affidavits and indemnifications from the Sellers for each parcel of the Real Property required by the Buyers and the Title Company for the conveyance of each parcel of the Real Property and the issuance of the Title Policies with respect thereto; and

(V)    assignments of the Assigned Contracts (for the avoidance of doubt, including the Lease Agreements), together with such consents and Estoppel Certificates as the Sellers may have obtained;

(iii)   possession of the Real Property and the Leased Premises;

(iv)   access to all books of account, payroll records, income records, inventory and other records relating to the Business, it being understood that, in the event the Sellers are required by law to retain such records, the Sellers shall provide copies thereof to the Buyers;

(v)   access to all information relating to customers and suppliers (including a list of all the customers of the Business during the last two (2) years);

(vi)   a list of potential customers to which outstanding quotations have been given as at the Closing Date;

(vii)  a list of unfulfilled orders as at the Closing Date;

(viii) access to relevant computer programs and other books and documents which relate to the Business (other than minute books relating to board and shareholders' meetings and statutory books);

(ix)   access to details of all Know-how, including all designs and drawings, formulas, test results, reports, project reports and testing and manufacturing procedures, instructions and training manuals, tables of operating conditions, market forecasts, plans, instructional and promotional material, sales publications, advertising materials, terms and conditions of sale and other technical material and sales matters which relate to the Business, together with any plates, blocks, negatives and similar material relating to the aforementioned documents/objects;

(x)   evidence that the Assets have been fully and finally released from floating charges or other Encumbrances;

(xi)   evidence satisfactory to the Buyers that each of the agreements set out on <u>Schedule 12.1.1(a)(vi)</u> have been terminated;

(xii)  evidence that all Governmental Approvals, Environmental Permits, licenses, consents, permits and authorizations necessary or required for

the Business have been transferred to the Buyers or terminated or otherwise provided for, in the sole discretion of the Buyers;

(xiii) evidence of the termination of the agreements and commitments required by Section 12.1.1(a)(vi);

(xiv) evidence, in form and substance reasonably satisfactory to the Buyers, that the Sellers have changed their names in accordance with Section 12.1.7;

(xv) access to a list of sales distributors, identifying sales by units and the territory served during the last twelve (12) months, and copies of all the current agreements with the distributors;

(xvi) the U.S. Assumption Agreement duly executed by the Sellers;

(xvii) the Canadian Assumption Agreement duly executed by the Sellers;

(xviii) the U.S. Bill of Sale, in form and substance reasonably satisfactory to the U.S. Buyer, with respect to the Assets, excluding the Assets of AFP Canada;

(xix) the Canadian Bill of Sale, in form and substance reasonably satisfactory to the Canadian Buyer, with respect to the Assets of AFP Canada;

(xx) if the Escrow Thresholds have not been met or it has not been finally determined as of the Closing whether they have been met pursuant to Section 6.6, the Escrow Agreement duly executed by the Sellers; and

(xxi) valid IRS Forms W-9 completed by each Seller (other than AFP Canada) and a valid IRS Form W-8BEN completed by AFP Canada;

and shall permit the Buyers to enter into and take possession of the Business; and

(b) (i) the U.S. Buyer shall, against performance by the Sellers of the requirements in Section 8.1.1(a), pay the Preliminary Purchase Price as set out in Section 6.2 and deliver the duly executed U.S. Assumption Agreement and, if the Escrow Thresholds have not been met or it has not been finally determined as of the Closing whether they have been met pursuant to Section 6.6, the Escrow Agreement, and (ii) the Canadian Buyer shall, against performance by the Sellers of the requirements in Section 8.1.1(a), pay the Canadian Purchase Price to AFP Canada and deliver the duly executed Canadian Assumption Agreement.

8.2     The Buyers may in its absolute discretion waive any requirement contained in Section 8.1.1(a).

**9      Employees**

9.1     The Sellers shall terminate, effective upon the Closing, the employment of all Employees and the Sellers shall have paid all compensation and other money due to

and shall have satisfied any and all liabilities that may exist in connection with the Employees, other than any accrued but unpaid wages since the date of the last weekly pay period and accrued vacation assumed by the Buyers. Effective as of the Closing Date, the Buyers shall offer employment to the Employees under the terms and conditions that are substantially similar, in the aggregate, to either (i) those provided to the similarly situated employees of the Buyers, or (ii) those provided to the Employees as of the date of this Agreement (to the extent disclosed on <u>Schedule 11.1.14</u>). Those employees who accept such offers of employment effective as of the Closing Date shall be referred to herein as the **"Transferred Employees."** Effective as of the Closing Date, the Buyers shall assume the liability of the Sellers in respect of the Transferred Employees for accrued but unpaid wages (but only for the period since the last weekly pay period and in an amount not to exceed one full weekly pay period) and accrued vacation; provided that such accrued vacation is reflected on the Closing Balance Sheet or relates to services rendered and arising after the Closing Balance Sheet Date in the ordinary course of business. The Sellers shall provide to the Buyers, prior to the Closing Date, information requested by the Buyers to determine wages and accrued vacation due to the Transferred Employees but unpaid as of the Closing Date.

9.2    The Sellers shall remain responsible for payment of any and all severance, retention, change in control or other similar compensation or benefits, including any payroll, excise, withholding or other employer taxes in respect thereof, that are or may become payable in connection with the consummation of the transactions contemplated by this Agreement, including such payments with respect to the Transferred Employees or to employees related to the Business who do not become Transferred Employees.

9.3    The Sellers shall remain responsible for any and all liabilities to or in respect of the Employees who do not accept to transfer to the Buyers and the Buyers shall not assume any responsibility or cost whatsoever in respect of such employees.

9.4    If the contract of employment between a Seller and any person other than the Employees listed on <u>Schedule 11.1.14(a)(i)</u> transfers, or is alleged to have transferred, to the Buyers as a result of this Agreement, the Sellers shall indemnify and hold the Buyers harmless from all Losses arising out of such transfer or alleged transfer.

9.5    The Sellers shall provide to the Buyers evidence reasonably satisfactory to the Buyers, immediately prior to Closing, that resolutions to terminate the Ameristar Fence Products, Inc. Profit Sharing Plan and any other Seller Benefit Plan qualified under Section 401(a) of the Code, shall have been adopted by the board of directors of AFP immediately prior to the Closing, and the Sellers and the Buyers agree to cooperate to implement such termination(s) promptly following the Closing.

9.6    Neither the Buyers nor any of its Affiliated Persons shall have any liability for benefits with respect to any employees of any Seller or Seller Benefit Plan or any claim thereof or related thereto. From and after the Closing, the Sellers shall, jointly

and severally, remain solely responsible for any and all benefit liabilities, including those relating to or arising from section 4980B of the Code and the Health Insurance Portability and Accountability Act of 1996, as amended, in respect of such employees, including the Transferred Employees and their beneficiaries and dependents, relating to or arising in connection with or as a result of (i) the employment or the actual or constructive termination of employment of any such employee by any Seller (including in connection with the consummation of the transactions contemplated by this Agreement), (ii) the participation in or accrual of benefits or compensation under, or the failure to participate in or to accrue compensation or benefits under, any Seller Benefit Plan or other employee or retiree benefit or compensation plan, program, practice, policy, agreement or arrangement of any Seller, or (iii) accrued but unpaid salaries, wages, bonuses, incentive compensation, vacation or sick pay or other compensation or payroll items (including deferred compensation), except, in any such case, to the extent any such benefit liability is specifically assumed by the Buyers pursuant to this Section 9.

9.7    The Sellers shall be responsible for notices or payments due to any employees of the Business, and all applications, notices, payments, fines or assessments due to any Governmental Authority, pursuant to any applicable law, with respect to the employment, discharge or layoff of any employees by any Seller prior to or at the Closing, including the Worker Adjustment and Retraining Notification Act ("**WARN Act**") or any comparable law as has been issued in connection with: (i) a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of the Sellers; (ii) a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility of the Sellers; or (iii) any action similar to clause (i) or (ii) under any applicable foreign, state or local law requiring notice to employees in the event of a plant closing or layoff. Buyers shall be responsible for all such notices, payments, fines and assessments arising from facts and circumstances that occur after the Closing.

9.8    Each Transferred Employee will be subject to the applicable requirements under the Buyers' standard hiring policies and procedures, including the procedure for attesting to the continued validity of his or her Employment Eligibility Verification form (Form I-9), and in the event that one or more Transferred Employees fails to satisfy these policies and procedures, the Buyers may decline to hire such employee or may terminate such employee without the payment of severance. The withdrawal by the Buyers of an offer of employment to a Transferred Employee who fails to satisfy the foregoing contingency shall not constitute a breach of this Agreement.

9.9    From and after the Closing Date: (a) the Sellers shall remain solely responsible for (i) any and all liabilities to or in respect of any employee of any Seller who is not a Transferred Employee relating to or arising in connection with any and all claims for workers' compensation benefits arising in connection with any occupational injury or disease occurring or existing on, prior to or after the Closing Date, and (ii) any and all liabilities to or in respect of any Transferred Employee relating to or

arising in connection with any and all claims for workers' compensation benefits arising in connection with any occupational injury or disease occurring or existing on or prior to the Closing Date; and (b) the Buyers shall be solely responsible for any and all liabilities to or in respect of any Transferred Employee relating to or arising in connection with any occupational injury or disease occurring or arising after the Closing Date.

9.10    The Sellers and the Buyers shall (i) treat each Buyer as a "successor employer" and each Seller, as applicable, as a "predecessor," within the meaning of sections 3121(a)(1) and 3306(b)(1) of the Code, with respect to Transferred Employees who are employed by the Buyers for purposes of taxes imposed under the United States Federal Unemployment Tax Act or the United States Federal Insurance Contributions Act, and (ii) cooperate with each other to avoid, to the extent possible, the filing of more than one IRS Form W2 with respect to each such Transferred Employee for the calendar year within which the Closing Date occurs; provided that such treatment is permissible under Rev. Proc. 2004-53.

9.11    The provisions of this <u>Section 9</u> are solely for the benefit of the Parties to this Agreement, and no employee or former employee or any other individual associated therewith shall be regarded for any purpose as a third party beneficiary of this Agreement. For the avoidance of doubt, nothing herein, whether express or implied, shall confer upon any person (including any Employee, even if such Employee is also a Seller), any right to employment or recall, any right to compensation or benefits, or any other right of any kind or nature whatsoever and nothing herein shall be construed to limit the right of the Buyers to terminate or decline to hire an Employee with or without cause or to amend or terminate any benefit plan or other compensation or benefit plan or arrangement following the Closing.

9.12    The Sellers shall give the Buyers reasonable advance opportunity to review and provide input on any communications with Transferred Employees regarding the impact of the transactions contemplated by this Agreement, including the Transferred Employees' compensation and benefits. In that regard, the Sellers shall ensure that copies of all written communications and/or slides for presentations, if applicable, are provided to the Buyers as soon as practicable in advance of the date of the intended communication.

9.13    Prior to the Closing Date, the Sellers shall afford the Buyers reasonable access to the Key Employees for the purpose of discussing and documenting the terms and conditions upon which each such employee may continue his employment with the Business following the Closing Date.

9.14    Prior to the Closing Date, the Buyers may elect to assume any Seller Benefit Plan (any such Seller Benefit Plan, together with any relevant administrative, service or other ancillary agreements and insurance contracts, an **"Assumed Seller Benefit Plan"**).

---

**10      Insurance**

10.1    Each Seller undertakes to the Buyers that it will notify the interest of the Buyers to the relevant insurers and keep in force, and not seek to change any rights or obligations under, its existing insurance policies, listed on <u>Schedule 10</u>, in respect of the Business, Employees, officers, directors or the Assets for a period of sixty (60) days from the Closing Date, provided that the Sellers shall not cancel with retrospective effect any "occurrence-based" insurance policy under which the Business, any Asset or any Assumed Liability continues to be insured.

10.2    The Sellers shall use commercially reasonable efforts after the Closing Date to recover and assign, to the extent assignable, to the Buyers all monies due from insurers in respect of any claim which has been made under any insurance policy before the Closing Date by or on behalf of the Sellers or any of their Affiliated Persons related to the Business and shall, except to the extent that the Losses in respect of which the claim is made have been made good prior to Closing or are reflected in the Closing Balance Sheet or are the subject of an indemnity by the Sellers to the Buyers under this Agreement, pay any monies received in respect of such claim to the Buyers as soon as practicable after receipt by the Sellers. Upon the request of the Buyers, the Sellers shall purchase or cause to be purchased, at the Buyers' expense, an extended reporting period with respect to such insurance.

10.3    With respect to any event, act or omission relating to the Business that occurred or existed prior to the Closing Date that is covered by an "occurrence-based" insurance policy, the Sellers shall, at the direction of the Buyers, make all necessary notifications and claims under the relevant insurance policy and the Buyers shall be entitled to be paid promptly any proceeds actually received under the insurance policy, provided that such proceeds relate to a claim made in respect of Losses for which the Buyers have not already been reimbursed, indemnified or otherwise compensated for under this Agreement.

10.4    Prior to the Closing, the Sellers shall obtain at the Sellers' cost a "tail" policy for any policies for which coverage is provided on a claims-made basis, including directors' and officers' liability, fiduciary liability, employment practices and employee benefits liability insurance, in each case, in an aggregate coverage amount not less than the coverage amounts maintained by the Sellers as of the Signing Date. To the extent that any such "tail" policy is not fully paid prior to the Closing, any unpaid premia shall constitute Seller Expenses.

**11      Representations and Warranties**

**11.1    Representations and Warranties of the Sellers**

As of the Signing Date and as of the Closing Date, each Seller jointly and severally represents and warrants to the Buyers as follows:

11.1.1  Corporate Existence, Power and Insolvency

---

A16931565

(a) Each Seller is duly incorporated and validly existing under the laws of the jurisdiction of its formation or incorporation to the extent applicable, and each Seller has the legal right, requisite power and authority to enter into and perform its duties and obligations under this Agreement and in any certificate or other document furnished or to be furnished under this Agreement and to consummate the transactions contemplated hereby. The Sellers have full power and authority and all necessary licenses, permits and authorizations to carry on the Business as now conducted and to own, lease and operate the assets and Properties necessary in connection therewith, including the Assets.

(b) The Sellers are duly qualified or licensed to do business and in good standing in each of the jurisdictions specified on <u>Schedule 11.1.1(b)</u>. In addition, the Sellers have contacts and make tax filings in other states as set out on <u>Schedule 11.1.1(b)</u> but the Sellers make no representation as to the necessity of qualifying to do business or licensing in any jurisdiction other than the states in which they have qualified.

(c) The Sellers have delivered to the Buyers complete and correct copies of the certificate of incorporation and by-laws, or other organizational documents of each Seller that is not a natural person, in each case, as amended and in effect on the Signing Date. None of the Sellers is in violation of any of the provisions of its certificate of incorporation by-laws, or other organizational documents.

(d) No Seller has filed, nor has had filed against it, any petition for its winding-up, bankruptcy or other insolvency proceedings, nor is insolvent within the meaning of applicable laws, rules or regulations or similar requirements, nor is unable to pay its debts as they fall due, nor has been held in default by any creditors and has not made any assignment in favor of its creditors, nor has any petition for receivership or any administration order been presented in respect of any Seller. No Seller has initiated any proceedings with respect to a compromise or arrangement with its creditors or for the dissolution, liquidation or reorganization of any Seller or the winding-up or cessation of the Business. No receiver or administrative receiver or liquidator has been appointed in respect of any Seller or any of its material assets. No steps have been taken to enforce any security over any assets of the Sellers and no events have occurred which, under applicable laws, would reasonably be expected to justify any actions or proceedings referred to in this <u>Section 11.1.1(d)</u>.

(e) No former stockholder of any Seller has any rights to the assets of such Seller or any consideration to be paid to such Seller pursuant to the terms of this Agreement.

11.1.2   Corporate Authorization and Non-Contravention

(a) This Agreement and any certificate or other document furnished or to be furnished under this Agreement and the performance by any Seller of its obligations under them have been duly authorized by all necessary actions on the part of each Seller, and this Agreement and any other document or

instrument executed in connection with this Agreement will, when executed, constitute valid and binding obligations of the Sellers in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting the enforcement of creditors' rights in general and by general principles of equity (regardless of whether enforcement is sought in equity or at law).

(b) The execution and delivery of and the performance by each Seller of its obligations under this Agreement and any other document or instrument in connection with it and the consummation of the transaction provided for in this Agreement do not and will not result in a breach of any provision of the certificate of incorporation and by-laws or other organizational documents of any Seller; of any applicable law, order, judgment or decree of any court, governmental agency or regulatory body; or of any agreement to which any Seller is a party or by which any Seller is bound.

(c) Gibbs is the sole income beneficiary and sole trustee of the Trust.

11.1.3    Assets

(a) A Seller lawfully owns and has good and valid (and in the case of Real Property, good, valid and marketable fee simple, and in the case of the Leased Premises, good, valid and marketable leasehold) title to, or otherwise has the right to use pursuant to a valid and enforceable lease, license or similar contractual arrangement, all of the Assets, free and clear of all Encumbrances, except as set out on Schedule 11.1.3(a) and except for the Encumbrances relating to the existing financing from the Bank of Oklahoma and related liens, which shall be paid off and released, respectively, as of the Closing Date, and there exists no agreement to create any Encumbrance over any of the Assets. Title to the Real Property is subject to easements of record. The Buyers will through this Agreement acquire good and marketable title to the Assets, free of any and all Encumbrances. All Assets are, where capable of possession, in the possession or under the control of a Seller, and no Asset is the subject of any factoring arrangement, conditional sale or credit agreement.

(b) The Assets comprise all Properties and assets, tangible and intangible, utilized by the Sellers in order to carry on the Business on a stand-alone basis fully and effectively as it is presently conducted, and all Assets are in good operating condition, ordinary wear and tear excepted, have been fully maintained and serviced on a timely basis and are not dangerous, obsolete, inefficient or surplus to requirements.

(c) Except as set out on Schedule 11.1.3(c), to the Sellers' knowledge, there are no facts or conditions affecting any Assets that would reasonably be expected, individually or in the aggregate, to interfere in any material respect with the current use, occupancy or operation of such Assets. Except as set out on Schedule 11.1.3(c), only the Sellers and their direct, wholly-owned subsidiaries have conducted the Business and the Business has not been conducted through

any other divisions or any other direct or indirect subsidiary or Affiliated Person of any Seller.

11.1.4    Permits and Licenses

(a)  Except as set out on <u>Schedule 11.1.4</u>, all licenses, consents, permits (including Environmental Permits), authorizations, orders, warrants, confirmations, permissions, certificates, approvals, registrations and authorities necessary, required for the Business have been obtained by the Sellers to enable them to carry on the Business in the places and in the manner in which it is now conducted and all such licenses, consents, permits (including Environmental Permits), authorizations, orders, warrants, confirmations, permissions, certificates, approvals, registrations and authorities are valid and subsisting, in force and have been complied with in all respects, and none of them will expire or be revoked as a result of the transaction contemplated by this Agreement.

(b)  Except as set out on <u>Schedule 11.1.4</u>, no Seller has received any notice or other communication indicating that any licenses, consents, permits (including Environmental Permits), authorizations, orders, warrants, confirmations, permissions, certificates, approvals, registrations or authorities held by any Seller may be suspended, revoked, modified, expire prematurely or may not be renewed or be renewed only on conditions less favorable than current conditions. Further, there are no circumstances or facts that would reasonably be expected to result in such suspension, revocation, modification, premature expiry or non-renewal.

11.1.5    Financial Statements

Attached as <u>Schedule 11.1.5</u> are complete and correct copies of the Financial Statements. The Financial Statements fairly present in all material respects the financial condition and results of operations of the Business as of their respective dates and were prepared from the books and records maintained by the Business in the ordinary course of business.

11.1.6    Undisclosed Liabilities

The Sellers have no obligations, commitments or liabilities in respect of the Business, liquidated or non-liquidated, contingent or otherwise, whether for Taxes or otherwise, except: (a) as set out on <u>Schedule 11.1.6</u>; (b) as and to the extent disclosed or reserved against in the Financial Statements; (c) related to the future performance of any contract; and (d) those incurred after the Balance Sheet Date in the ordinary course of business.

11.1.7    Accounts Receivable

All Accounts Receivable have arisen in the ordinary course of business and all outstanding claims will be collected at full book value within ninety (90) days from the respective invoice due date. To the Sellers' knowledge, there are no facts or circumstances, other than general economic conditions, that would reasonably be

---

expected to result in any material increase in the uncollectibility of such receivables in excess of the reserves therefor reflected in the Financial Statements.

11.1.8   Accounts Payable

Schedule 11.1.8 sets out an aging schedule of accounts payable of the accounts payable of the Business as of the most current date available, which in no event is earlier than August 31, 2013, which schedule is accurate and complete in all material respects. All accounts payable set out on Schedule 11.1.8 have arisen in the ordinary course of business of the Business.

11.1.9   Leased Premises and Real Property

(a)   There are no lease, sublease, occupancy, license or management agreements for premises occupied, operated or otherwise managed or under the control of or by any Seller or any Affiliated Person of any Seller, or any guarantees or indemnification agreements of any Seller or any Affiliated Person of any Seller, related to the Business other than those set out on Schedule 11.1.9(k).

(b)   None of the Sellers has given any oral or written notice to any lessor under any of the Lease Agreements indicating that it will not be exercising any extension or renewal options under the Lease Agreements. All security deposits required under the Lease Agreements have been paid to and, to the Sellers' knowledge, are being held by the applicable landlord under the Lease Agreements and have not been applied in respect of a breach or a default under such Lease Agreement which has not been re-deposited in full. The Sellers which are parties to the Lease Agreements as tenants have non-disturbance agreements with the applicable landlord's lender for each such Leased Premises. None of the Lease Agreements or any interest in the Leased Premises has been assigned by the Sellers or an Affiliated Person of any Seller.

(c)   All Leased Premises are being leased by a Seller under valid and enforceable leases, subject only to such Encumbrances which may follow from law, and there is no subsisting breach, non-observance, default or event which after notice or lapse of time, or both, would reasonably be expected to constitute a default by any party under any lease agreement. There is no right for the landlord to terminate any lease before the expiry of the agreement term, otherwise than by breach of the lease by the lessee, and there has been no termination for vacating or renegotiation of the rent or other conditions and no rent reviews are currently under negotiation or the subject of review by any court, authority or other competent body.

(d)   No Seller currently owes, nor will it owe in the future, any brokerage commissions or finder's fees with respect to the Real Property or any of the Leased Premises.

(e)   The Sellers are the owner and the registered title owner of the Real Property, in each case of the whole Real Property, and the Sellers do not own, nor are in contract or in discussions to own, any other real property related to or used in

A16931565

39

the Business. Except for Permitted Encumbrances, the Real Property is owned free and clear from any Encumbrances.

(f) The Properties are fully maintained, in good repair and condition and is currently used by the Sellers in the Business. The Sellers are in possession of the whole of each of the Properties and no part of any of the Properties is leased to, occupied by or used by a third party and no third party is entitled to such lease, occupation or use.

(g) The Real Property has the benefit of such rights and easements as are necessary for the present use of the Real Property.

(h) Except as set out on Schedule 11.1.9(h), there are no material defects on the Real Property or circumstances reasonably likely to lead to such defects and no outstanding notices, disputes or other existing circumstances which would reasonably be expected to adversely affect the present use of the Real Property.

(i) Except as set out on Schedule 11.1.3(c), there are no orders or regulations which affect the present use and occupation of the Real Property.

(j) There are no outstanding options or rights of first refusal to purchase or lease the Real Property or any portion thereof or interest therein. There are no pending or, to the Sellers' knowledge, threatened condemnation or expropriation proceedings before any Governmental Authority with respect to any Real Property.

(k) Schedule 11.1.9(k) sets out a complete and correct list of all of the Leased Premises, including the address, landlord and tenant for each lease. The Sellers have delivered to the Buyers complete and correct copies of each lease relating to the Leased Premises. No Seller is a sublessor or grantor under any sublease or other instrument granting to another Person any right to the possession, lease, occupancy or enjoyment of the Leased Premises.

(l) The use and operation of the Real Property and the Leased Premises in the conduct of the Business do not violate in any material respect any law, consent, Encumbrance or agreement of any Governmental Authority. No material improvements constituting a part of the Real Property or the Leased Premises encroach on any real property not owned or leased by the Sellers to the extent that removal of such encroachment would reasonably be expected to materially impair the manner and extent of the current use, occupancy and operation of such improvements.

(m) To the Sellers' knowledge, there are no pending or contemplated special assessments or reassessments of any parcel included in the Real Property or any parcel included in the Leased Premises that would reasonably be expected to result in a material increase in the real property taxes or other similar charges payable by any Seller with respect to any parcel of Real Property or in the rent, additional rent or other sums and charges payable by any Seller under the leases of the Leased Premises.

(n) Each parcel included in the Real Property is assessed for real property tax purposes as a wholly-independent tax lot, separate and apart from any adjoining land or improvements not constituting a part of that parcel.

11.1.10   Assigned Contracts

(a) All Assigned Contracts are valid and binding and in full force and effect and the text of the agreements accurately reflects the complete contents of such agreements.

(b) No Seller has received any notice that any Seller is in default under a provision of any Assigned Contract, and no Seller has received or given notice of termination of, or of intention to terminate, and there are no grounds for rescinding, rendering void or adjusting, any Assigned Contract.

(c) No Seller is:

(i)   in default under any provision of any Assigned Contract and no event has occurred which would constitute such a default;

(ii)   aware of, or has any reason to believe, that any counterparty to an Assigned Contract is in default under any provision of any Assigned Contract; or

(iii)   a party to or bound by any agreement, judgment or order under which the execution or performance of this Agreement would result in the creation of an Encumbrance on any Asset.

(d) Except as set out on Schedule 11.1.10, no Assigned Contract:

(i)   contains provisions for material price re-determination or price revision except for compensation for inflation, movements in exchange rates, and discounts for bulk buying;

(ii)   relates to indebtedness (in either case, whether incurred, assumed, guaranteed or secured by any Asset);

(iii)   relates to a joint venture, partnership, limited liability company or other similar contract;

(iv)   relates to any outstanding commitment for capital expenditures;

(v)   relates to the acquisition, disposition or lease of any Person, business or material real property or other assets (whether by merger, sale of stock, sale of assets or otherwise);

(vi)   (A) limits the freedom of any Seller or the Business to compete in any line of business or with any Person or in any geographic area or (B) contains exclusivity obligations or restrictions binding on any Seller or the Business, in each case, whether before or after the Closing;

(vii) relates to sales, distribution, agency and marketing involving in excess of twenty-five thousand dollars ($25,000) in any annual period;

(viii) relates to the purchase by any Seller of any products or services;

(ix) relates to any interest rate, currency or commodity derivatives or hedging transaction;

(x) contains any "change of control" or similar provisions;

(xi) includes any "take-or-pay" or keepwell agreement, under which (A) any Person has directly or indirectly guaranteed any liabilities or obligations of any Seller or (B) any Seller has directly or indirectly guaranteed liabilities or obligations of any other Person;

(xii) relates to any employment, retention or consulting agreement;

(xiii) is (A) not made in the ordinary course of business or (B) material to the Assets or the Business, taken as a whole;

(xiv) would as a result of the execution or performance of this Agreement give any other contracting party the right to terminate or adversely change the terms and conditions of such Assigned Contract, or otherwise have a negative effect for the Business;

(xv) contains any terms or conditions not consistent with fair market terms, conditions and prices;

(xvi) is not on an arm's length basis;

(xvii) is incapable of termination or modification in accordance with its terms on thirty (30) Business Days' notice or less; or

(xviii) cannot readily be fulfilled or performed on time or without excessive or undue expenditure of money or effort.

(e) The Business is not party to any Government Contract (or series of related Government Contracts) and there is no outstanding proposal or bid for any Government Contract.

(f) The Sellers have properly disclosed in all material respects to the United States of America government the pricing, cost accounting, estimating, procurement and other data relating to all material Government Contracts to the extent required by applicable law or the terms of such Government Contracts.

(g) Except as set out on Schedule 11.1.10(g), to the Sellers' knowledge, none of the Sellers nor any of their directors, officers, employees, consultants or agents is currently, or has been in the past five (5) years: (i) under any material administrative, civil or criminal investigation, audit, indictment or information request by any Governmental Authority or had a civil or criminal or other judgment rendered against them, (ii) the subject of any audit or investigation by the Sellers, in each case, with respect to any alleged act or omission arising

under or relating to any Government Contract, (iii) debarred or suspended from doing business with any Governmental Authority, nor has any Seller received written notice that any such suspension or debarment action has been proposed or (iv) convicted of a crime for which the maximum potential sentence which could have been imposed exceeded one (1) year. In the past five (5) years, no show cause notices, notices of termination for default, notices of termination for convenience or cure notices have been issued against any Seller. No Seller in the past five (5) years has (i) made any disclosure regarding material non-compliance relating to any Government Contract that remains unresolved in any material respect or that was resolved within the twelve (12) months prior to the date of this Agreement in the ordinary course of business or (ii) ever been denied a security clearance with respect to or necessary to perform any Government Contract unless such clearance has later been granted. No Seller has assigned or otherwise conveyed or transferred, or agreed to assign, to any Persons, any Government Contract, or any account receivable relating thereto, whether as a security interest or otherwise. There exist no facts or circumstances that, to the Sellers' knowledge, would warrant the institution of suspension or debarment proceedings or a finding of non-responsibility or ineligibility or the revocation of a security clearance with respect to the Sellers or any of their respective directors, officers, employees, consultants or agents, in any such case, for purposes of doing business with any Governmental Authority.

11.1.11  Insurance

(a) Schedule 10 sets out a complete and correct list of all insurance policies and self-insurance programs relating to the Assets, the Business or the employees, officers or directors of the Sellers in respect of the Business, including, with respect to each policy, the carrier, policy number, expiration date and a general description of the type of coverage provided (including whether it is a "claims made" or an "occurrence based" policy). All such policies are in full force and effect. The Sellers maintain insurance policies on fire, theft, loss, disruption, product and general liability and other forms of insurance with reputable insurers which would reasonably be judged to be sound, required and adequate for the Business, covering the Assets to their full value and against such losses and risks as are generally covered for comparable businesses and properties. To the Sellers' knowledge, such policies are of the type and in the amounts customarily carried by Persons conducting businesses similar to the Business. To the Sellers' knowledge, there has been no threatened termination or non-renewal of premium increase with respect to, or alteration of coverage under, any of such policies.

(b) To the Sellers' knowledge, there are no special or unusual limits, terms, exclusions or restrictions in any of the policies and the premiums payable are not in excess of the normal rates and no circumstances exist which are likely to give rise to any increase in premiums.

(c) Except as set out on <u>Schedule 11.1.11</u>, no claims have been made and no claim is outstanding and no fact or circumstance exists which may give rise to a claim under any of the Sellers' insurance policies and self-insurance programs relating to the Assets as set out on <u>Schedule 10</u>.

(d) The Sellers' insurance policies do not contain any provisions regarding a change of control or management of the insured.

(e) The Sellers are in compliance with all terms and conditions contained in the insurance policies, all premiums have been duly paid in respect of the insurance policies, no act, omission, misrepresentation or non-disclosure by or on behalf of the Sellers has occurred which would make any policy or insurance void or voidable and there has been no breach of the terms, conditions and warranties of any of the policies that would entitle insurers to decline to pay all or any part of any claim made under the policies or to terminate any policy.

11.1.12    Environmental Matters

(a) Except as set out on <u>Schedule 11.1.12</u>, each Seller has complied and is in compliance in all material respects with all applicable Environmental Laws with respect to the Business or the Assets. No notice of violation, notification of liability or request for information has been received by any Seller, and no legal action, litigation, prosecution, mediation, suit, administrative, arbitration, settlement agreement or any other proceeding is pending or, to the Sellers' knowledge, threatened by any Person, involving the Business or the Assets and relating to or arising out of any Environmental Law. No Order has been issued and is currently in effect and no penalty or fine has been assessed, involving the Business or the Assets and relating to or arising out of any Environmental Law.

(b) No Hazardous Substances are located and no Releases of Hazardous Substances have occurred at, on, above, under or from the Real Property or any properties currently or formerly owned, leased, operated or used in connection with the Business that has resulted or could reasonably be expected to result in any material liability of any Seller under any Environmental Law.

(c) No Seller nor, to the Sellers' knowledge, any other Person, has caused or taken any action, or refrained from taking any action, that could reasonably be expected to result in any material Liability relating to (x) the Environmental conditions at, on, above, under or about the Real Property or any properties or assets currently or formerly owned, leased, operated or used in connection with the Business, or (y) the past or present use, management, handling, transport, treatment, generation, storage, disposal, Release or threatened Release of Hazardous Substances.

(d) The Sellers have provided to the Buyers all Environmental site assessments, audits, investigations and studies in the possession, custody or control of any Seller relating to the Real Property or properties or assets currently or formerly owned, leased, operated or used in connection with the Business.

A16931565

44

11.1.13   Intellectual Property

(a) Schedule 11.1.13 sets out a true and complete list of: (i) all registrations and applications for the Owned Intellectual Property; (ii) all IP Licenses (other than licenses for standard off-the-shelf software licensed pursuant to shrink-wrap or click-wrap agreement, in each case, that is not material to the Business); and (iii) any proceedings or actions before any Governmental Authority (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) related to any of the Owned Intellectual Property or Licensed Intellectual Property.

(b) The Licensed Intellectual Property is lawfully used with the consent of the owner under a license or agreement or otherwise used under the authority of the owner and such licenses and agreements (including all amendments, novations, supplements or replacements to those licenses and agreements), with the exception of standard office software licenses, are in full force and effect and no notice has been given on either side to terminate them. The obligations of all parties to such licenses and agreements have been fully complied with and no disputes have arisen or are foreseeable in respect of them.

(c) The Owned Intellectual Property and the Licensed Intellectual Property are: (i) to the Sellers' knowledge valid and binding; and (ii) to the Sellers' knowledge not subject to any Encumbrance or any license or authority in favor of any third party and all application, maintenance or renewal fees which are due and steps which are required for their maintenance and protection have been paid and taken and no such payment or action will have to be made during a period of ninety (90) Business Days from the Closing Date.

(d) To the Sellers' knowledge, the Owned Intellectual Property, the Licensed Intellectual Property and the IP Licenses constitute all the Intellectual Property used in the ordinary conduct of the Business as currently conducted or intended to be conducted and there are no other items of Intellectual Property that are necessary for the ordinary conduct of the Business or for the business contemplated by the Sellers to be conducted as of the Signing Date.

(e) There are no applications pending in respect of any Intellectual Property which if granted might be material to the Business as currently conducted or contemplated to be conducted.

(f) There is no litigation, proceeding, investigation, claim or action of any nature alleging that the operation of the Business as formerly or currently conducted or the business contemplated to be conducted or the use of the Owned Intellectual Property or the Licensed Intellectual Property infringes, misappropriates, or otherwise violates or conflicts with the Intellectual Property of any Person. No litigation, proceedings, investigations, claims or actions of such nature are pending or are threatened. No Owned Intellectual Property or Licensed Intellectual Property is subject to any settlement agreement, court order, or other contract that restricts in any manner the use, transfer or licensing

thereof by the Sellers or may affect the validity, use or enforceability of such Intellectual Property.

(g) No Person has been engaged, is engaged or is expected to engage in, any activity or use of any Intellectual Property that infringes, misappropriates, or otherwise violates or conflicts with the Owned Intellectual Property or the Licensed Intellectual Property. The Business has not been engaged in, is not engaged in and is not expected to engage in any activity which infringes Intellectual Property owned by a third party.

(h) (i) To the Sellers' knowledge, the products (and the use thereof) and the services of the Business have not infringed, do not infringe and are not likely to infringe any rights or interests of third parties in Intellectual Property; and (ii) no claims of infringement of any such rights or interests have been made by any third party.

(i) The consummation of the transactions contemplated by this Agreement will not cause any impairment of any Owned Intellectual Property or Licensed Intellectual Property or lead to any breach or right of termination of any IP License or effect any change in such agreement adverse to the Buyers or otherwise affect any Owned Intellectual Property or Licensed Intellectual Property. Under the terms of the IP Licenses, following the Closing Date, the Buyers shall be permitted to exercise all of the Sellers' rights under the IP Licenses to the same extent such Sellers would have been able to had the transactions contemplated hereby not occurred and without the payment of any material additional amounts or consideration other than ongoing fees, royalties or payments that such Sellers would otherwise be required to pay.

(j) There has not been and there is no misuse of third party Know-how by the Business and neither the Sellers nor any of their respective directors, officers, employees or agents has made any disclosure of Know-how to any person other than to the Buyers except properly and in the ordinary course of business and on the basis that such disclosure is to be treated as being of a confidential character.

(k) The Business is not in breach of any duty of confidentiality owed to any person through ownership or use of any Intellectual Property or Know-how and neither the sale of the Business or the Assets nor the disclosure of any confidential information to the Buyers will constitute a breach of any duty of confidentiality owed to any person.

(l) The Sellers have taken all steps that are reasonably required to protect the Sellers' rights in confidential information and trade secrets of the Sellers or provided by any other Person to the applicable Sellers.

(m) There are no outstanding or, to the Sellers' knowledge, potential claims against the Sellers under any agreement or under any law providing for employee compensation or ownership in respect of any rights or interests in Intellectual Property.

11.1.14    Employment, Pensions and Labor Matters

(a)    Schedule 11.1.14(a) fully and completely lists:

(i)    all Employees;

(ii)    the benefits (other than salary), period of employment (if appropriate, including periods of employment with previous employers), location, grade and age of each Employee;

(iii)    all collective bargaining agreements of the Sellers; and

(iv)    all Seller Benefit Plans and all loans to Employees, guarantees for liabilities of Employees and payments or liabilities to any Employee.

(b)    The Sellers have made available to the Buyers true, correct and complete copies of the following: (i) a list of the salary of each Employee, (ii) all Seller Benefit Plan documents (including all benefit schedules, all amendments thereto and, in the case of a Seller Benefit Plan not set forth in writing, a written description thereof), (iii) all trust documents, declarations of trust and other documents establishing funding arrangements and the latest financial statements thereof, (iv) summary plan descriptions and summaries of material modifications, (v) the annual report (Form 5500 series) for each Seller Benefit Plan for the two (2) most recent plan years and all schedules thereto, (vi) all communications material to any Employee relating to any Seller Benefit Plan with respect to any amendments, terminations, establishments, increases or decreases in benefits, acceleration of payments or vesting schedules or other events that could result in any material liability to the Sellers, and (vii) the Sellers' Form I-9 documentation confirming eligibility of employment for all Employees to accept new employment with the Buyers and to work for the Buyers.

(c)    Other than as set out on Schedule 11.1.14(c) or in the ordinary course of business consistent with the past practice, there has been no amendment to or written announcement by the Business relating to, or change in employee participation or coverage under, any Seller Benefit Plan which would increase the expense of maintaining such a plan above the level of expense incurred therefor for the most recent fiscal year.

(d)    Except as set out on Schedule 11.1.14(d), since the Balance Sheet Date, the Sellers have not (i) engaged or appointed any additional employee, (ii) made any amendment to the terms and conditions of employment (including remuneration, pension entitlements and other benefits) of any Employee (other than minor increases in the ordinary course of business consistent with past practice), (iii) provided or agreed to provide any gratuitous payment or benefit to any Employee or any of his or her dependents (other than in the ordinary course of business consistent with past practice), (iv) discontinued or amended any Seller Benefit Plans to any material extent or commenced to wind them up or terminate them or (vi) cause them to cease to admit new members or paid any benefits under any of the Seller Benefit Plans other than in accordance with

---

the terms of the documents governing such arrangements (and not under any discretionary power).

(e) None of the Key Employees has given or received notice of termination of his employment and no such Key Employee has any current intention of giving such notice.

(f) No Employee is entitled to severance pay or similar termination indemnities.

(g) Except as set out on <u>Schedule 11.1.14(g)</u>, there are no, and have not been any during the last two (2) years, controversies between the Sellers and any Employee, and there are no unresolved labor union grievances, unfair labor practices or labor arbitration proceedings pending or threatened relating to the Business.

(h) None of the Employees of the Business is covered by any collective bargaining agreement and no collective bargaining agreement is currently being negotiated by the Business. No one has petitioned the National Labor Relations Board within the last two (2) years and no one is now petitioning for union representation of the Business's employees. Neither the announcement nor the consummation of the transactions contemplated by this Agreement will entitle any third party (including any labor union, labor organization or other employee representative) to notice or consultation rights or to any payments or benefits under any labor agreements.

(i) Except as set out on <u>Schedule 11.1.14(i)</u>, the Sellers are in compliance with all foreign and U.S. laws applicable to the Business with respect to the Employees and their own policies relating to employment and employment practices, terms and conditions of employment, wages and hours, equal opportunity, civil rights, labor relations, occupational health and safety, harassment and payroll taxes including the Immigration and Reform Control Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Americans with Disabilities Act, The Federal Age Discrimination in Employment Act, the Affordable Care Act of 2010 and any federal, state or local law.

(j) Neither the execution or delivery of this Agreement, nor the completion of the transaction contemplated by this Agreement will: (i) entitle any Employee to severance pay, unemployment compensation or any other payment; (ii) accelerate the time of payment or vesting of or result in any payment or funding (through a grantor trust or otherwise) of or increase the amount of compensation due to any such Employee; (iii) entitle any Employee to terminate or shorten his employment; or (iv) cause any Key Employee to leave his employment.

(k) Except as set out on <u>Schedule 11.1.14(k)</u>, the Employees do not require sponsorship from the Buyers, for either an immigrant or non-immigrant visa, in order to accept new employment in the U.S. with the Buyers and to work for the Buyers. The Sellers acknowledge that the Buyers will require each Employee to certify that his I-9 Employment Eligibility Verification forms

currently used by any Seller is true, correct and complete, and that all offers of employment made by the Buyers to the Employees shall be contingent upon each Employee's ability to secure and maintain the legal right to work for the Buyers in the U.S., without sponsorship from the Buyers for an immigrant or non-immigrant visa, and to present evidence of such valid work authorization.

(l) To the Sellers' knowledge, the Sellers are not liable to make any outstanding payment to an Employee by way of damages or compensation for loss of office or employment or for redundancy or unfair or wrongful dismissal.

(m) There is no agreement or arrangement between any Seller and an Employee under which such Employee is entitled to a bonus or any other remuneration (monetary or non-monetary) which is conditional upon the completion of the transaction contemplated by this Agreement.

(n) A purchaser of the Business could not be liable for any social security contributions arising out of any grant, exercise or release of the awards and options which are not fully provided for in the Financial Statements.

(o) Each Seller Benefit Plan has been maintained, operated and administered in compliance with its terms, ERISA, the Code and all applicable laws and regulations. No Seller Benefit Plan is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code. None of the Sellers or their ERISA Affiliates has contributed to or been obligated to contribute to any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA or any plan with two or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA. The Sellers do not have any outstanding liability (including liability for unpaid benefits, contributions or insurance premiums) with respect to any Seller Benefit Plan. No Seller has any liability for life, health, medical or other welfare benefits to current or future retired or terminated employees or beneficiaries or dependents thereof, except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA and at no expense to any Seller.

(p) Each Seller Benefit Plan which constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code is identified as such on Schedule 11.1.14(p) and has been operated and maintained in accordance with Section 409A of the Code. No obligation exists to gross up or reimburse any Employee for taxes incurred under Sections 4999 or 409A of the Code.

11.1.15   Compliance with Law

(a) Except as set out on Schedule 11.1.15(a), to the Sellers' knowledge each Seller is conducting and has at all times in the five (5) years prior to the Signing Date conducted the Business in compliance with all applicable laws and regulations (including Environmental Laws).

(b) There is no controversy or investigation pending or, to the Sellers' knowledge, threatened or expected with respect to the Business by any Governmental Authority or any other Person relating, *inter alia*, to any violation or possible violation of applicable laws and no injunctions, cautions or remarks by authorities have been directed towards any Seller or any person for whose acts or defaults it may be liable and there are no outstanding orders, decrees or judgments in respect of any Seller or any person for whose acts or defaults it may be liable.

(c) No circumstances have occurred which imply or would reasonably be expected to imply any limitation or restriction on the conduct of the present activities of the Business.

(d) No Employee nor any of the directors, officers, agents or other employees or persons acting on behalf of the Business has been party to: (i) the use of any Asset or any other assets of the Sellers for improper or unlawful contributions, gifts, entertainment or other improper or unlawful expenses relating to political activity or to the making of any direct or indirect improper or unlawful payment to government officials or employees, or private officers or employees, from such assets; (ii) the establishment or maintenance of any improper, unlawful or unrecorded fund of monies or other assets; (iii) the making of any false or fictitious entries on the books or records of any Seller; (iv) the making of any improper, unlawful or undisclosed payment; or (v) the making or authorization of any payment, contribution, or gift of money, property or services involving the direct or indirect use of any funds of any Seller (including entertainment or other expenses), whether or not in contravention of applicable law, (A) as a "kickback" or bribe to any Person, or (B) to any political organization or the holder of (or Person who seeks) any elective or appointed public office related to political activity or otherwise related to political activity.

(e) No Employee nor any Seller nor any of its respective directors, officers, agents or other employees or persons acting on behalf of any Seller, nor any of its Affiliated Persons has engaged in any activity or conduct that has resulted or may result in a violation of any Anti-Corruption Laws or any applicable laws relating to economic or trade sanctions, including the laws or regulations implemented by the Office of Foreign Assets Controls of the United States Department of the Treasury and any similar laws or regulations in other jurisdictions.

(f) No Seller is a party to or bound by any agreement, arrangement or concerted practice or is carrying on any practice which in whole or in part may contravene or may be invalidated by any anti-trust, fair trading, dumping, state aid, consumer protection or similar legislation in any jurisdiction.

(g) No Seller nor, to the Sellers' knowledge, any of the Employees or consultants to the Sellers has, directly or indirectly, during the past five (5) years: (i) been suspended or debarred from doing business with the United States of America

---

government or has been declared non-responsible or ineligible for United States of America government contracting; or (ii) been denied export privileges involving items subject to the Export Administration Regulations or has been suspended or debarred from participating directly in the export of defense articles, including technical data, or in the furnishing of defense services, for which a license or approval is required under the International Traffic in Arms Regulations.

(h) Schedule 11.1.15(h) sets out a complete and correct list of each material consent held by the Sellers in the conduct of the Business, together with the name of the Governmental Authority issuing such consent.

(i) To the Sellers' knowledge, no determination of non-responsibility or ineligibility has ever been issued or, to the Sellers' knowledge, made against the Sellers with respect to any quotation, bid or proposal for a Government Contract.

(j) To the Sellers' knowledge, no Seller has been or is now under any administrative, civil or criminal investigation or indictment involving alleged false statements, false claims or other improprieties relating to the Sellers' Government Contracts or quotations, bids and proposals for Government Contracts. To the Sellers' knowledge, there is no valid basis for any such investigation or indictment.

(k) No Seller has been nor is now a party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to quotations, bids and proposals for Government Contracts. The Sellers know of no valid basis for any such proceeding.

11.1.16    Litigation

(a) No Employee nor any Seller nor any other person for whose acts or defaults any Seller may be liable in respect of the Business is involved whether as claimant or defendant or other party in any legal action, litigation, prosecution, mediation, suit, administrative, arbitration or other proceeding other than as claimant in the collection of debts arising in the ordinary course of its business.

(b) There is no legal action, litigation, prosecution, mediation, suit, administrative, arbitration, settlement agreement or other proceeding (including Tax proceedings) pending or, to Sellers' knowledge, threatened affecting the Business, any Asset or any Assigned Contract, nor are there any circumstances which would reasonably be expected to result in such legal action, litigation, prosecution, mediation, investigation, inquiry, suit, administrative, arbitration, settlement agreement or other proceeding. No Seller has received any claims or complaints relating to the Business, any Asset or any Assigned Contract and, to the Sellers' knowledge, no grounds exist for such claims or complaints.

(c) Except as set out on Schedule 11.1.16(c), no investigation or inquiry is being or has been conducted by any governmental, fiscal, regulatory or other body in

A16931565

51

respect of the Business, and no such investigation is pending, or, to the Sellers' knowledge, threatened or expected.

11.1.17    Products

Except as set out on Schedule 11.1.17, none of the Sellers has received any notice relating to, nor, to the Sellers' knowledge, are there any facts or circumstances that would reasonably be expected to give rise to, any material claim with respect to the Business (a) relating to an alleged defect in design, manufacture, materials, workmanship or performance, or any alleged failure to warn, or from any alleged breach of implied representations or warranties, or any alleged non-compliance with any applicable laws, and (b) involving any service provided or any product designed, manufactured, serviced, produced, modified, distributed or sold by or on behalf of any Seller in connection with the Business. There has been no product recall, rework or post-sale warning or similar action (collectively, a "**Recall**") conducted by any Seller with respect to any product designed, manufactured, serviced, produced, modified, distributed or sold by or on behalf of any Seller in connection with the Business, or any investigation or consideration made by any director, officer or key employee thereof concerning whether to undertake or not undertake any Recall.

11.1.18    Customers and Suppliers

(a)    Schedule 11.1.18(a) sets out a complete and correct list of (i) the names and addresses of the top ten (10) customers of the Business (based on the aggregate purchase price of products and services provided) for each of the past two (2) calendar years and (ii) the amount of purchases by each such customer during such periods expressed as a percentage of the Sellers' consolidated net revenues for such periods. No Seller has received any notice or has any reason to believe that any such customer (x) has ceased or will cease to use the products or services of any Seller, (y) has materially reduced or will materially reduce the use of products or services of any Seller or (z) has sought to reduce the price it will pay for products or services of any Seller, including, in each case, as a result of this Agreement or the transactions contemplated hereby.

(b)    Schedule 11.1.18(b) sets out a complete and correct list of (i) the names and addresses of the top ten (10) suppliers to the Business (based on the aggregate purchase price of raw materials, supplies or other products or services ordered) for each of the past two (2) calendar years and (ii) the amount of orders from each such supplier during such periods expressed as a percentage of the Sellers' aggregate purchases from all suppliers during such periods. No Seller has received any notice or has any reason to believe that (x) there has been any material adverse change in the price of any raw materials, supplies or other products or services provided by any such supplier or (y) any such supplier will not sell raw materials, supplies and other products and services to the Business after the Closing Date on terms and conditions that are substantially similar to those used in its current sales to the Sellers, subject to general and customary

price increases, including, in each case, as a result of this Agreement or the transactions contemplated hereby.

11.1.19    Information

(a) All information contained in this Agreement and each document and all other information, whether oral or written, provided to the Buyers or any of their Affiliated Persons by or on behalf of the Sellers or any of their Affiliated Persons was when given and remains true, complete and accurate in all respects and no information or document provided to the Buyers or any of their Affiliated Persons by or on behalf of the Sellers or any of their Affiliated Persons, contains any untrue or inaccurate statement of a material fact or omits to state a material fact necessary to make the statements contained therein not misleading.

(b) There are no material facts or circumstances relating to the Business, any Asset or any Assigned Contract which have not been disclosed to the Buyers and which, if disclosed, might reasonably have been expected to influence the decision of the Buyers to purchase the Business or the Assets or the price at or the terms on which the Buyers would be willing to purchase the Business or the Assets.

11.1.20    Absence of Certain Changes or Events

Except as set out on Schedule 11.1.20, from the Balance Sheet Date until the Signing Date:

(a) the Business has been conducted in the ordinary course of business without any interruption or alteration in its nature, scope or manner and with a view to maintaining it as a going concern;

(b) all agreements and commitments have been entered into on customary terms and conditions;

(c) there has not been any material amendment to any Assigned Contract;

(d) no event has occurred or arisen which has resulted in or may result in a material adverse change in the value of the Business;

(e) no capital commitments involving capital expenditure;

(f) no Seller has incurred any additional borrowings or incurred any other indebtedness in respect of the Business, except in the ordinary course of business consistent with past practice;

(g) no Seller has taken steps to procure payment by any debtor generally in advance of the date on which book and other debts are usually payable in accordance with the standard terms of business of the Business or (if different) the period extended to any particular debtor in which to make payment;

(h) no Seller has delayed making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in

accordance with the credit period authorized by the relevant creditors or (if different) the period extended by creditors in which to make payment;

(i) there has been no unusual increase or decrease in the level of stock of the Business;

(j) there has been no increase in the salary, compensation or benefits (including bonuses) payable or becoming payable to any employee, agent, independent contractor or consultant, other than such increase as is made in the ordinary course of business, or any acceleration in the rate at which any such compensation accrues;

(k) any forgiveness or cancellation of any debt or claim by the Business on behalf of any Employee;

(l) there has been no change of accounting methods, principles or practices of any Seller or any reevaluation of any material Asset;

(m) there has been no material amendment or modification of the certificate of incorporation, by-laws or other organizational documents of any Seller;

(n) there has been no material damage, destruction or other casualty loss (whether or not covered by insurance) affecting the Business or the Assets;

(o) there has been no Tax election made or changed, no annual Tax accounting period changed, no method of Tax accounting adopted or changed, no amended Tax Returns or claims for Tax refunds filed, no closing agreement entered into, no proposed Tax adjustments or assessments, no Tax claim, audit or assessment settled, and no right to claim a Tax refund, offset or other reduction in Tax liability surrendered;

(p) there has been no sale, transfer, lease or other disposition of any Asset, other than inventory sold in the ordinary course of business, or any acquisition of any other Person, whether by merger or consolidation or by purchasing all or a material portion of the capital stock or assets of such Person, or by any other manner;

(q) there has been no making of any loan, advance or capital contributions to or investment in any Person;

(r) there has been no commencement or settlement of any litigation relating to the Business or the Assets, other than in the ordinary course of business;

(s) no Seller has created any Encumbrance over any Asset or any of its other assets (including, for the avoidance of doubt, the Properties); and

(t) no Seller has agreed or arranged to do any of the foregoing.

11.1.21    Governmental Approvals

The execution, delivery and performance by the Sellers of this Agreement to which they will be a party, and the consummation of the transactions contemplated hereby

and thereby, require no Governmental Approvals other than those listed on <u>Schedule 11.1.21</u>.

11.1.22    Brokers and Finders

No Person has been retained by or is authorized to act on behalf of the Sellers or any of their Affiliated Persons, and no such Person is entitled to any fee or commission from the Buyers or any of its Affiliated Persons in connection with the transactions contemplated by this Agreement.

11.1.23    State Takeover Statutes

No "fair price," "moratorium," "control share acquisition," or other anti-takeover statute or similar statute or regulation applies or purports to apply to this Agreement or any of the transactions contemplated hereby.

11.1.24    Affiliate Transactions; Guarantees

(a)    <u>Schedule 11.1.24(a)</u> sets out a complete and correct list of all contracts, Lease Agreements or other transactions relating to the Business between any Seller, on the one hand, and any of its Affiliated Persons (other than any other Seller), on the other hand, that (i) were entered into in the prior three (3) calendar years, (ii) are currently pending or in effect, or (iii) involve continuing liabilities or obligations that, individually or in the aggregate, have been or would reasonably be expected to be material to any Seller (each, an **"Affiliate Transaction"**). Each such Affiliate Transaction was on terms and conditions no more favorable to such Affiliated Person than would have been obtainable at the time in a comparable arm's-length transaction with a Person other than such Seller. No stockholder, officer, director or employee of or consultant to any Seller, or any family member, relative or Affiliated Person of any such stockholder, officer, director or employee or consultant, (i) owns, directly or indirectly, any interest in (x) any asset or other property used or held for use in the Business or (y) any Person that is a supplier, customer or competitor of any Seller, (ii) serves as an officer, director or employee of or consultant to any Person that is a supplier, customer or competitor of any Seller or (iii) is a debtor or creditor of any Seller.

(b)    Except as set out on <u>Schedule 11.1.24(b)</u>, none of the obligations or liabilities of the Business or of any Seller incurred in connection with the Business or the Assets is guaranteed by or subject to a similar contingent obligation of any other Person. Except as set out on <u>Schedule 11.1.24(b)</u>, no Seller has guaranteed or become subject to a similar contingent obligation in respect of the obligations or liabilities of any other Person. There are no outstanding letters of credit, surety bonds or similar instruments of the Sellers or any of their Affiliated Persons in connection with the Business or the Assets.

11.1.25    Taxes

(a)    All Tax Returns relating to the Assets or Business have been or will be timely filed when due in accordance with all applicable laws.

(b) All Taxes relating to the Assets or Business (whether or not shown on the Tax Returns) have been timely paid by the Sellers.

(c) The Tax Returns completely, accurately and correctly reflect the material facts regarding the income, properties, operations and status of the Assets or Business, as applicable, and any entity required to be shown thereon.

(d) Each Seller has delivered correct and complete copies of all federal income Tax Returns relating to the Assets or Business, examination reports, and statements of deficiencies assessed against, or agreed to by such Seller since January 1, 2006.

(e) Each Seller has adequate reserves on its financial statements for Taxes accrued but not yet due.

(f) There are no consents currently in effect for the extension or waiver of the time (i) to file any Tax Return by any Seller or (ii) for assessment or collection of any Taxes relating to any Seller, and no Person has been requested in writing to enter into any such consent.

(g) No claim has ever been made by an authority in a jurisdiction in which a Seller does not file Tax Returns that any Seller or the Assets or Business is or may be subject to taxation by that jurisdiction.

(h) All Taxes which each Seller is required by law to withhold or collect have been duly withheld or collected and have been timely paid over to the appropriate Governmental Authorities to the extent due and payable and proper provisions have been made for any such Taxes that are not yet due and payable. The Sellers have timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(i) There is no action, suit, proceeding, investigation, audit or claim currently pending, or, to the Sellers' knowledge, threatened, regarding any Taxes relating to any Seller or the Assets or Business.

(j) All Tax deficiencies that have been claimed, proposed or asserted in writing against each Seller or with respect to the Assets or Business have been fully paid or finally settled.

(k) No Seller expects any Governmental Authority to assess any additional Taxes for any period for which Tax Returns have been filed with respect to the Assets or Business.

(l) No Person has executed or entered into a closing agreement pursuant to Section 7121 of the Code (or any comparable provision of state, local or foreign law) that is currently in force and determines the Tax liabilities of any Seller or relates to the Assets or Business.

---

A16931565

56

(m) There are no tax allocation or other agreements with or relating to any income or other Taxes with any other Person to which any Seller is now or ever has been a party that will continue to be in effect with respect to the Business after Closing.

(n) No Seller has agreed, and is not required, to make any adjustment under Section 481(a) of the Code (or any comparable provision of state, local or foreign law) by reason of a change in accounting method or otherwise.

(o) No power of attorney is currently in effect, and no income tax ruling has been requested of any Governmental Authority, with respect to any Tax matter relating to any Seller that will continue to be in effect with respect to the Business after Closing.

(p) Each Seller is not now and has never been included in any "affiliated group" within the meaning of Section 1504(a) of the Code (or any similar group defined under a similar provision of state, local or foreign law) filing a consolidated federal income Tax Return (or similar Tax Returns) in each case, which includes the Assets or the Business.

(q) The Buyers will not be required to deduct and withhold any amount pursuant to Section 1445(a) of the Code or other provision of U.S. federal, state or local or non-U.S. law as a result of any of the transactions contemplated by this Agreement. None of the Assets being acquired from AFP Canada are "United States real property interests" as defined in Section 897(c)(1)(A) of the Code.

(r) Each Seller has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

(s) No Seller has liability for the Taxes of any Person as a transferee or successor, by contract, or otherwise.

(t) There are no Encumbrances or security interests on any of the Assets that arose in connection with any failure (or alleged failure) to pay any Taxes and there are no liens for any Tax upon any Asset.

(u) None of the Assets are (i) "tax-exempt use property" within the meaning of Section 168(h) of the Code, (ii) "tax-exempt bond financed property" within the meaning of Section 168(g)(5) of the Code or (iii) property that is required to be treated as owned by another Person pursuant to provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, and in effect immediately prior to the enactment of the Tax Reform Act of 1986, and no depreciation or amortization with respect to such assets will be disallowed as a deduction under Section 197(f)(9) of the Code or otherwise.

(v) AFP is an "S corporation" as defined in Section 1361(a)(1) of the Code for U.S. federal income tax purposes and has been treated as such an S corporation since May 1, 2006.

A16931565

(w) The Trust is a trust permitted to be a shareholder of an S corporation as described under Section 1361(c)(2) of the Code.

(x) The Trust is a revocable living trust to which subpart E of part I of subchapter J of Chapter 1 (Sections 671 through 679) of the Code applies, whose sole grantor and sole beneficiary is Gibbs.

(y) Gibbs is the sole owner of the Trust and all items of income, deductions, and credits against tax of the Trust which would be taken into account under Chapter 1 of the Code in computing taxable income or credits against the tax of an individual are included in computing the taxable income and credits of Gibbs pursuant to Sections 61 and 671 of the Code.

(z) ACP is wholly owned by the Trust and is properly classified as an entity that is disregarded as separate from its owner for U.S. federal income tax purposes as described in U.S. Treasury Regulations Section 301.7701-2(c)(2).

(aa) ASP is wholly owned by Gibbs and is properly classified as an entity that is disregarded as separate from its owner for U.S. federal income tax purposes as described in U.S. Treasury Regulations Section 301.7701-2(c)(2).

**11.2    Representations and Warranties of the Buyers**

As of the Signing Date and the Closing Date, the Buyers represent and warrant to the Sellers as follows:

11.2.1    Corporate Status; Authorization; Binding Effect

Each Buyer is a corporation duly organized, validly existing and, where the concept is recognized, in good standing under the laws of the jurisdiction of its incorporation with full corporate power and authority to execute and deliver this Agreement to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each of the Buyers of this Agreement, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all requisite corporate and stockholder action of each of the Buyers. Each of the Buyers has duly executed and delivered this Agreement. This Agreement is a legal, valid and binding obligation of each of the Buyers, enforceable against each of the Buyers in accordance with its respective terms.

11.2.2    Governmental Approvals

The execution, delivery and performance by each of the Buyers of this Agreement to which it will be a party, and the consummation of the transactions contemplated hereby and thereby, require no Governmental Approvals other than those listed on Schedule 11.2.2.

11.2.3    No Conflicts

The execution, delivery and performance by each of the Buyers of this Agreement, and the consummation of the transactions contemplated hereby and thereby, do not

and will not conflict with or result in a violation or breach of or default under (with or without the giving of notice or the lapse of time, or both): (i) any applicable law; (ii) the certificate of incorporation or by-laws or other organizational documents of each of the Buyers; or (iii) any contract, agreement or other instrument applicable to each of the Buyers or any of its properties or assets, except, in the case of clause (iii), for violations and defaults that, individually and in the aggregate, have not and will not materially impair or delay the ability of each of the Buyers to perform its obligations under this Agreement.

11.2.4    Litigation

There is no litigation pending or, to the Buyers' knowledge, threatened against or affecting the Buyers relating to the transactions contemplated hereby.

11.2.5    Brokers and Finders

No investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of the Buyers or any of its Affiliated Persons, and no such Person is entitled to any fee or commission from the Sellers or any of their Affiliated Persons in connection with the transactions contemplated by this Agreement.

**12      Covenants**

**12.1    Covenants of the Seller**

12.1.1    Conduct of the Business between Signing and Closing

(a)    During the period between the Signing Date and the Closing Date, each of the Sellers shall:

(i)    maintain in force all existing insurance policies in all material respects on the same terms and similar level of cover prevailing at the Signing Date for the benefit of the Business, make all insurance claims related to the Business promptly and, in accordance with the requirements of the relevant policy, thereafter not do or omit to do anything that might prejudice such claim and shall not settle any claim made under any insurance policy below the amount claimed;

(ii)    take all steps to preserve the validity of the Owned Intellectual Property, including paying all renewal and registration fees, and Licensed Intellectual Property;

(iii)    keep any Governmental Approvals in full force and effect;

(iv)    allow the Buyers and its respective agents, upon reasonable notice, reasonable access to, and to take copies of, the books, records and documents of or relating, in whole or in part, to the Business, including minutes, contracts, licenses, supplier lists and customer lists, provided that the obligations of the Sellers under this Section 12.1.1(a)(iv) shall not extend to allowing access to information which is reasonably regarded as

confidential to the activities of the Sellers otherwise than in relation to the Business;

(v) to the extent it has not already done so, implement procedures to prevent bribery by any of its directors, officers or employees, any of its Affiliated Persons or any other person acting on behalf of the Seller, such procedures to be fully in accordance with any Anti-Corruption Laws, and shall take into account all reasonable comments from the Buyers as to the content and implementation of such procedures and shall maintain and fully comply with such procedures;

(vi) terminate the agreements and commitments set out on <u>Schedule 12.1.1(a)(vi)</u>; and

(vii) promptly do whatever the Buyers reasonably require to: (A) facilitate the granting or perfection of security for any debt incurred by the Buyers or any of their Affiliated Persons for the purposes of or in connection with the acquisition of the Business; and (B) facilitate and ensure that any security granted over the Assets is released on the Closing Date on terms satisfactory to the financing parties of the Buyers.

(b) During the period between the Signing Date and the Closing Date, the Sellers shall carry on the Business diligently and in the ordinary and usual course of business in the same manner as preceding the Signing Date with a view to maintaining the Business as a going concern. Without limiting the foregoing, the Sellers shall not, except with prior written consent from the Buyers, insofar as it relates to the Business:

(i) enter into or give notice of termination of any material contract or agree to modify or waive compliance with any material contract;

(ii) sell, acquire, invest in, assign, transfer, pledge or otherwise create an Encumbrance over, lease, license or otherwise dispose of any Asset;

(iii) increase the rates of compensation (including bonuses) payable or to become payable to any Employee (which exceed (in the aggregate) three percent (3%) of all amounts so payable as of the Balance Sheet Date) or any acceleration in the rate at which any such compensation accrues);

(iv) (A) grant any severance or termination pay to any Employee, other than those made in the ordinary course of business pursuant to normal severance policies in effect at the date of this Agreement and to the extent required by applicable law, (B) increase the salary or other compensation of any director, officer, employee or consultant to the Business, except for normal increases in the ordinary course of business, (C) increase the coverage or benefits available under any (or create any new) Seller Benefit Plan or otherwise modify or terminate any such plan, except as may be required by applicable law, (D) enter into any, or amend any, employment, deferred compensation, severance, special pay, consulting,

non-competition, or similar agreement or arrangement with any director, officer, employee or consultant to the Business, except as may be required by applicable laws, or (E) hire or terminate (other than for cause) any senior level employee;

(v)     change any of its accounting methods, principles or practices;

(vi)    take steps to procure payment by any debtor generally in advance of the date on which book and other trade receivables are usually payable in accordance with the standard terms of business of the Business or (if different) the period extended to any particular debtor in which to make payment;

(vii)   delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade payables should be paid in accordance with the credit period authorized by the relevant creditors or (if different) the period extended by creditors in which to make payment;

(viii)  Except as set out on Schedule 12.1.1(b)(viii), materially delay production or purchasing activities or otherwise materially increase or decrease the level of stock of the Business, other than in the ordinary course of business, consistent with past practice;

(ix)    materially delay or suspend any capital commitment of the Business involving ordinary capital expenditure, except that there will be no investments in Fixed Assets that each exceeds fifteen thousand dollars ($15,000) or fifty thousand dollars ($50,000) in the aggregate;

(x)     amend, to any material extent, any of the terms on which goods, facilities or services are supplied;

(xi)    enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or create any Encumbrance over any Asset (including, for the avoidance of doubt, the Properties) or directly or indirectly enter into, or amend any, hedging or currency exchange contracts;

(xii)   in relation to any Real Property or Leased Premises, as applicable: (A) apply for any planning permission or implement any planning permission already obtained but not implemented; (B) carry out any material structural alteration or addition to, or materially effect any change of use of, such Real Property or Leased Premises under any Lease Agreement; (C) terminate or serve any notice to terminate, surrender or accept any surrender of or waive the terms of any Lease Agreement, tenancy or license which is material in the context of the Business; (D) agree upon any new rent or fee payable under any Lease Agreement, tenancy or license which is material in the context of the Business; (E) enter into or vary any agreement, lease, tenancy, license, occupancy or other commitment which is material in the context of the Business; or (F) sell,

A16931565

61

convey, transfer, assign or charge any Real Property or grant any rights or easements over any Real Property or enter into any covenants affecting any Real Property;

(xiii) take or implement any decisions in any matters of material importance to the Business (for the avoidance of doubt, even if this could be considered being within the ordinary and usual course of business); or

(xiv) agree or arrange to do any of the foregoing.

12.1.2    Events Occurring Between Signing and Closing

If between the Signing Date and the Closing Date:

(a) the Sellers become aware that any of the Sellers' representations and warranties was untrue or inaccurate in any material respect as of the Signing Date; or

(b) any event occurs or matter arises of which the Sellers become aware which results or may result in any of the Sellers' representations and warranties being untrue or inaccurate in any material respect as of the Closing Date, had the Sellers' representations and warranties been repeated on Closing,

the Sellers shall notify the Buyers in writing as soon as practicable and in any event prior to Closing setting out full details of the matter and the Sellers shall make any investigation concerning the event or matter and take such action, at their own cost, as the Buyers may reasonably require.

12.1.3    Accounts Receivable

In the event that any of the Accounts Receivable outstanding on the Closing Date are not collected within ninety (90) days following the Closing Date, the Buyers shall be entitled to assign or cause to be assigned to the Sellers all rights, claims, actions or causes of action relating to such unpaid receivables, except as set out on Schedule 12.1.3. The Buyers shall, in case of such assignment to the Sellers, receive the full outstanding amount of the receivables, including any interest accrued, from the Sellers.

12.1.4    Non-Competition; Non-Solicitation

(a) For a period of five (5) years from and after the Closing Date none of the Sellers or any of their respective Affiliated Persons shall: (i) engage, directly or indirectly, in any business that is competitive with the Business or with the Buyers or any Affiliated Person of the Buyers in any area of the world (a **"Competitive Business"**); (ii) own an interest in, manage, operate, control or participate in or be connected with (as a partner, member, stockholder, lender, co-venturer, consultant or otherwise) any other Person that engages in a Competitive Business, excluding any such interest in any passive investment of not more than one percent (1%) of the common equity of a Competitive Business that is publicly traded on any securities exchange or national market system; or (iii) assist or have any active interest in, own any assets or shares in

or act as agent or adviser or consultant to, or otherwise enter into any relationship with, any customer or supplier of the Business.

(b) The Sellers, directly or indirectly, undertake for a period of five (5) years from the Closing Date not to solicit the services of or endeavor to entice away any Employee who has been transferred to the Buyers or any of the Buyers' Affiliated Persons, nor to employ any such person during such period of time whether as employee, consultant or otherwise and whether or not such employee would thereby commit a breach of his contract of service.

(c) If any part of this Section 12.1.4 shall be adjudged to be excessively broad as to duration, geographical scope, activity or subject, the Parties intend that such provision shall be deemed modified to the minimum degree necessary to make such provision valid and enforceable under applicable law and that such modified provision shall thereafter be enforced to the fullest extent possible.

(d) The Parties acknowledge that there may be no adequate remedy at law for a breach of this Section 12.1.4 and that money damages may not be an appropriate remedy for breach of this Section 12.1.4. The Parties accordingly agree that the Buyers shall have the right to injunctive relief and specific performance of this Section 12.1.4 in the event of any breach of such Section in addition to any rights they may have for damages, which shall include out-of-pocket expenses, loss of business opportunities and any other damages, direct and indirect, consequential, punitive or otherwise. The remedies set forth in this Section 12.1.4(d) are cumulative and shall in no way limit any other remedy that any Party hereto has at law, in equity or pursuant hereto.

12.1.5   Cooperation by the Sellers

(a) The Sellers shall, at any time and from time to time, whether before, at, or after the Closing Date, execute and deliver any further instruments or documents and take all such further action as the Buyers may reasonably request in order to effectively consummate the transactions contemplated by this Agreement and to deliver to the Buyers legal title to the Assets and to vest in the Buyers all rights to the Business and all rights under the Assigned Contracts. The costs (the **"Cooperation Costs"**) of such action taken by the Sellers pursuant to this Section 12.1.5(a) shall be shared equally by the Buyers, on the one hand, and the Sellers, on the other hand, subject to Section 17.1.

(b) The Sellers shall take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective as promptly as possible the transactions contemplated by this Agreement and to cooperate with the Buyers in connection with the foregoing, such as to provide all information and documents required for the Buyers to complete notification to the Competition Authorities. The Sellers shall, as promptly as practicable, obtain, or cause to be obtained, the authorizations, consents, orders and approvals of regulatory bodies and officials that may be or become necessary for the performance of its obligations pursuant to this Agreement, including the

Governmental Approvals, and the consummation of the transactions contemplated by it. The Sellers shall, and shall cause its Affiliated Persons to, cooperate with the Buyers in promptly seeking to obtain such authorizations, consents, orders and approvals as may be necessary for the performance of the Parties' respective obligations pursuant to this Agreement.

(c) Specifically, the Sellers undertake to take all actions necessary to prepare and file as promptly as practicable a notification under the Hart-Scott-Rodino Act of 1976 (**"HSR Act"**). The Sellers shall promptly inform the Buyers of any communication with any Governmental Authority regarding any filings or other actions contemplated by this <u>Section 12.1.5</u>. Furthermore, the Sellers shall (i) permit the Buyers to review in advance any proposed written communication to any Competition Authority; (ii) consult with counsel for the Buyers and incorporate the Buyers' reasonable comments into any written or oral communication with any Competition Authority; (iii) furnish the Buyers promptly with copies of all correspondence, filings and written communications with any Competition Authority with respect to the transactions contemplated by this Agreement; and (iv) inform the Buyers of any meetings scheduled with any Competition Authority and afford the Buyers the possibility to attend such meeting.

12.1.6   The Sellers' Waiver of Rights against the Employees

Each of the Sellers undertakes to the Buyers and the Employees to waive any rights, remedies or claims which it may have in respect of any misrepresentation, inaccuracy or omission in or from any information or advice supplied or given by the Employees or any consultant in connection with assisting the Sellers in the giving of any representation or warranty or the preparation of the Schedules and otherwise in connection with this Agreement.

12.1.7   Change of Company Name

Each of AFP, ACP, ASP and AFP Canada covenants to change its present company name, with effect as at the Closing Date, to a name, which cannot be confused with "Ameristar" or any trademark or product names that have been used by the Business.

12.1.8   Provision of Permits

Prior to the Closing Date, the Sellers shall provide to the Buyers copies of any permits, licenses, consents, approvals, judgments, decisions, registrations, waiver, order, exemption and other authorizations or notifications which are issued, granted or required by any Governmental Authority which are used in or required for the operation of the Business or the occupation or use of the Properties.

**12.2     Covenants of the Buyers**

12.2.1     Further Actions

(a) The Buyers shall, as promptly as practicable, file or supply, or cause to be filed or supplied, all applications, notifications and information required to be filed or supplied by the Buyers pursuant to applicable law in connection with this Agreement and the consummation of the transactions contemplated hereby, including filings necessary to obtain the receipt of all unconditional clearances and approvals and expiration of any applicable waiting period and any extension thereof by the Competition Authorities. Notwithstanding anything to the contrary contained herein, the Buyers shall not be required to (i) agree to sell, divest, dispose of or hold separate any assets or businesses, or otherwise take or commit to take any action that could reasonably be expected to limit its freedom of action with respect to, or ability to retain, one or more businesses, product lines or assets; or (ii) litigate or defend against any administrative or judicial action or proceeding (including any proceeding seeking a temporary restraining order or preliminary injunction) challenging any of the transactions contemplated hereby as violative of any laws of the Competition Authorities.

(b) The Buyers shall coordinate and cooperate with the Sellers in exchanging such information and supplying such assistance as may be reasonably requested by the Sellers in connection with the filings and other actions contemplated by Section 12.2.1(a). The Buyers shall promptly inform the Sellers of any communication, and any proposed understanding, undertaking or agreement, with any Governmental Authority regarding any filings or other actions contemplated by this Section 12.2.1(b).

(c) At all times prior to the Closing, the Buyers shall notify the Sellers in writing of any condition or occurrence that would be reasonably likely to result in the failure of any of the conditions contained in Sections 7.1 and 7.2 to be satisfied, promptly upon becoming aware of the same.

(d) The Buyers shall operate the Business in good faith during the Earn-Out Period consistent with the principles set out in paragraph 6.5.4. To the extent the Buyers deviate from the principles set out on Schedule 6.5.5 in the operation of the Business during the Earn-Out Period, the Earn-Out EBIT amount shall be adjusted in such a manner as to negate the effects of such deviation.

12.2.2     Further Assurances

(a) Following the Closing, the Buyers shall, from time to time, execute and deliver such additional instruments, documents, conveyances or assurances and take such other actions as shall be necessary, or otherwise reasonably requested by the Sellers, to confirm and assure the rights and obligations provided for in this Agreement and render effective the consummation of the transactions contemplated hereby.

---

A16931565

(b) Each of the Parties hereto shall from time to time at each other's request and without further consideration, execute and deliver such other instruments of transfer, conveyance and assignment and take such further action as the other may reasonably require effectively to (i) assign, transfer and convey to the Buyers, or to perfect or record the Buyers' title to or interest in, the Assets, (ii) assign, transfer and convey to the Buyers the Assumed Liabilities, and (iii) otherwise to carry out the provisions hereof and the transactions contemplated hereby. In the event that any asset, property or right not included in the Assets is inadvertently transferred or conveyed by the Sellers to the Buyers, the Parties shall cooperate promptly in good faith to determine appropriate means to reconvey such asset, property or right to the applicable Seller and shall effect reconveyance as promptly as practicable thereafter. In the event that any asset, property or right included in the Assets is inadvertently not transferred or conveyed by the Sellers to the Buyers, the Parties shall cooperate promptly in good faith to determine appropriate means to convey such asset, property or right to the Buyers and shall effect conveyance as promptly as practicable thereafter.

(c) Each of the Buyers shall use its commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated hereby by the Closing Date.

12.2.3   Cooperation

Specifically, the Buyers undertake to take all actions necessary to prepare and file as promptly as practicable a notification under the HSR Act. The Buyers shall promptly inform the Sellers of any communication with any Governmental Authority regarding any filings or other actions contemplated by this Section 12.2.3. Furthermore, the Buyers shall (i) permit the Sellers to review in advance any proposed written communication to any Competition Authority; (ii) consult with counsel for the Sellers and incorporate the Sellers' reasonable comments into any written or oral communication with any Competition Authority; (iii) furnish the Sellers promptly with copies of all correspondence, filings and written communications with any Competition Authority with respect to the transactions contemplated by this Agreement; and (iv) inform the Sellers of any meetings scheduled with any Competition Authority and afford the Sellers the possibility to attend such meeting.

12.2.4   The Buyers' Waiver of Rights against the Employees

Each of the Buyers undertakes to the Sellers and the Employees to waive any rights, remedies or claims which it may have in respect of any misrepresentation, inaccuracy or omission in or from any information or advice supplied or given by the Employees or any consultant in connection with assisting the Sellers in the giving of any representation or warranty or the preparation of the Schedules and otherwise in connection with this Agreement; provided that (a) such waiver is limited to any rights, remedies or claims the Buyers may have against such

Employees or consultants relating to the enforcement of any contractual rights under this Agreement, (b) shall not alter the status of the Employees as at-will employees of the Buyer following Closing, and (c) shall not restrict the Buyers' ability to terminate any Employee or consultant for "cause," including, in whole or in part, because of the facts underlying any breach of a representation or warranty contained in this Agreement or otherwise.

12.3 **Joint Covenants**

12.3.1 The Buyers and Sellers shall cooperate in in good faith to seek business interruption insurance covering the business interruption-related portion of Environmental Liabilities and Costs at commercially reasonable costs which policy shall cover the Business for periods both prior to and following the Closing.

12.3.2 In the event that the Closing does not occur on or before November 20, 2013, if the Closing occurs:

(a) in addition to the Closing Balance Sheet, the Parties shall prepare an **"October 31 Balance Sheet"**, which shall be a combined balance sheet of the Business as of the close of business on October 31, 2013, and the provisions in this Agreement relating to the preparation and determination of the Closing Balance Sheet shall apply *mutatis mutandis* to the preparation and determination of the October 31 Balance Sheet; and

(b) the Purchase Price shall be (1) increased by the amount by which the October 31, 2013 Working Capital Position is greater than $55,000,000 or (2) decreased by the amount by which the October 31, 2013 Working Capital Position is less than $55,000,000; to be paid by increasing or decreasing, as the case may be, the adjustment to the Preliminary Purchase Price payable pursuant to <u>Section 6.3.1</u> (it being understood that such increase or decrease may result in a payment to a different party than would have received an a payment absent the application of this <u>Section 12.3.2</u>).

For purposes of this <u>Section 12.3.2</u>, **"October 31 Working Capital Position"** means the Working Capital as reflected in the October 31 Balance Sheet.

13 **Indemnification**

13.1 **Indemnification by the Sellers**

13.1.1 The Sellers shall, jointly and severally, defend, indemnify and hold harmless each of the Buyers, the Parent and their respective Affiliated Persons and representatives (collectively, the **"Buyer Indemnitees"**) from and against, and pay or reimburse the Buyer Indemnitees for, any and all Losses, resulting from, arising out of or relating to: (a) any breach of or inaccuracy in any representation or warranty when made by the Sellers in or pursuant to this Agreement or any Ancillary Agreement or in any certificate furnished by any Seller hereunder or thereunder; (b) any failure of the Sellers to perform any covenant or agreement hereunder or under any Ancillary Agreement; (c) any Excluded Liabilities or Excluded Assets; (d) any and all Losses

A16931565

67

in respect of any employees of any Seller related to occurrences at or prior to the Closing except, with respect to Transferred Employees, to the extent assumed by the Buyers pursuant to Section 9; (e) the operation of the Business by the Sellers or the Sellers' ownership, operation or use of the Assets at or prior to the Closing; and (f) any product liability claim with respect to products manufactured or sold or events occurring at or prior to the Closing; and (g) Seller Expenses.

13.2    **Indemnification by the Buyers**

The Buyers shall defend, indemnify and hold harmless the Sellers and their respective representatives (collectively, the **"Seller Indemnitees"**) from and against any and all Losses resulting from, arising out of or relating to: (a) any breach of or inaccuracy in any representation or warranty made by the Buyers in or pursuant to this Agreement or any Ancillary Agreement or in any certificate furnished by the Buyers hereunder or thereunder; (b) any failure of the Buyers to perform any covenant or agreement hereunder or thereunder; (c) the Assumed Liabilities; (d) the operation of the Business by the Buyers or the Buyers' ownership, operation or use of the Assets following the Closing, except, in the case of clause (d), to the extent such Losses result from, arise out of or relate to any Excluded Liabilities or constitute Losses that the Sellers are required to indemnify the Buyer Indemnitees under Section 13.1.1; (e) environmental liabilities and costs arising out of the operation of the Business following the Closing; and (f) the Buyers' expenses incurred on or before the Closing in connection with transactions contemplated by this Agreement.

13.3    **Certain Limitations**

13.3.1    Except with respect to claims for indemnification based on breaches of or inaccuracies in the representations and warranties contained in Sections 11.1.1, 11.1.2, 11.1.3(a), 11.1.21 and 11.1.22 (the **"Fundamental Representations"**), the Sellers shall not be required to indemnify the Buyer Indemnitees with respect to any claim for indemnification pursuant to Section 13.1.1(a) (a) for any Losses with respect to any individual breach of or inaccuracy in a representation or warranty (or series of related breaches of or inaccuracies in representations or warranties arising out of the same facts and circumstances) if the amount of such Losses is less than ten thousand dollars ($10,000) (a **"De Minimis Loss"**) and (b) unless and until the aggregate amount of its Losses (including any De Minimis Losses) exceeds one hundred thousand dollars ($100,000) (the **"Threshold Amount"**), in which event the Sellers shall be responsible for the full amount of such Losses, including the Threshold Amount.

13.3.2    Except with respect to claims for indemnification based on breaches of or inaccuracies in the representations and warranties contained in Sections 11.2.1, 11.2.2 and 11.2.5, the Buyers shall not be required to indemnify the Sellers with respect to any claim for indemnification pursuant to Section 13.3.1 unless and until the aggregate amount of its Losses exceeds the Threshold Amount, in which event

the Buyers shall be responsible for the full amount of such Loss, including the Threshold Amount.

13.3.3    For purposes of this <u>Section 13</u>, the calculation of any Losses shall be determined without regard to any knowledge, materiality or Material Adverse Effect or similar qualification or exception and any qualification or requirement that a matter be or not be reasonably expected to occur.

13.3.4    The rights to indemnification provided for in this <u>Section 13</u> shall be the sole and exclusive remedy of the Buyers or the Sellers, as the case may be, after the Closing for any breach of or inaccuracy of any representation or warranty of the Sellers or the Buyers, respectively, herein; provided that nothing herein shall limit in any way any such Party's remedies in respect of fraud, gross negligence or willful misconduct by the other Party in connection herewith or the transactions contemplated hereby.

13.3.5    No claim for indemnification for a breach of any representation or warranty shall be made after the Closing to the extent the party seeking indemnification had actual knowledge of the facts material to the breach, by virtue of prior disclosure by the indemnifying party of such facts, including information expressed in any due diligence report received by the party seeking indemnification before the Signing Date.

13.3.6    The Parties agree that any indemnification payments made pursuant to this Agreement shall be treated for Tax purposes as an adjustment to the Purchase Price.

13.3.7    Any indemnity payment made by any Seller to the Buyer Indemnitees in respect of <u>Section 13.1.1(a)</u>, other than in respect of any breach or inaccuracy of a Fundamental Representation, shall be satisfied solely by a reduction of the 2014 Earn-Out Amount and the 2015 Earn-Out Amount.

13.3.8    The amount of any Loss for which indemnification is provided under <u>Section 13.1.1</u> shall be increased to take into account any Tax cost incurred by the Buyer Indemnitees arising from the receipt or accrual of indemnity payments hereunder.

13.3.9    The Buyers and the Sellers expressly agree that the Sellers are not, nor shall the Sellers be deemed, to have assumed any duty, responsibility, obligation or liability of the Buyers resulting from, relating to or arising out of the ownership or operation of the Assets following the Closing, including any contracts, agreements, commitments or warranties associated therewith, unless otherwise provided by law or regulation or provided herein or agreed to in writing by the Sellers.

13.3.10    The Parties shall cooperate with each other with respect to resolving any claim or liability with respect to which one party is obligated to indemnify the other party hereunder, including by using commercially reasonable efforts to mitigate or resolve any such claim or liability.

13.4    **Indemnification Procedures for Third Party Claims**

13.4.1    In the event of any litigation asserted by a third party (a **"Third Party Claim"**) against a party entitled to indemnification under this Agreement (the **"Indemnified Party"**), notice shall be given by the Indemnified Party to the party required to provide indemnification (the **"Indemnifying Party"**) within thirty (30) days after such Indemnified Party has actual knowledge of such Third Party Claim. The failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such failure results in a lack of actual notice to the Indemnifying Party and such Indemnifying Party is materially prejudiced thereby.

13.4.2    If the Indemnifying Party acknowledges in writing its indemnification obligation with respect to such Third Party Claim, the Indemnifying Party may elect to assume the defense of such Third Party Claim, at the expense of the Indemnifying Party, by written notice to the Indemnified Party within twenty (20) days after the Indemnified Party has provided notice of the Third Party Claim; provided that counsel for the Indemnifying Party who shall conduct the defense of such Third Party Claim shall be reasonably satisfactory to the Indemnified Party and that the Indemnified Party may participate in such defense at such Indemnified Party's expense. Except with the prior written consent of the Indemnified Party, no Indemnifying Party, in the defense of any such Third Party Claim, shall consent to entry of any judgment or enter into any settlement that provides for injunctive or other non-monetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of an irrevocable release from all liability with respect to such Third Party Claim. Notwithstanding the foregoing, in the event that the Indemnified Party shall in good faith determine that the Indemnified Party may have available to it one or more defenses or counterclaims that are inconsistent with one or more of those that may be available to the Indemnifying Party in respect of such Third Party Claim, the Indemnified Party shall have the right, but not the obligation, at all times to take over and assume control over the defense, settlement, negotiations or litigation relating to any such Third Party Claim at the expense of the Indemnifying Party; provided that if the Indemnified Party does so take over and assume control, the Indemnified Party shall not settle such Third Party Claim without the written consent of the Indemnifying Party, such consent not to be unreasonably withheld or delayed.

13.4.3    If the Indemnifying Party does not assume the defense of such Third Party Claim in accordance with the preceding paragraph, the Indemnified Party shall be entitled to assume and control such defense and to settle or agree to pay in full such Third Party Claim without the consent of the Indemnifying Party without prejudice to the ability of the Indemnified Party to enforce its claim for indemnification against the Indemnifying Party hereunder.

13.4.4    In all cases, the Parties shall cooperate in the defense of any Third Party Claim subject to this Section 13 and the records of each shall be available to the other with

respect to such defense. The Party controlling the defense of such Third Party Claim shall keep the other Party reasonably advised of the status of such Third Party Claim and the defense thereof and shall consider in good faith any reasonable recommendations made by the non-controlling Party with respect thereto.

13.4.5    In the event that an Indemnified Party sustains any Losses not involving a Third Party Claim that such Indemnified Party believes gives rise to a claim for indemnification hereunder, such Indemnified Party shall, if it intends to make a claim with respect thereto against an Indemnifying Party, deliver notice of such claim to the Indemnifying Party within thirty (30) days of sustaining such Loss. If the Indemnifying Party does not notify the Indemnified Party in accordance with Section 20 within forty-five (45) days after its receipt of such notice that the Indemnifying Party disputes its liability to the Indemnified Party, such claim specified by the Indemnified Party in such notice shall be conclusively deemed a liability of the Indemnifying Party and the Indemnifying Party shall pay the amount of such claim to the Indemnified Party promptly after demand therefor or, in the case of any notice in which the amount of the claim (or any portion thereof) is estimated, on such later date on which such amount (or such portion) is finally determined. If the Indemnifying Party has timely disputed its liability with respect to such claim as provided above, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution of such dispute, and if not resolved through such negotiations, such dispute shall be resolved by the dispute resolution procedure set out in Section 23 in accordance with Sections 23 and 30.

13.5    **Survival of Representations and Warranties**

All claims for indemnification under Section 13.1 or 13.2 with respect to the representations and warranties contained herein must be asserted on or prior to the date that is thirty (30) days after the termination of the respective survival periods set forth in this Section 13.5. The representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement, any examination by or on behalf of the Parties hereto and the completion of the transactions contemplated herein, but only to the extent specified below:

13.5.1    Except as set forth below, the representations and warranties shall survive until the 2015 Earn-Out Amount is paid or until final determination that no payment is due for the 2015 Earn-Out Amount; and

13.5.2    The Fundamental Representations shall survive without limitation. Notwithstanding the expiration of any such survival period, if the Indemnified Party has provided notice with respect to a breach of representation or warranty within the applicable survival period, the relevant representation or warranty shall survive, solely with respect to such claim as is asserted in such notice, until the claim has finally been resolved. The covenants, obligations and agreements of each Party contained in this Agreement shall survive the Closing Date indefinitely in accordance with their respective terms.

**14**     **Transfer Taxes**

The cost of all Transfer Taxes, if any, that are payable in connection with the transactions contemplated by this Agreement shall be shared equally by the Buyers on the one hand and the Sellers on the other hand, subject to Section 17.1. All Parties shall use commercially reasonable efforts to avail themselves of any available exemptions from any such Transfer Taxes, and to cooperate with the other Parties in obtaining such exemptions and in providing any information and documentation that may be necessary to obtain such exemptions. The Sellers shall prepare and timely file all Tax Returns required to be filed in respect of Transfer Taxes (including all notices required to be given with respect to bulk sales taxes); provided that the Buyers shall be permitted to prepare any such Tax Returns that are the primary responsibility of the Buyers under applicable law. In the case that the Buyers are required to pay any Transfer Taxes, the Buyers shall be entitled to invoice the Sellers for half of the portion of such Transfer Taxes, which invoice shall be paid within fifteen (15) Business Days from the Sellers' receipt of such invoice.

**15**     **Confidentiality**

15.1     Each Party undertakes not to use or disclose any Confidential Information unless: (a) required to do so by law or pursuant to any order of court or other competent authority or tribunal; (b) required to do so by any applicable stock exchange regulations or the regulations of any other recognized market place; (c) such disclosure has been consented to by the other Party in writing (such consent not to be unreasonably withheld); or (d) the information is disclosed to its professional advisers who are bound to such Party by a duty of confidentiality which applies to any information disclosed. If a Party becomes required, in circumstances contemplated by clause (a) or (b), to disclose any information, the disclosing Party shall use its commercially reasonable efforts to consult with the other Party prior to any such disclosure.

15.2     Notwithstanding Section 15.1, as from the Closing Date, the Buyers shall be entitled to use and disclose any Confidential Information relating to the Business.

**16**     **Announcements**

All press releases, public announcements and public relations activities by the Parties with regard to this Agreement or the transactions contemplated by it shall be mutually approved by the Parties in advance of such release, announcement or activity. A Party shall, however, not be prevented from, after reasonable consultation with the other Party, disclosing such information which is required under law or pursuant to any order of court or other competent authority or tribunal or under any applicable stock exchange regulations or the regulations of any other recognized market place.

**17**      **Costs**

17.1      The Buyers, on the one hand, and the Sellers, on the other hand, shall share equally the Consent Costs, the Title Policy Costs, the Cooperation Costs and the Transfer Taxes unless the sum of those amounts exceeds $200,000, in which case, the Sellers shall pay $100,000 for such costs and the rest shall be paid by the Buyers.

17.2      Any filing fee required for the notification under the HSR Act shall be paid by the Buyers.

17.3      Except as provided in Sections 17.1 and 17.2 and as otherwise provided in this Agreement, each Party shall pay its own costs and expenses in connection with the preparation for and completion of the transactions contemplated by, or otherwise incurred in the performance of such Party's obligations or exercise of its rights under, this Agreement, including all fees and expenses of its own representatives, agents, brokers, legal and financial advisers and authorities.

**18**      **Entire Agreement**

This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof at the Signing Date to the exclusion of any terms implied by law which may be excluded by contract and supersedes all prior written or oral negotiations, understandings and agreements relating to the subject matter hereof.

**19**      **Amendments and Waivers**

19.1      This Agreement may only be amended by an instrument in writing duly executed by the Parties. No change, termination, modification or waiver of any provision, term or condition of this Agreement shall be binding on the Parties, unless it is made in writing.

19.2      In no event shall any delay, failure or omission of a Party in enforcing, exercising or pursuing any right, claim or remedy under this Agreement be deemed as a waiver thereof, unless such right, claim or remedy has been expressly waived in writing.

**20**      **Notices**

20.1      All notices, requests, demands, approvals, waivers and other communications required or permitted under this Agreement must be in writing in the English language and shall be deemed to have been received by a Party when:

     (a)    if delivered by post, unless actually received earlier, on the fifth (5th) Business Day after posting;

     (b)    if delivered by hand, on the day of delivery; or

     (c)    if delivered by fax, on the day of dispatch if supported by a written confirmation from the sender's fax machine that the message has been properly transmitted.

---

20.2    All such notices and communications shall be addressed as set out below or to such other addresses as may be given by written notice in accordance with this <u>Section 20</u>.

|  |  |
|---|---|
| If to the Sellers: | Ameristar Fence Products, Inc.<br>Attention: Eddy Gibbs<br>9101 North 193rd East Avenue<br>Owasso, Oklahoma 74055<br>Fax No +1 (918) 582-8803<br>eddygibbs1947@gmail.com |
| With a copy to: | Benjamin C. Faulkner<br>Attorney at Law<br>1111 Park Centre Building<br>525 S. Main Street<br>Tulsa, Oklahoma 74103<br>ben@bfaulknerlaw.com<br>Fax No +1 (918) 582-8803 |
| If to the Buyers or Parent: | Attention: L. Page Heslin<br>ASSA ABLOY Americas<br>110 Sargent Drive<br>New Haven, Connecticut 06511<br>pheslin@assaabloyusa.com<br>Fax No +1 (203) 498-5592 |
| With a copy to: | Linklaters LLP<br>Attention: Scott I. Sonnenblick<br>       Peter Cohen-Millstein<br>1345 Avenue of the Americas<br>New York, New York 10105<br>scott.sonnenblick@linklaters.com<br>peter.cohen-millstein@linklaters.com<br>Fax No +1 (212) 903-9100 |

For the purposes of this Agreement, "writing" or "written" shall include faxes but not e-mails.

## 21    Assignments

No Party may assign, delegate, sub-contract, or otherwise transfer or pledge or grant any other security interest in or over any of its rights or obligations under this Agreement without the prior written consent of the other Party, except that the Buyers may transfer or assign, in whole or in part, to one or more of its Affiliated Persons from time to time the right to purchase all or a portion of the Assets

provided that no such transfer will relieve the Buyers of its obligations, or affect the rights of the Sellers, under this Agreement. Notwithstanding the above, the Buyers may pledge or grant security interests over its rights under this Agreement for the purpose of financing the transaction contemplated by this Agreement.

**22      Partial Invalidity**

If any provision of this Agreement or the application of it shall be declared or deemed illegal, void, invalid or unenforceable, in whole or in part, for any reason, the remaining provisions of this Agreement shall continue in full force and effect. If any illegal, void, invalid or unenforceable provision would be legal, valid and enforceable if some part of it were deleted or modified, the provision shall apply with whatever deletion or modification is necessary to give effect to the commercial intention of the Parties.

**23      Governing Law and Disputes**

23.1     This Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma (without regard to any conflict of law principles found herein).

23.2     Any dispute, controversy or claim arising out of, or in connection with, this Agreement, or the breach, termination or invalidity of the Agreement, shall be submitted to mediation in accordance with the JAMS mediation rules (the **"Mediation"**). The Mediation shall be conducted in Chicago, Illinois, and the language used shall be English.

23.3     If, and to the extent that, any such dispute, controversy or claim has not been settled pursuant to the Mediation within sixty (60) days of appointment of the mediator, the resolution of such dispute, controversy or claim shall, upon the application of the Buyers or the Sellers, be finally settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration.

23.4     The place of arbitration shall be Chicago, Illinois. The language to be used in the arbitral proceedings shall be English. The arbitral tribunal shall be composed of three (3) arbitrators. The Party initiating arbitration (the **"Claimant"**) shall appoint an arbitrator in its request for arbitration (the **"Request"**). The Party responding (the **"Respondent"**) shall appoint an arbitrator within thirty (30) Business Days of receipt of the Request and shall notify the Claimant of such appointment in writing. If within thirty (30) Business Days of the Request by the Respondent, either Party has not appointed an arbitrator, then that arbitrator shall be appointed by the American Arbitration Association. The first two (2) arbitrators appointed in accordance with this Section 23.4 shall appoint a third (3rd) arbitrator within thirty (30) Business Days after the Respondent has notified the Claimant of the appointment of the Respondent's arbitrator or, in the event of the failure by either Party to appoint, within thirty (30) Business Days after the American Arbitration Association has notified the Parties and any arbitrator already appointed of its

appointment of an arbitrator on behalf of the Party failing to appoint. When the third (3rd) arbitrator has accepted the appointment, the two (2) arbitrators making the appointment shall promptly notify the Parties of such appointment. If the first two (2) arbitrators appointed fail to appoint a third (3rd) arbitrator or so to notify the Parties within the time period prescribed above, then the American Arbitration Association shall appoint the third (3rd) arbitrator and shall promptly notify the Parties of such appointment. The third (3rd) arbitrator shall act as Chair of the tribunal.

23.5    The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the Parties. The award may include an award of costs, including reasonable attorneys' fees and disbursements. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant Party or its assets.

23.6    Unless the Parties expressly agree in writing to the contrary, the Parties undertake to keep confidential all awards and orders in arbitration proceedings commenced pursuant to this Section 23, together with all materials in the proceedings created for the purpose of the arbitration and all other documents produced by the other Party in the proceedings, which are not in the public domain, save to the extent that disclosure may be required of a Party by a legal duty, for the purpose of reporting within its corporate group, to protect or pursue a legal right, or to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority. The Parties also undertake to use their commercially reasonable efforts to ensure that the terms of this Section 23 are respected by witnesses, experts, external and in-house counsel and any other individuals who may be granted access to the materials referred to above in the context of these proceedings.

23.7    The Parties undertake and agree that all arbitral proceedings conducted with reference to this arbitration clause will be kept strictly confidential. This confidentiality undertaking shall cover all information disclosed in the course of such arbitral proceedings, as well as any decision or award that is made or declared during the proceedings. Information covered by this confidentiality undertaking may not, in any form, be disclosed to a third party without the written consent of the other Party. This notwithstanding, a Party shall not be prevented from disclosing such information in order to safeguard in the best possible way his rights vis-à-vis the other Party in connection with the dispute, or if the Party is obligated to so disclose pursuant to statute, regulation, a decision by an authority, a stock exchange contract or similar.

23.8    In case this Agreement or any part of it is assigned or transferred to a third party, such third party shall automatically be bound by the provisions of this arbitration clause.

**24      Schedules**

The disclosure of any matter in the Schedules referenced by a particular Section shall be deemed to be disclosed with respect to any other Section as and to the

---

A16931565

extent that the relevance of such matter to such other Section is readily apparent on the face of such disclosure.

25    **Bulk Sales**

The Sellers and the Buyers agree to waive compliance with Article 6 of the Uniform Commercial Code as adopted in each of the jurisdictions in which any of the Assets are located to the extent that such Article is applicable to the transactions contemplated hereby.

26    **Counterparts**

This Agreement may be executed in several counterparts (including by facsimile or other electronic transmission), each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

27    **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns.

28    **No Third Party Beneficiaries**

Except as provided in <u>Section 13,</u> with respect to indemnification of Indemnified Parties hereunder, nothing in this Agreement shall confer any rights upon any person or entity other than the Parties hereto and their respective heirs, successors and permitted assigns.

29    **Specific Performance**

The Parties acknowledge that there may be no adequate remedy at law for a breach of this Agreement and that money damages may not be an appropriate remedy for any such breach. The Parties accordingly agree that the Buyer shall have the right to injunctive relief and specific performance in the event of any breach of this Agreement in addition to any rights it may have for damages. The remedies set forth in this <u>Section 29</u> are cumulative and shall in no way limit any other remedy any Party has at law, in equity or pursuant hereto.

30    **Waiver of Jury Trial**

EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY

OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; (b) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (c) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (d) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 30</u>.

---

*[signature page follows]*

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first written above.

AMERISTAR FENCE PRODUCTS, INC.

By: _Edward L. Gibbs_

Name: Edward L. Gibbs

Title: CEO

AMERISTAR COIL PROCESSING, LLC

By: _Edward L. Gibbs_

Name: Edward L. Gibbs

Title: Owner/Manager

AMERISTAR SECURITY PRODUCTS, LLC

By: _Edward L. Gibbs_

Name: Edward L. Gibbs

Title: Owner/Manager

AMERISTAR FENCE PRODUCTS CANADA

By: _Edward L. Gibbs_

Name: Edward L. Gibbs

Title: PRESIDENT

EDWARD L. GIBBS, individually

By: _Edward L. Gibbs_

EDWARD L. GIBBS, as Trustee of the Edward L. Gibbs Trust dated April 8, 1986

By: _Edward L. Gibbs_

ASSA ABLOY INC.

By: _____

Name:

Title:

COIL USA INC.

By: _____

Name:

Title:

ASSA ABLOY COIL CANADA, LTD.

By: _____

Name:

Title:

*[Signature Page to Asset Purchase Agreement]*

A16931565

79

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first written above.

AMERISTAR FENCE PRODUCTS, INC.

By: _____
Name:
Title:

AMERISTAR SECURITY PRODUCTS, LLC

By: _____
Name:
Title:

EDWARD L. GIBBS, individually

By: _____


AMERISTAR COIL PROCESSING, LLC

By: _____
Name:
Title:

AMERISTAR FENCE PRODUCTS CANADA

By: _____
Name:
Title:

EDWARD L. GIBBS, as Trustee of the Edward L. Gibbs Trust dated April 8, 1986

By: _____


ASSA ABLOY INC.

By: _Jeffrey A Mereschuk_
Name: Jeffrey A. Mereschuk
Title: Vice President

ASSA ABLOY COIL CANADA, LTD.

By: _Jeffrey A Mereschuk_
Name: Jeffrey A. Mereschuk
Title: Authorized Signatory


COIL USA INC.

By: _Jeffrey A Mereschuk_
Name: Jeffrey A. Mereschuk
Title: Authorized Signatory


*[Signature Page to Asset Purchase Agreement]*

## Liability Insurance

### Continuum Products/Completed Operations Insurance

### Table Of Contents

| Section | Page No. |
|---|---|
| Who Is Insured | 3 |
| Coverage | 5 |
| Limits Of Insurance | 5 |
| Investigation, Defense And Payment Of Damages | 6 |
| Supplementary Payments | 6 |
| Coverage Territory | 7 |
| Bodily Injury/Property Damage Exclusions | 7 |
| Policy Exclusions | 9 |
| Conditions | 11 |
| Definitions | 15 |

*Reference Copy*

**EXHIBIT**

tabbies®

**2**

LIABILITY
CONTRACT
CONTINUUM PRODUCTS/COMPLETED
OPERATIONS INSURANCE

## *Continuum Products/Completed Operations Insurance*

### *Contract*

COVERAGE APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE **INSURED** DURING THE CLAIM REPORTING PERIOD SHOWN IN THE DECLARATIONS. PLEASE READ THIS POLICY CAREFULLY.

Words and phrases that appear in **bold** print have special meanings and are defined in the Definitions section of this policy.

Throughout this contract the words "you" and "your" refer to the Named **Insured** shown in the Declarations of this policy, and any other person or organization qualifying as a Named **Insured** under this contract. The words "we," "us" and "our" refer to the Company providing this insurance.

In addition to the Named **Insured**, other persons or organizations qualify as **insureds**. Those persons or organizations and the conditions under which they qualify are identified in the Who Is Insured section of this policy.

### *Who Is Insured*

| | |
|---|---|
| *Sole Proprietorship* | If you are an individual, you and your spouse are **insureds**, but only with respect to the conduct of a business of which you are the sole owner. |
| *Partnership Or Joint Venture* | If you are a partnership or joint venture, you are an **insured**. Your members, your partners, and their spouses are also **insureds**, but only with respect to the conduct of your business. |
| *Other Organizations* | If you are an organization other than a partnership, joint venture or limited liability company, you are an **insured**. Your **executive officers** and directors are **insureds**, but only with respect to their duties as your officers or directors. Your stockholders are also **insureds** but only with respect to their liability as stockholders. |
| *Employees* | Your **employees**, other than your **executive officers**, are **insureds**, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. |

No **employee** is an **insured** for:

A. **bodily injury:**

    1.   to you, your partners or members (if you are a partnership, joint venture or limited liability company), or to a co-**employee** while in the course of his or her employment or while performing duties related to the conduct of your business;

    2.   to the spouse, child, parent, brother or sister of that co-**employee** as a consequence of an injury described in paragraph A.1. above; or

    3.   for which there is any obligation to share damages with or repay someone else who must pay damages because of an injury described in paragraphs A.1. or A.2. above.

Paragraphs A.1., A.2., and A.3. do not apply to officers or supervisors.

*Reference Copy*

## *Who Is Insured*

| | |
|---|---|
| *Employees (continued)* | B.    **property damage** to property owned or occupied by or rented or loaned to the **employee**, any of your other **employees**, or any of your partners or members (if you are a partnership, joint venture or limited liability company). |
| *Volunteer Workers* | Your volunteer workers (at your option) are **insureds**. |
| *Real Estate Manager* | Any person (other than your **employee**) or any organization while acting as your real estate manager are **insureds**. |
| *Custodian* | Any person or organization having proper temporary custody of your property if you die are **insureds**, but only with respect to the maintenance or use of that property until your legal representative has been appointed. |
| *Legal Representative* | Your legal representative is an **insured**, if you die. That representative will have all of your rights and duties, but is an **insured** only with respect to his duties as your legal representative. |
| *Vendors* | Any vendor is an **insured**, but only with respect to **bodily injury** or **property damage** arising out of the distribution or sale of **your products** in the regular course of that vendor's business and only if products/completed operations coverage is provided under this contract. |

No vendor is an **insured** with respect to:

- **bodily injury** or **property damage** for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in **the** absence of the contract or agreement;

- any express warranty unauthorized by you;

- any physical or chemical change in **your products** made intentionally by the vendor;

- repacking, unless unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instruction from the manufacturer and then repacked in the original container;

- demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of **your products**;

- **your products** which after distribution or sale by you have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance, by or for the vendor;

- any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of **your products**;

- any of **your products** or completed operations contained within the **products-completed operations hazard** which have been excluded from this insurance; or

- any **occurrence** which takes place after the contract with the vendor expires or the end of the Injury Period, whichever comes first.

*Reference Copy*

## *Continuum Products/Completed Operations Insurance*

### Who Is Insured

**Vendors
(continued)**

This insurance does not apply to any person or organization, as **insured**, from whom you have acquired **your products** or any ingredient, part or container, entering into, accompanying or containing **your products**.

**Subsidiaries**

If there is no other similar insurance available, the following will qualify to be a named **insured**:

any financially controlled subsidiary of yours, but no person or organization is an insured with respect to any liability arising out of the conduct of any organization you acquire or form, if:

1.   such liability results from injury that occurred before you acquired or formed that organization; or

2.   you acquire or form the organization after the beginning of the Claim Reporting Period.

**Limitation On Who Is Insured**

No one is an **Insured** for the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a named **Insured** in the Declarations.

### Coverage

**Bodily Injury And Property Damage**

Subject to the applicable Limits Of Insurance, we will pay damages the **insured** becomes legally obligated to pay by reason of liability imposed by law or assumed under an **insured contract** for **bodily injury** or **property damage** to which this insurance applies caused by an **occurrence**.

This insurance applies to **bodily injury** or **property damage** included within the **products-completed operations** hazard which occurs during the Injury Period stated in the Declarations only if a claim for damages is first made against any **insured** during the Claim Reporting Period shown in the Declarations.

For purposes of this insurance:

*   a claim by a person or organization seeking damages will be deemed to have been made when notice of such claim is received and recorded by any **Insured**, our licensed agent, or by us, whichever comes first;

*   all claims for damages for **bodily injury** to the same person, including damages claimed by any person or organization for care or loss of services resulting at any time from the **bodily injury**, will be deemed to have been made at the time the first of those claims is made against any **insured**;

*   all claims for damages for **property damage** causing loss to the same person or organization as a result of an **occurrence** will be deemed to have been made at the time the first of those claims is made against any **insured**.

Damages for **bodily injury** include damages claimed by any person or organization for care or loss of services resulting at any time from the **bodily injury**.

**Limits Of Insurance**

The Limits Of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

*   **insureds**;

*Reference Copy*

| | |
|---|---|
| **Limits Of Insurance**<br>*(continued)* | •    claims made or **suits** brought; or<br><br>•    persons or organizations making claims or bringing **suits**. |

**Aggregate Limit**

Subject to Each **Occurrence** Limit, the Aggregate Limit is the most we will pay for the sum of damages under **bodily injury** and **property damage** coverage included in the **products-completed operations hazard**.

**Each Occurrence Limit**

The Each **Occurrence** Limit is the most we will pay for the sum of damages under **bodily injury** and **property damage** arising out of any one **occurrence**.

Any amount paid for damages arising out of an **occurrence** will reduce the amount of the Aggregate Limit available for payment of damages arising out of any other **occurrence**.

If the Aggregate Limit has been reduced by payment of damages to an amount that is less than the Each Occurrence Limit stated in the Declarations, the remaining Aggregate Limit is the most that will be available for payment of damages arising out of any other **occurrence**.

**Investigation, Defense And Payment Of Damages**

We will have the right and duty to defend any **insured** against a **suit** seeking damages for **bodily injury** or **property damage**. However, we will have no duty to defend any **insured** against a **suit** seeking damages to which this insurance does not apply. We may at our discretion investigate any **occurrence** and settle any claim or **suit** that may result.

The amount we will pay for damages is limited as described in Limits Of Insurance. Our right and duty to defend end when we have used up the applicable Limit Of Insurance in the payment of judgments or settlements under **bodily injury** or **property damage**.

We have no further obligation or liability to pay sums or perform acts or services unless explicitly provided for under Supplementary Payments shown below.

**Supplementary Against Payments**

We will pay, with respect to any claim we investigate or settle, or any **suit** an **insured** we defend:

•    all expenses we incur;

•    the premium amount of bonds to release attachments, but only premium amounts within the amount of insurance available. We do not have to furnish these bonds;

•    reasonable expenses incurred by the **insured** at our request to assist us in the investigation or defense of the claim or **suit**, including actual loss of earnings up to $300 a day because of time off from work;

•    costs taxed against the **insured** in the **suit**;

•    prejudgment interest awarded against the **insured** on that part of the judgment we pay. If we make an offer to pay the applicable Limit Of Insurance, we will not pay any prejudgment interest based on that period of time after the offer;

•    all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit Of Insurance.

These payments will not reduce the Limits Of Insurance.

*Reference Copy*

## *Continuum Products/Completed Operations Insurance*

*Coverage Territory*

This insurance applies anywhere. However, the **insured's** responsibility to pay damages must be determined in a **suit** on the merits in the United States of America (including its territories or possessions), Canada or Puerto Rico, or in a settlement we agree to.

## *Bodily Injury/Property Damage Exclusions*

*Contracts, Various*

This insurance does not apply to **bodily injury** or **property damage** for which the **insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

This exclusion does not apply to liability for damages:

- that the **insured** would have in the absence of the contract or agreement; or
- assumed in an oral or written contract or agreement that is an **insured contract**, provided the **bodily injury** or **property damage** occurs subsequent to the execution of the contract or agreement. When a claim for such **bodily injury** or **property damage** is made, we will defend that claim provided the **insured** has assumed the obligation to defend such claim in the **insured contract**. Such defense payments will not reduce the Limits Of Insurance.

*Damage To Impaired Property*

This insurance does not apply to **property damage** to **impaired property** or property that has not been physically injured arising out of:

- a defect, deficiency, inadequacy, or dangerous condition in **your product** or **your work**; or
- a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

*Damage To Property Of Others (Care, Custody Or Control)*

This insurance does not apply to **property damage** to:

- property you rent or occupy;
- property loaned to you;
- personal property in the care, custody or control of the **insured**;
- that particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf are performing operations, if the **property damage** arises out of those operations; or
- that particular part of any property that must be restored, repaired or replaced because **your work** was incorrectly performed on it.

This exclusion does not apply to liability assumed under a sidetrack agreement.

*Damage To Your Product*

This insurance does not apply to **property damage** to **your product** arising out of it or any part of it.

*Reference Copy*

---

### *Bodily Injury/Property Damage Exclusions*
*(continued)*

| | |
|---|---|
| *Damage To Your Work* | This insurance does not apply to **property damage** to **your work** arising out of it or any part of it and included in the **products-completed operations hazard**. |
| | This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor. |

*Employer's Liability*

This insurance does not apply to **bodily injury** to:

A.  an **employee** of the **insured** arising out of and in the course of:

    1.  employment by the **insured**; or

    2.  performing duties related to the conduct of the **insured's** business; or

B.  the spouse, child, parent, brother or sister of the **employee** as a consequence of A. above.

This exclusion applies:

* whether the **insured** may be liable as an employer or in any other capacity; and

* to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the **insured** under an **insured contract**.

*Expected Or Intended Injury*

This insurance does not apply to **bodily injury** or **property damage** which results from an act that:

* is intended by the **insured**; or

* can be expected from the standpoint of a reasonable person

to cause **bodily injury** or **property damage**, even if the injury or damage is of a different degree or type than actually intended or expected.

This exclusion does not apply to **bodily injury** resulting from the use of reasonable force to protect persons or property.

*Liquor Liability*

This insurance does not apply to **bodily injury** or **property damage** for which any **insured** may be held liable by reason of:

* causing or contributing to the intoxication of any person;

* the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

* any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

*Reference Copy*

## *Continuum Products/Completed Operations Insurance*

### *Bodily Injury/Property Damage Exclusions*
*(continued)*

| | |
|---|---|
| *Product Recall* | This insurance does not apply to **bodily injury** or **property damage** claimed for any loss, cost, or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of: |

- **your product;**
- **your work**; or
- **impaired property**

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

| | |
|---|---|
| *Property Formerly Owned* | This insurance does not apply to **property damage** to premises you sell, give away or abandon, if the **property damage** arises out of any part of those premises. |

This exclusion does not apply if the premises are **your work** and were never occupied, rented, or held for rental by you.

| | |
|---|---|
| *Property Owned* | This insurance does not apply to **property damage** to property you own. |

| | |
|---|---|
| *Workers' Compensation And Similar Laws* | This insurance does not apply to any obligation of the **insured** under a workers compensation, disability benefits or unemployment compensation law or any similar law. |

### *Policy Exclusions*

| | |
|---|---|
| *Asbestos* | This insurance does not apply to **bodily injury** or **property damage** arising out of: |

- the mining, processing, manufacturing, use, testing, ownership, sale or removal of asbestos, asbestos fibers, or materials containing asbestos;
- exposure to asbestos, asbestos fibers, or material containing asbestos; or
- any error or omission in supervision, instructions, recommendations, notices, warnings or advice given, or which should have been given, in connection with asbestos, asbestos fibers or material containing asbestos.

| | |
|---|---|
| *Known Circumstances* | This insurance does not apply to **bodily injury** or **property damage** arising out of any circumstances known to you prior to the Claim Reporting Period of this policy, which could reasonably be expected to result in a claim under this policy. However, this exclusion does not apply to a circumstance described under a Known Circumstance Endorsement, if we attach such an Endorsement to this policy. |

*Reference Copy*

**Policy Exclusions**
(continued)

*Nuclear Energy*

A. This insurance does not apply to **bodily injury** or **nuclear property damage**:

    1. with respect to which an **insured** under the policy is also an **insured** under a nuclear energy liability policy issued by American Nuclear Insurers, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an **insured** under any such policy but for its termination upon exhaustion of its limit of insurance; or

    2. resulting from the **nuclear hazardous properties** of **nuclear material** and with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the United States of America Atomic Energy Act of 1954, or any law amendatory thereof; or (b) the **insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. This insurance does not apply to **bodily injury** or **nuclear property damage** resulting from the **nuclear hazardous properties** of **nuclear material**, if the:

    1. **nuclear material**: (a) is at any **nuclear facility** owned by, or operated by or on behalf of, an **insured**; or (b) has been discharged or dispersed therefrom;

    2. **nuclear material** is contained in **nuclear spent fuel** or **nuclear waste** at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **insured**; or

    3. **bodily injury** or **nuclear property damage** arises out of the furnishing by an **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility**, but if such facility is located within the United States of America (including territories or possessions) or Canada, this exclusion 3. applies only to **nuclear property damage** to such **nuclear facility** and any property thereat.

*Pollution*

A. This insurance does not apply to **bodily injury** or **property damage** arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**.

B. This insurance does not apply to any loss, cost or expense arising out of any:

    1. request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

    2. claim or **suit** by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing or in any way responding to, or assessing the effects of **pollutants**.

*Reference Copy*

## *Continuum Products/Completed Operations Insurance*

### *Conditions*

| | |
|---|---|
| *Arbitration* | We are entitled to exercise all of the **insured's** rights in the choice of arbitrators and the conduct of any arbitration proceeding, except when the proceeding is between us and the **insured**. |
| *Audit of Books and Records* | We may audit your books and records as they relate to this insurance at any time. |
| *Bankruptcy* | Bankruptcy or insolvency of the **insured** or the **insured's** estate will not relieve us of any obligation to which this insurance applies. |
| *Cancellation* | This policy will not go into effect unless you pay the premium promptly when due. If the premium is paid when due, this policy may not be cancelled. |
| *Changes* | This policy can only be changed by a written endorsement that becomes part of this policy. The endorsement must be signed by one of our authorized representatives. |
| *Compliance By Insureds* | We have no duty to provide coverage under this policy unless you and any other involved **insured** have fully complied with all of the terms and conditions of the policy. |
| *Conformance* | Any terms of this insurance which are in conflict with the applicable statutes of the State in which this policy is issued are amended to conform to such statutes. |

*Duties In The Event Of Occurrence, Claim Or Suit*

A.   You must see to it that we are notified as soon as practicable of any circumstance or **occurrence** which may result in a claim. To the extent possible, notice should include:

   1.   how, when and where the **occurrence** took place;

   2.   the names and addresses of any injured persons and witnesses; and

   3.   the nature and location of any injury or damage arising out of the **occurrence**.

Notice of any circumstance or **occurrence** is not notice of a claim.

B.   If a claim is made or **suit** is brought against any **insured**, you must:

   1.   immediately record the specifics of the claim or **suit** and the date received; and

   2.   notify us in writing as soon as possible.

C.   You and any other involved **insured** must:

   1.   immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or **suit**;

   2.   authorize us to obtain records and other information;

   3.   cooperate with us in the:

*Reference Copy*

## *Conditions*

*Duties In The Event Of Occurrence, Claim Or Suit (continued)*

    a.    investigation or settlement of the claim; or

    b.    defense of the **suit**; and

4.    assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the **insured** because of injury or damage to which this insurance may also apply.

D.    No **insured** will, except at that **insured's** own cost, make a payment, assume any obligation, or incur any expense, without our consent.

*First Named Insured*

The person or organization first named in the Declarations is primarily responsible for payment of all premiums.

*Inspections And Surveys*

We may:

- make inspections and surveys at any time;
- give you reports on the conditions we find; and
- recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

- are safe or healthful; or
- comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations for us.

*Legal Action Against Us*

No person or organization has a right under this insurance:

- to join us as a party or otherwise bring us into a **suit** asking for damages from an **insured**; or
- to sue us on this insurance unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an **agreed settlement** or on a final judgment against an **insured** obtained after:

- an actual trial in a civil proceeding;
- an arbitration proceeding; or
- an alternative resolution proceeding,

but we will not be liable for damages that are not payable under the terms of this insurance or that are in excess of the applicable Limits Of Insurance.

*Reference Copy*

### *Continuum Products/Completed Operations Insurance*

#### *Conditions*
*(continued)*

*Other Insurance*

If other valid and collectible insurance is available to the **insured** for a loss we cover under this insurance, our obligations are limited as follows:

Excess Insurance

This insurance is excess over and above any other valid and collectible insurance, whether primary, excess, contingent or on any other basis, (including any deductible or self-insured portion) or agreement of indemnity, available to you.

We will have no duty under this insurance to defend any insured against a **suit** that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the **insured's** rights against all those other insurers.

We will pay only our share of the amount of the loss, if any, that exceeds the sum of:

- the total amount that all such other insurance would pay for the loss in the absence of this insurance; and

- the total of all deductible and self-insured amounts under all that other insurance.

*Separation Of Insureds*

Except with respect to the Limits Of Insurance and any rights or duties specifically assigned in this insurance to the first named **insured**, this insurance applies:

- as if each named **insured** were the only named **insured**; and

- separately to each **insured** against whom claim is made or **suit** is brought.

*Title Of Paragraphs*

The titles of the various paragraphs of this policy and endorsements, if any, attached to this policy are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provisions to which they relate.

*Transfer Of Rights and Duties*

Your rights and duties under this insurance may not be transferred without our written consent. However, if you die, then your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative, or to anyone having temporary custody of your property until your legal representative has been appointed.

*Transfer Of Rights Of Recovery*

If the **insured** has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The **insured** must do nothing after loss to impair them. At our request, the **insured** will bring **suit** or transfer those rights to us and help us enforce them.

*Reference Copy*

### *Continuum Products/Completed Operations Insurance*

| | |
|---|---|
| **Definitions** | WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT: |

*Agreed Settlement*

**Agreed settlement** means a settlement and release of liability signed by us, the **insured** and the claimant or the claimant's legal representative.

*Auto*

**Auto** means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment**.

*Bodily Injury*

**Bodily injury** means physical:

- injury,
- sickness, or
- disease

sustained by a person and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time.

*Employee*

**Employee** includes a **leased worker** but does not include a **temporary worker**.

*Executive Officer*

**Executive officer** means a person holding any of the officer positions created by your charter, constitution or by-laws.

*Impaired Property*

**Impaired property** means tangible property, other than **your product** or **your work**, that cannot be used or is less useful because:

- it incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate, or dangerous; or
- you have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

- the repair, replacement, adjustment or removal of **your product** or **your work**; or
- your fulfilling the terms of the contract or agreement.

*Insured*

**Insured** means any person or organization qualifying as an **insured** under the Who Is Insured provision and against whom claim is made or **suit** is brought.

*Insured Contract*

**Insured contract** means:

- a lease of premises;
- a sidetrack agreement;
- an easement or license agreement;

*Reference Copy*

| **Definitions** | WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT: |
|---|---|

**Insured Contract**
**(continued)**

**Insured contract** means:

- an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

- an elevator maintenance agreement;

- that part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization.

An **insured contract** does not include that part of any contract or agreement that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

- preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

- giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

**Leased Worker**

**Leased worker** means a person leased to you, by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. **Leased worker** does not include a **temporary worker**.

**Loading Or Unloading**

Loading or unloading means the handling of property:

- after it is moved from the place where it is accepted for movement into or onto an aircraft, **auto** or watercraft;

- while it is in or on an aircraft, **auto** or watercraft; or

- while it is being moved from an aircraft, **auto** or watercraft to the place where it is finally delivered.

**Loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, **auto** or watercraft.

**Mobile Equipment**

**Mobile equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

A.   bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

B.   vehicles maintained for use solely on or next to premises you own or rent;

C.   vehicles that travel on crawler treads;

D.   vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

1.   power cranes, shovels, loaders, diggers or drills; or

2.   road construction or resurfacing equipment such as graders, scrapers or rollers;

*Reference Copy*

## *Continuum Products/Completed Operations Insurance*

| | |
|---|---|
| *Definitions* | WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT: |

*Mobile Equipment (continued)*

E.   vehicles not described in A., B., C. or D. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    1.   air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    2.   cherry pickers and similar devices used to raise or lower workers; and

F.   vehicles not described in A., B., C. or D. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not **mobile equipment** but will be considered **autos**:

    1.   equipment designed primarily for:

        a.   snow removal;

        b.   road maintenance, but not construction or resurfacing; or

        c.   street cleaning;

    2.   cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    3.   air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

*Nuclear By-Product, Nuclear Source Material And Special Nuclear Material*

**Nuclear by-product, nuclear source material** and **special nuclear material** have the meanings given them in the United States of America Atomic Energy Act of 1954 or in any law amendatory thereof.

*Nuclear Facility*

**Nuclear Facility** means any:

A.   **nuclear reactor**;

B.   equipment or device designed or used for:

    1.   separating the isotopes of uranium or plutonium;

    2.   processing or utilizing **nuclear spent fuel**; or

    3.   handling, processing or packaging **nuclear waste**;

C.   equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233, or any combination thereof, or more than 250 grams of uranium 235; or

D.   structure, basin, excavation, premises or place prepared or used for the storage or disposal of **nuclear waste**;

*Reference Copy*

| *Definitions* | WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT: |
|---|---|
| *Nuclear Facility (continued)* | and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations. |
| *Nuclear Hazardous Properties* | **Nuclear hazardous properties** includes radioactive, toxic or explosive properties. |
| *Nuclear Material* | **Nuclear material** means **nuclear by-product material, nuclear source material** or **special nuclear material**. |
| *Nuclear Property Damage* | **Nuclear property damage** means **property damage** including all forms of radioactive contamination of property. |
| *Nuclear Reactor* | **Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. |
| *Nuclear Spent Fuel* | **Nuclear spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor.** |

*Nuclear Waste*

**Nuclear waste** means any waste material:

A.   containing **nuclear by-product material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **nuclear source material** content; and

B.   resulting from the operation by any person or organization of any **nuclear facility** included within the definition of **nuclear facility** under paragraphs A. or B.

*Occurrence*

**Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*Pollutants*

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be disposed of, recycled, reconditioned or reclaimed.

*Products-Completed Operations Hazard*

1.   **Products-completed operations hazard** includes all **bodily injury** and **property damage** occurring away from premises you own or rent and arising out of **your product** or **your work** except:

•   products that are still in your physical possession; or

•   work that has not yet been completed or abandoned.

2.   **Your work** will be deemed completed at the earliest of the following times:

*Reference Copy*

## *Continuum Products/Completed Operations Insurance*

**Definitions**

WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT:

**Products-Completed
Operations Hazard**
*(continued)*

- when all of the work called for in your contract has been completed;
- when all of the work to be done at the site has been completed if your contract calls for work at more than one site;
- when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

3. This hazard does not include **bodily injury** or **property damage** arising out of:

- the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the **loading or unloading** of it; or
- the existence of tools, un-installed equipment or abandoned or unused materials.

**Property Damage**

**Property damage** means:

- physical injury to tangible property including the resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
- loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

**Suit**

**Suit** means a civil proceeding in which damages because of **bodily injury** or **property damage** to which this insurance applies are alleged. **Suit** also includes:

- an arbitration proceeding in which such damages are claimed and to which the **insured** must submit or does submit with our consent; or
- any other alternative dispute resolution proceeding in which such damages are claimed and to which the **insured** submits with our consent.

**Temporary Worker**

**Temporary Worker** means a person who is furnished to you for a finite time period to support or supplement your work force in special work situations such as **employee** absences, temporary skill shortages and seasonal workloads.

**Your Product**

**Your product** means:

A. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

1. you;
2. others trading under your name; or
3. a person or organization whose business or assets you have acquired; and

B. containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

*Reference Copy*

| **Definitions** | WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT: |
|---|---|

*Your Product*
*(continued)*

**Your product** includes:

- warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product**; and
- the providing of or failure to provide warnings or instructions.

**Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

*Your Work*

**Your work** means:

- work or operations performed by you or on your behalf; and
- materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

- warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and
- the providing of a failure to provide warnings or instructions.

*Reference Copy*

**bfassistant@hotmail.com**

---

| ttachments: | American Fence Georgetown RGB246 Invoiced 2013 & 2014.xlsx; Ameristar_Damian - 1st Supplemental Obj. and Resp. to P_s ROGs and RFPs ....docx |

**From:** Heslin, Page <Page.Heslin@assaabloy.com>
**Sent:** Friday, May 24, 2019 3:28 PM
**To:** ben@bfaulknerlaw.com
**Subject:** Kade Damian

Dear Ben:

As a follow up to our earlier correspondence and conversations, I am writing with additional materials relating to the manufacture date of the fence involved in this case. You will recall that the homeowner purchased and installed the fence involved in this accident in November 2013. The distributer that sold the fence to the homeowner is American Fence. I am attaching a spreadsheet reflecting the sales of the relevant fence panel styles to American Fence in 2013 and early 2014. The sales history establishes that there were only four deliveries of the relevant style fence to American Fence in 2013, and the last one was on September 23, 2013, well before closing.  As an aside, the first sale after closing was not until March 31, 2014. Based on this I don't think there can be any doubt that this fence was manufactured prior to closing and is an excluded liability.

As we also discussed, I would greatly appreciate it if you could put me in touch with the adjuster on the file for Eddie's ~~c~~arrier. Discovery is underway, and it would be best to coordinate our efforts and form a strategy as soon as possible. I'm attaching written discovery responses that we need to file shortly, and the plaintiffs are requesting depositions of Ameristar employees. We've been holding them off and saying as little as possible as we'd prefer not to go on record with too many things before we have had a chance to coordinate, but they are becoming insistent.

Have a great weekend, and I hope the water doesn't keep rising.  I look forward to speaking with you early next week.

Best,
Page

Page Heslin
General Counsel and Secretary
ASSA ABLOY Americas
110 Sargent Drive
New Haven, CT 06511
Phone: (203) 499-6868
Mobile: (203) 376-5977
Fax: (203) 498-5592
page.heslin@assaabloy.com

PRIVILEGED & CONFIDENTIAL

Unless otherwise indicated or obvious from the nature of the foregoing communication, the information contained herein is attorney-client privileged and/or confidential information or work product. The communication is intended

EXHIBIT
**3**

for the use of the individual(s) or entities) named above. is not clear that the reader of this transmission is an intended recipient, you are hereby notified that any review, copying, dissemination or distribution of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is intended, please immediately notify the sender by return e-mail and destroy any copies, electronic, paper or otherwise, which you may have of this communication, including any attachments

**Benjamin.faulkner@bfaulknerlaw.com**

| | |
|---|---|
| **From:** | Benjamin.faulkner@bfaulknerlaw.com |
| **Sent:** | Thursday, July 11, 2019 9:46 AM |
| **To:** | 'Adkins, George W' |
| **Subject:** | FW: Ameristar Fence - Kade Damian |
| **Attachments:** | American Fence Georgetown RGB246 Invoiced 2013 & 2014.xlsx; Ameristar_Damian - 1st Supplemental Obj. and Resp. to P_s ROGs and RFPs ....docx |

George:

Attached is the letter of counsel, Page Heslin of the new Ameristar, stating that their research shows that the product in question was manufactured by us and delivered before September 23, 2013.

They have attached what purports to be a listing of sales made to our distributor.

The homeowner purchased the fence in November 2013. The product was delivered no later than September 23, 2013. On the time continuum, this would have been before our sales closing.

Please review and advise.

I would like to tell counsel asap that we will assume the defense, if you agree.

There are important reasons for us to assume the defense, because our settlement interest would be different than the ongoing business enterprise interest.

Ben



Benjamin C. Faulkner
Attorney at Law
10 West 2nd Street
Sand Springs, OK 74063
918-582-8801 office
918-515-3333 facsimile
Bfaulknerlaw.com

*Information contained in the accompanying transmission is or may be protected by the attorney-client and/or the attorney work product privilege, and is confidential. It is intended only for the use of the addressee identified above. If the reader of this message is not the intended recipient, you are notified that any dissemination or distribution of the accompanying communication is prohibited. No applicable privilege is waived by the party sending the accompanying communication. If you have received this communication in error, please notify us immediately by telephone (918-582-8801) or reply email, and delete this communication from your server. Thank you.*

**From:** Benjamin.faulkner@bfaulknerlaw.com <Benjamin.faulkner@bfaulknerlaw.com>
**Sent:** Thursday, July 11, 2019 9:37 AM



EXHIBIT
4

**Benjamin.faulkner@bfaulknerlaw.com**

| | |
|---|---|
| **From:** | Adkins, George W <gadkins@chubb.com> |
| **Sent:** | Friday, July 12, 2019 7:06 AM |
| **To:** | benjamin.faulkner@bfaulknerlaw.com |
| **Subject:** | FW: Ameristar Fence - Kade Damian  Chubb claim # 092019013551 |
| **Attachments:** | American Fence Georgetown RGB246 Invoiced 2013 & 2014.xlsx; Ameristar_Damian - 1st Supplemental Obj. and Resp. to P_s ROGs and RFPs ....docx |

Ben,

Upon review of the documents, I tend to agree with your analysis. However, would you please request copies of the invoices referenced in the Excel spreadsheet?  If the invoices support the spreadsheet, Chubb will retain defense counsel in the case as the Continuum Policy period may have been triggered.

Can you provide me with copy of the sales agreement between GAFP, Inc. and the successor compan(ies)? We need to confirm that the "Ameristar" defendant is an **insured** as defined by the policy.

Thanks for your assistance.

George

⊏ ⊓ ⊔ ⊟ ⊟˙

**George W. Adkins, SCLA**
Claim Director, North America Casualty Claims

P.O. Box 42065, Phoenix, AZ 85027, United States of America
O 1.405.330.6082   F 1.800.664.1765
E george.adkins@chubb.com

Please note that we work in a paperless environment. I am located in Oklahoma, but should it be necessary to direct any physical documentation to me, please send your correspondence to the above address in Phoenix, AZ. It is very important that your correspondence contain the Chubb claim file number displayed on the cover page of your documentation so all papers can be scanned electronically and forwarded to me. Thanks for your cooperation.

**Chubb. Insured.˙**

**From:** Benjamin.faulkner@bfaulknerlaw.com [mailto:Benjamin.faulkner@bfaulknerlaw.com]
**Sent:** Thursday, July 11, 2019 9:46 AM
**To:** Adkins, George W <gadkins@chubb.com>
**Subject:** [EXTERNAL] FW: Ameristar Fence - Kade Damian

George:
Attached is the letter of counsel, Page Heslin of the new Ameristar, stating that their research shows  that the product in question was manufactured by us and delivered before September 23, 2013.
They have attached what purports to be a listing of sales made to our distributor.

The homeowner purchased the fence in November 2013.  The product was delivered no later than September 23, 2013. On the time continuum, this would have been before our sales closing.

Please review and advise.

EXHIBIT
5

**CHUBB**

Chubb North America     O:  214-754-8264
P.O. Box 42065          F:  623-445-2276
Phoenix, AZ  85080    E:  mmoore@chubb.com
U.S.A.

September 10, 2019

Mr. Benjamin Faulkner
Attorney at Law
Via email: Benjamin.faulkner@bfaulknerlaw.com  (Electronic Receipt Requested)

Re:   Insured:         GAFP, Inc. (f/k/a Ameristar Fence Products, Inc.)
      Suit:            Julie Damian et al; v. Clifton Rosenbaum et al; Cause No. 18-1403-C26
                     In The 26th Judicial District Court of Williamson County, Texas
      Policy Number:  3599-09-99
      Claim Number:  092019013551
      Company:       Federal Insurance Company

Dear Mr. Faulkner:

Federal Insurance Company ("Federal") hereby acknowledges receipt of the above-cited Plaintiffs'
Fourth Amended Original Petition And Request For Disclosure (the "Petition").

We have now had the opportunity to review this matter for the purpose of analyzing coverage for the
allegations and claims set forth within the Petition under the applicable Policy indicated above.

We will continue our coverage evaluation while we provide a defense to Ameristar Fence Products, Inc.
and GAFP, Inc. (the "Insured Defendants") subject to a reservation of rights. The basis for this position is
set forth below.

**The Petition:**

Plaintiffs assert that on March 22, 2018, Kade Damian, a 2 year old child got his neck stuck in between
two vertical bars protruding from the top of a neighbor's wrought iron fence panel and as a result was
killed. This is a strict products liability suit (as to the products defendants) alleging design and marketing
defects involving the Montage Genesis fence panel which is a short wrought iron fence about forty seven
inches tall with vertical bars about four inches apart which allegedly allows for a child to get entrapped.

**The Policy:**

Federal issued policy number 3599-09-99 to GAFP, Inc. (f/k/a Ameristar Fence Products, Inc.).
The policy provides limits of $1,000,000 Each Occurrence and $1,000,000 Aggregate Limit subject to all
the terms and conditions of the policy. The Injury Or Offense period is from November 1, 2013 to
November 1, 2018 and the Claim Reporting Period is from November 1, 2013 to November 1, 2019.

**Analysis of Provisions Relevant to the Claim**

**A.     Potentially Covered Claims**

Pursuant to Form 80-02-2464 entitled *Limitations Of Coverage As Designated-Isolated Exposures*, the
Policy is a Continuum Products/Completed Operations policy that only applies to the insured's financial


EXHIBIT
6

control of and **your products** distributed or manufactured by, or **your work** performed by GAFP, Inc. (f/k/a Ameristar Fence Products) and only includes all products manufactured, sold, and distributed prior to November 1, 2013.

**B.    Defense Will Be Provided Under the Policies**

Federal will agree to provide a defense of the case to the Insured Defendants while we continue to evaluate our coverage obligations under the Policy. We will share in the defense of this matter with any other carrier who also has a duty to defend the same Insured Defendants. You have expressed an interest in our recommendation for defense counsel which we will provide to you. We will further arrange for direct billing of defense expense to Federal for reasonable expenses incurred in the defense of the suit.

**C.    Potential Coverage Issues**

If it is determined that the subject fence panel was not "manufactured, sold, and distributed" by the Insured Defendants prior to November 1, 2013, there would be no coverage under the Policy. Federal reserves the right to cease providing a defense of the suit or to indemnify for any settlement or judgment that occurs if this fact becomes established. Regarding any potential or future claim asserted by Assa Abloy or any other party pursuant to the Asset Purchase Agreement between the Ameristar parties (Sellers) and the Assa Abloy parties (Buyers), the Policy contains a *Various Contracts* exclusion that precludes coverage for bodily injury for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement unless such liability would exist in the absence of the agreement or unless the contract/agreement at issue meets the definition of an **insured contract** under the policy. The indemnity provision in the Asset Purchase Agreement may not qualify as an **insured contract** to the extent the indemnity provision does not assume the tort liability of Assa Abloy to pay for bodily injury to a third person or organization (such as Plaintiffs).

**D.    Obligations Going Forward**

Please contact me upon receipt of this letter in order to make arrangements for defense counsel to represent the Insured Defendants so that we may enter into a billing agreement for the case. While Federal is defending this matter, we remind you that the Policies require you to cooperate with us in the defense. You must obtain our prior consent before offering or agreeing to pay in order to settle this suit. Therefore, all settlement demands, offers or proposals made by or contemplated by you should be conveyed to us before any action is taken. You have advised us that there are no excess or umbrella insurance carrier who provide additional coverage for the Insured Defendants in this matter.

**E.    Additional Information and/or Coverage Issues**

In summary, Federal agrees to defend the Insured Defendants under the Policy subject to the reservation of rights, while continuing to investigate and evaluate any coverage obligations under the Policy. Any judgment or settlement obtained by the Insured Defendants that falls outside the insuring agreement or within the exclusionary language of the Policy shall be the responsibility of the Insured Defendants and not that of Federal.

The analysis of coverage outlined herein is not meant to be exhaustive. We reserve the right to re-examine and re-analyze all coverage issues involved and not merely those raised by any additional information or evidence. By limiting policy references to those cited, we do not waive any other policy provisions. We are prepared to re-evaluate our position should the Petition be amended, and/or if there are any material changes in the allegations or in the facts. If you have any additional information or coverage theories that

you believe may have bearing upon our analysis of coverage in this matter, please advise us immediately for our further consideration.

Should you have any questions or concerns about the content of this letter, please feel free to contact me.


Sincerely,

*Michael Moore*

Michael Moore, SCLA, AIC
Executive Claim Director/Assistant Vice President
North American Casualty Claims


C:  sue.barnes@hubinternational.com

# ALSTON & BIRD

Chase Tower
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
214-922-3400 | Fax: 214-922-3899

Stephanie D. Clouston                    Direct Dial:  214-922-3403              Email:  Stephanie.clouston@alston.com

March 3, 2020

**Via email and overnight delivery**
Andrew Hutton
Gordon Rees Scully Mansukhani
816 Congress Avenue, Suite 1510
Austin, TX 78701

Re:   Cause No. 18-1403-C26; *Julie Damian, et al. v. Clifton Rosenbaum,
et al.*

Dear Mr. Hutton:

I'm writing in connection with GAFP, Inc.'s ("GAFP") and Eddie Gibbs's indemnification obligations under the Asset Purchase Agreement dated September 30, 2013 and amended November 1, 2013 (the "APA").  My clients previously notified GAFP and Mr. Gibbs of their indemnification obligations in November 2018, and since then there have been multiple communications regarding indemnification.  However, to date, GAFP and Mr. Gibbs, along with the other sellers under the APA, including but not limited to the Edward L. Gibbs Trust (together the "Sellers"), have refused to comply with their indemnification obligations.

As has been explained in numerous conversations and correspondence, the APA requires the Sellers (including GAFP and Mr. Gibbs) to indemnify Coil USA Inc. n/k/a Ameristar Perimeter Security USA Inc. ("Ameristar") and ASSA ABLOY Inc. ("ASSA ABLOY") for "any product liability claim with respect to products manufactured or sold or events occurring at or prior to the Closing," and as has been previously explained, the fence at issue in the above titled and numbered lawsuit was manufactured and sold before the closing date under the APA.  Specifically, the homeowners have stated in verified interrogatory responses that they purchased the fence in November 2013, and the corporate sales records show that the only sales of this style fence to the distributor from whom the homeowners purchased the fence in 2013 occurred prior to closing.  Accordingly, it is clear that the fence was both manufactured and sold before the date of the closing, and that the Sellers (including GAFP and Mr. Gibbs) are obligated to indemnify Ameristar and ASSA ABLOY in connection with Plaintiffs' claims.

Alston & Bird LLP

Atlanta | Beijing | Brussels | Charlotte | Dallas | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley |

**EXHIBIT**

**7**

Andrew Hutton - Page 2

After the December 4, 2019, hearing, you mentioned that GAFP understood that, if the last shipment to the distributor before the homeowners purchased the fence preceded the closing date, then Sellers (including GAFP and Mr. Gibbs) were obligated to indemnify Ameristar and ASSA ABLOY. You stated, however, that GAFP wanted additional information to confirm that the fence was manufactured or sold before the closing date.

As I mentioned at the December 4th hearing, the relevant information resides in an electronic database, and Ameristar does not have hard copies of invoices or purchase orders from 2013; thus, we have obtained a sworn affidavit from Mr. Willingham explaining how Ameristar's sales database clearly shows that the fence was manufactured and sold before the closing date, and therefore falls squarely within your client's indemnification obligations.

If GAFP and Mr. Gibbs continue to ignore their indemnification obligations, we will be required to take additional steps to protect our clients' interests, including but not limited to, filing breach of contract claims against Sellers (including GAFP and Mr. Gibbs, individually), and seeking a pre-judgment attachment of the property and assets of GAFP, the Edward L. Gibbs Trust, and Mr. Gibbs. We hope to avoid taking such extreme measures, but if your client and the other Sellers do not accept their indemnification obligations, we are prepared to immediately take these additional steps.

We also need some additional information regarding available insurance for this case. Could you provide us with the following information/documents in the next five (5) business days:

- A complete copy of GAFP's relevant insurance policy with Federal Insurance Company;
- Confirmation that GAFP and Mr. Gibbs sent our indemnification tender notice to the relevant insurer(s);
- A complete copy of any relevant insurance policies for Mr. Gibbs and the Edward L. Gibbs Trust;
- Information on whether GAFP, Mr. Gibbs, and the Edward L. Gibbs Trust have any excess insurance policies that could apply to this case, and if so, a copy of the excess insurance policy(ies);
- The adjuster's name and contact information for each underlying policy identified above and any applicable excess insurance policy(ies); and
- Whether Ameristar and/or ASSA ABLOY is named as an additional insured, either specifically or under a blanket endorsement, in the relevant insurance policies.

Please respond to this letter by March 9, 2020. If GAFP and Mr. Gibbs do not respond, or their response regarding indemnification is inadequate, we will be forced to withdraw from the Joint Defense Agreement between our clients and will be forced to take additional steps to ensure your client's compliance with its indemnification obligations.

Andrew Hutton - Page 3

Please feel free to reach out to me if you have any questions or want to discuss any of the matters addressed in this letter.

Sincerely,

Stephanie D. Clouston

Enclosures

cc:    Ben Faulkner, Esq. (via overnight delivery)
       Page Heslin, Esq.

# BENJAMIN C. FAULKNER

Ben@bfaulknerlaw.com
www.Bfaulknerlaw.com

**ATTORNEY AT LAW**
10 West 2nd Street
(2ᴿᴰ and Main)
Sand Springs, OK 74063

Telephone (918) 582-8801
Facsimile (918) 515-3333

March 6, 2020

Michael Moore
Chubb Insurance
P.O. Box 42065
Phoenix, AZ 85027

Delivery by Email to: mmoore@chubb.com

RE:    Damian v GAFP, Inc.
        Chubb Claim # 092019013551

Michael:

Thank you for the conversation on March 5, 2019 regarding the status of the subject litigation and the aggressive demand letter we have received from Stephanie Clouston, the ASSA Abloy counsel, conveying indemnification issues.

To recap, under the Asset Purchase Agreement between GAFP and others, and ASSA Abloy, dated September 1, 2013 ("APA"), paragraph 13, Indemnification, sets out the parties' responsibilities to indemnify each other under certain circumstances. Section 13.4 sets out the procedures. We have not acknowledged in writing to ASSA an indemnification obligation concerning the claim or fence involved.

From the insured's perspective, my reading of our policy is that this is an Insured Contract, insofar as coverage for the indemnification is concerned. So, we will rely upon your guidance and that of counsel, Andy Hutton of Gordon, Rees, Scully, Mansukhani, to respond appropriately to the letter from Stephanie Clouston.

As discussed, it is our opinion that discussions be held with counsel for ASSA to formulate a joint defense of this claim, and the issues of indemnification has yet to be proven. If the Plaintiffs continue to pursue ASSA, it must be on a basis that the Plaintiffs believe the proof will show it to be ASSA's fence, not GAFP's fence. In that regard, conceding indemnification at this point would seem to be premature, in light of the Plaintiffs' pending claims.

In our conversation yesterday, we agreed that Andy Hutton would engage ASSA's counsel in a discussion on the matter.

**EXHIBIT**
**8**

Chubb North American Claims    O +214.754.8264
P.O. Box 42065    mmoore@chubb.com
Phoenix, Arizona 85027    www.chubb.com

December 7, 2023

Mr. Benjamin Faulker
10 West 2ⁿᵈ Street
Sand Springs, OK 74063

Via Email
benjamin.faulkner@bfaulknerlaw.com
Electronic Receipt Requested

Re:    Cause No. 18-1403-C26; *Julie Damian, et al. v. Clifton Rosenbaum,
       et al.*; in the 26ᵗʰ Judicial District Court, Williamson County, Texas (the
       "Underlying Lawsuit")

|  |  |
|---|---|
| Named Insured: | GAFP, Inc. (f/k/a Ameristar Fence Products, Inc.) ("Ameristar") |
| Insurer: | Federal Insurance Company ("Federal") |
| Policy: | 3599-09-99 [11/01/2013 to 11/01/2018] (the "Policy") |
| Claim No.: | 092019013551 |

Dear Mr. Faulkner:

Federal writes regarding the above Claim and Underlying Lawsuit filed against
Ameristar. As you know, Federal issued the above Policy to Ameristar and,
recently, the claims against Ameristar were settled in the Underlying Lawsuit in
exchange for payment of the entire Policy limits, exhausting the Policy.

Recently, Federal was advised that ASSA ABLOY Inc., ("AASA ABLOY"), the
company which acquired Ameristar's fence manufacturing business in 2013, has
re-asserted its indemnification claim to Ameristar pursuant to the September
30, 2013, Asset Purchase Agreement between Ameristar and ASSA ABLOY.[1]
Specifically, counsel for ASSA ABLOY demands that Ameristar reimburse it for
$1,010,237.36 in fees and costs incurred in defending ASSA ABLOY in the
Underlying Lawsuit and agree to indemnify it for costs that have and will be
incurred in the future relative to the Underlying Lawsuit.

The Policy provides that the most Federal will pay regardless of the number of
insureds, claims made, suits brought, or persons or organizations making claims
or bringing suits is the applicable[2] $1,000,000 limit of insurance set forth in the
Policy Declarations. Further, the Policy provides that Federal's right and duty to
defend ends when Federal has used up the applicable Limit of Insurance in the
payment of judgments or settlements under bodily injury or property damage
coverage.

---

[1]    Federal understands this Asset Purchase Agreement was amended on November 1, 2013.
[2]    The Policy provides that the Each Occurrence Limit is the most Federal will pay for the sum of damages under
       bodily injury and property damage arising out of any one occurrence. It is undisputed that a single occurrence is
       at issue relative to the Underlying Lawsuit.



EXHIBIT
9

As noted above, the Policy limits were previously exhausted when Federal agreed to settle the claims against Ameristar in the Underlying Lawsuit for the full per occurrence limit. Accordingly, Federal has no further coverage obligations under the Policy for any additional contractual indemnity claims made against Ameristar by ABBA ABLOY.

We trust you understand that any reference above to specific terms, conditions, and exclusions should not be construed as a waiver of any other potentially applicable terms, conditions, or exclusions in the Policy. Nothing contained in this letter, and no action on our part in investigating this matter, should be construed as an admission of coverage or as a waiver of any right, remedy, or defense that may be available to Federal. Federal continues to fully reserve its rights under the Policy, at law, and in equity.

If you have any questions, please do not hesitate to contact the undersigned right away.

Sincerely,

Michael Moore

Michael Moore, SCLA, AIC
Executive Claim Director/Assistant Vice President
North American Casualty Claims

cc:    sue.barnes@hubinternational.com
       ahutton@grsm.com

2